[No. S011960. Aug. 19, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
CYNTHIA LYNN COFFMAN and JAMES GREGORY MARLOW,
Defendants and Appellants.

4

## COUNSEL

William J. Kopeny, under appointment by the Supreme Court; Law Office of John D. Barnett and Albert A. Newton for Defendant and Appellant Cynthia Lynn Coffman.

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant James Gregory Marlow.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly D. Wilkens and Pamela Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—A San Bernardino County jury convicted Cynthia Lynn Coffman and James Gregory Marlow of one count of each of the following offenses: murder (Pen. Code, § 187),[1] kidnapping (§ 207, subd. (a)), kidnapping for robbery (§ 209, subd. (b)), robbery (§ 211), residential burglary (§ 459) and forcible sodomy (§ 286, subd. (c)). The same jury found true as to both defendants special circumstance allegations that the murder was committed in the course of, or immediate flight from, robbery, kidnapping, sodomy and burglary within the meaning of section 190.2, subdivision (a)(17)(A), (B), (D) and (G). The jury further found that Coffman and Marlow were personally armed with a firearm. (§ 12022, subd. (a).) Following Marlow's waiver of a jury trial on allegations that he had suffered two prior serious felony convictions within the meaning of section 667, subdivision (a), the trial court found those allegations to be true. The jury returned a verdict of death, and the trial court entered judgment accordingly. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

I. FACTS

A. *Guilt Phase*

1. *Prosecution's Case-in-chief*

On Friday, November 7, 1986, around 5:30 p.m., Corinna Novis cashed a check at a First Interstate Bank drive-through window near the Redlands Mall, after leaving her job at a State Farm Insurance office in Redlands. Novis, who was alone, was driving her new white Honda CRX automobile. Novis had been scheduled for a manicure at a nail salon owned by her friend Terry Davis; she never arrived for the appointment. Novis also had planned to meet friends at a pizza parlor by 7:00 that evening, but she never appeared.

That same day, Coffman and Marlow went to the Redlands Mall, where Marlow's sister, Veronica Koppers, worked in a deli restaurant. Between 5:00 and 5:30 p.m., Veronica pointed the couple out to her supervisor as they sat in the mall outside the deli. Coffman was wearing a dress; Marlow, a suit and tie.[2] Later, at the time they had arranged to pick Veronica up from work,

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

[2] Since their arrival in San Bernardino County in late October 1986, Marlow and Coffman had been staying with Veronica at the home she shared with her husband, Paul Koppers, and his brother, Steve Koppers, in the City of San Bernardino. The arrangement did not work out, and, on November 6, 1986, Paul told Veronica that Marlow and Coffman would have to leave. Veronica, reacting with hostility, decided to go with them. Taking a pair of handcuffs belonging

Coffman and Marlow entered the deli and handed Veronica her car keys, explaining they had a ride.

Around 7:30 p.m., Coffman and Marlow brought Novis to the residence of Richard Drinkhouse. Drinkhouse, who was recovering from injuries sustained in a motorcycle accident and having some difficulty walking, was home alone in the living room watching television when the three arrived. Marlow was wearing dress trousers; Coffman was still wearing a dress; and Novis wore jeans and a black and green top and had a suit jacket draped over her shoulders. Marlow told Drinkhouse they needed to use the bedroom, and the three walked down the hallway. The women entered the bedroom. Marlow returned to the living room and told Drinkhouse they needed to talk to the girl so they could "get her ready teller number" in order to "rob" her bank account. Drinkhouse complained about the intrusion into his house and asked Marlow if he were crazy. Marlow replied in the negative and assured Drinkhouse "there won't be any witnesses. How is she going to talk to anybody if she's under a pile of rocks?" Drinkhouse asked Marlow to leave with the women. Marlow declined, saying he was waiting for Veronica to bring some clothing. He told Drinkhouse to stay on the couch and watch television.

Knowing Marlow had a gun and having previously observed him fight and beat another man, and also being aware of his own physical disability, Drinkhouse was afraid to leave the house. At one point, when Drinkhouse appeared to be preparing to leave, he saw Coffman, in the hallway, gesture to Marlow, who came out of the bedroom to ask where he was going. Drinkhouse then returned to his seat on the couch in front of the television.

Veronica arrived at the Drinkhouse residence 10 to 15 minutes after Coffman, Marlow and Novis. Marlow came out of the bedroom, told Veronica he "had someone [t]here" and cautioned her not to "freak out" on him. Marlow said he needed something from the car; Coffman and Veronica went outside and returned with a brown tote bag. About 10 minutes later, Coffman drove Veronica to a nearby 7-Eleven store in Novis's car, leaving Marlow in the bedroom with Novis. Drinkhouse heard Novis ask Marlow if they were going to take her home; Marlow answered, "As soon as they get back." Veronica testified that, during this period, Coffman did not appear frightened or ask her for help in escaping from Marlow. Drinkhouse likewise testified Coffman appeared to be going along willingly with what Marlow was doing.

Upon returning from the 7-Eleven store, Coffman entered the bedroom where Marlow was holding Novis prisoner and remained with them for 10 to

---

to Paul, Coffman and Marlow, along with Veronica, went to stay at the Fontana home of Richard Drinkhouse, a boyhood friend of Marlow's.

15 minutes. During this time, Drinkhouse heard the shower running. After the shower was turned off, Marlow emerged from the bedroom wearing pants but no shoes or shirt; he had a towel over his shoulders and appeared to be wet. He walked over to Veronica, said, "We've got the number," and started going through a purse, removing a wallet and identification. Marlow then returned to the bedroom with the purse. Veronica left the house. About five minutes later, Coffman, dressed in jeans, emerged from the bedroom, followed by Novis, handcuffed and with duct tape over her mouth, and Marlow. Novis's hair appeared to be wet. The three then left the house. Drinkhouse never saw Novis again.

Marlow and Coffman returned the following afternoon to ask if Drinkhouse wanted to buy an answering machine or knew anyone who might. When Drinkhouse responded negatively, the two left.

Novis's body was found eight days later, on November 15, in a shallow grave in a vineyard in Fontana. She was missing a fingernail on her left hand, and her shoes and one earring were gone. An earring belonging to Novis was later found in Coffman's purse. Forensic pathologist Dr. Gregory Reiber performed an autopsy on November 17. Dr. Reiber concluded that Novis had been killed between five and 10 days previously. Marks on the outside of her neck, injuries to her neck muscles and a fracture of her thyroid cartilage suggested ligature strangulation as the cause of death, but suffocation was another possible cause of death due to the presence of a large amount of soil in the back of her mouth. Marks on her wrists were consistent with handcuffs, and sperm were found in her rectum, although there was no sign of trauma to her anus.

When Novis uncharacteristically failed to appear for work on Monday, November 10, without calling or having given notice of an intended absence, her supervisor, Jean Cramer, went to Novis's apartment to check on her. Cramer noticed Novis's car was not parked there, the front door was ajar, and the bedroom was in some disarray. Cramer reported these observations to police, who found no sign of a forced entry. Terry Davis went to Novis's apartment later that day and determined Novis's answering machine and typewriter were missing.[3]

Around 9:30 p.m. on Friday, November 7, the night Novis apparently was killed, Veronica Koppers visited her friend Irene Cardona and tried to sell her an answering machine, later identified as the one taken from Novis's apartment. Cardona accompanied Veronica, Coffman and Marlow to the house of a

---

[3] Detective Carlos Pimentel of the Redlands Police Department processed Novis's apartment for fingerprints, but was unable to find any matching those of defendants.

friend, who agreed to trade the answering machine for a half-gram of methamphetamine. The next day, Debra Hawkins bought the answering machine that Cardona had traded. The Redlands Police Department eventually recovered the machine. Harold Brigham, the proprietor of the Sierra Jewelry and Loan in Fontana, testified that on November 8, Coffman pawned a typewriter, using Novis's identification.

Victoria Rotstein, the assistant manager of a Taco Bell on Pacific Coast Highway in Laguna Beach, testified that between 11:00 p.m. and 12:00 a.m. one night in early November 1986, after the restaurant had closed for the evening, a woman came to the locked door and began shaking it. When told the restaurant was closed, the woman started cursing, only to run off when Rotstein said she was going to call the police. Rotstein identified Coffman in a photo lineup and a physical lineup, but did not identify her at trial. On November 11, 1986, the Taco Bell manager found a bag near a trash receptacle behind the restaurant; inside the bag were Coffman's and Novis's drivers' licenses, Novis's checks and bank card, and various identification papers belonging to Marlow.

The day after Novis's disappearance, Marlow, Coffman and Veronica Koppers returned to Paul Koppers's home; Marlow asked him if he could get any "cold," i.e., nontraceable, license plates for the car. On the morning of November 12, Marlow and Coffman returned to Paul Koppers's residence, where they told him they had been down to "the beach," "casing out the rich people, looking for somebody to rip off." Koppers asked Marlow if he knew where Veronica was; after placing two telephone calls, Coffman learned Veronica was in police custody. On the Kopperses' coffee table, Marlow saw a newspaper containing an article about Novis's disappearance with a photograph of her car. Marlow told Coffman they had to get rid of the car. Paul Koppers refused Marlow's request to leave some property at his house.

Coffman and Marlow left the Koppers residence and drove to Big Bear, where they checked into the Bavarian Lodge using a credit card belonging to one Lynell Murray (other evidence showed defendants had killed Murray on November 12). Their subsequent purchases using Murray's credit card alerted authorities to their whereabouts, and they were arrested on November 14 as they were walking on Big Bear Boulevard, wearing bathing suits despite the cold weather. Coffman had a loaded .22-caliber gun in her purse. Novis's abandoned car was found on a dirt road south of Santa's Village, about a quarter-mile off Highway 18. Despite Coffman's efforts to wipe their fingerprints from the car, her prints were found on the license plate, hood and ashtray; a print on the hood of the car was identified as Marlow's. A resident of the Big Bear area later found discarded on his property a pair of gray slacks with handcuffs in the pocket, as well as a receipt and clothing from the Alpine Sports Center, where Coffman and Marlow had made purchases.

### 2. *Marlow's Case*

Dr. Robert Bucklin, a forensic pathologist, reviewed the autopsy report and related testimony by Dr. Reiber. Based on the lack of anal tearing or other trauma, Dr. Bucklin opined there was insufficient evidence to establish that Novis had suffered anal penetration. He also questioned Dr. Reiber's conclusion that Novis might have been suffocated, as opposed to aspirating sandy material during the killing or coming into contact with it during the burial process.

### 3. *Coffman's Case*

Coffman testified on her own behalf, describing her relationship with Marlow, his threats and violence toward her, and other murders in which, out of fear that he would harm her or her son, she had participated with him while nonetheless lacking any intent to kill. Coffman also presented the testimony of Dr. Lenore Walker, a psychologist and expert on battered woman syndrome, in support of her defense that she lacked the intent to kill. The trial court admitted much of this evidence over Marlow's objections.

Coffman testified she was born in St. Louis, Missouri, in 1962 and, following her graduation from high school, gave birth to a son, Joshua, in August 1980. Shortly thereafter she married Joshua's father, Ron Coffman, from whom she separated in April 1982. In April 1984, Coffman left St. Louis for Arizona, leaving Joshua in his father's care, intending to come back for him when she was settled in Arizona.

Coffman testified that when she met Marlow in April 1986, she was involved in a steady relationship with Doug Huntley. She and Huntley had lived in Page, Arizona, before moving to Barstow, where Huntley took a job in construction. Coffman, who previously had worked as a bartender and waitress, was briefly employed in Barstow and also sold methamphetamine. In April 1986, both Coffman and Huntley were arrested after an altercation at a 7-Eleven store in which Coffman pulled a gun on several men who were "hassling" Huntley and "going to jump him." Charged with possession of a loaded weapon and methamphetamine, Coffman was released after five days. The day after she was released, Marlow, whom she had never met, showed up at the apartment she shared with Huntley. Marlow said he had been in jail with Huntley and had told him he would check on Coffman to make sure she was all right. Coffman and Marlow spent about an hour together on that occasion and smoked some marijuana. After Huntley's release, he and Coffman visited Marlow at the Barstow motel where Marlow was staying.

By June 1986, Huntley was again in custody and Coffman was preparing to leave him when Marlow reappeared at her apartment. At Marlow's request,

Coffman drove him to the home of his cousin, Debbie Schwab, in Fontana; while there, he purchased methamphetamine. Within a few days, Coffman moved with Marlow to Newberry Springs, where they stayed with Marlow's friends Steve and Karen Schmitt. During this period, Marlow told her he was a hit man, a martial arts expert and a White supremacist, and that he had killed Black people in prison. In Newberry Springs, Coffman testified, Marlow for the first time tied her up and beat her after accusing her of flirting with another man. During this episode, his demeanor and voice changed; she referred to this persona as Folsom Wolf, after the prison where Marlow had been incarcerated, and over the course of her testimony identified several other occasions when Marlow had seemed to become Wolf and behaved violently toward her. After this initial beating, he apologized, said it would never happen again, and treated her better for a couple of days. She discovered he had taken her address book containing her son's and parents' addresses and phone numbers, and he refused to give it back. He became critical of the way she did things and when angry with her would call her names. He refused to let her go anywhere without him, saying that if she ever left him, he would kill her son and family.

After some weeks in Newberry Springs, Marlow told Coffman his father had died and left him some property in Kentucky and that they would go there. Coffman would get her son back, he suggested, and they would live together in Kentucky or else sell everything and move somewhere else. Marlow prevailed on her to steal a friend's truck for the journey; after having it repainted black, they set off. Not long before they left, Marlow bit her fingernails down to the quick. They went by way of Colorado, where they stayed with a former supervisor of Marlow's, Gene Kelly, who discussed the possibility of Marlow's working for him again in Georgia. They then passed through St. Louis. Arriving in the evening and reaching her parents by telephone at midnight, Coffman was told it was too late for her to visit that night; the next morning, Marlow told her there was no time for her to see her son. Accordingly, although Coffman had not seen her son since Christmas 1984, they drove straight to Kentucky.

Upon arriving, they stayed with Marlow's friend Greg ("Lardo") Lyons and his wife Linda in the town of Pine Knot. Marlow informed Coffman the real reason for the trip was to carry out a contract killing on a "snitch." Once they had located the intended victim's house, Marlow told her she was to do the killing. She protested, but ultimately did as he directed, carrying a gun, fashioning her bandana into a halter top, and luring the victim out of his house on the pretext of needing help with her car. When the victim, who had a gun tucked into his belt, had come to the spot where their truck was parked and was taking a look under the hood, Marlow appeared and demanded to know what the man was doing with his sister. Marlow then grabbed the man's gun. Coffman testified she heard a shot go off, but did not see what

happened. Coffman and Marlow returned to Lyons's home. Sometime later, Marlow and Lyons left the house and returned with a wad of money. Coffman counted it: there was $5,000.

Coffman testified that Marlow subjected her to several severe beatings in Kentucky. In mid-August 1986, they drove to Atlanta, where Marlow told her he had a job. While in a bar after his fourth day working for Gene Kelly, Marlow became angry at Coffman. That night, in their hotel room, he began beating her, took a pair of scissors, threatened to cut her eye out, and then cut off all her hair. He forced her out of the motel room without her clothes, let her back in and forcibly sodomized her. Marlow failed to show up for work the next day and was fired. They then returned to Kentucky, where they unsuccessfully attempted a burglary and spent time going on "pot hunts," i.e., searching rural areas for marijuana plants to steal. Just before they left Kentucky to go to Arizona, they stole a station wagon.

Back in Arizona, they burglarized Doug Huntley's parents' house and stole a safe. After opening it to find only some papers and 10 silver dollars, they took the coins and buried the safe in the desert. Returning to Newberry Springs and again briefly staying with the Schmitts, they sold the stolen car and stole two rings belonging to their hosts, pawning one and trading the other for methamphetamine.

From Newberry Springs, in early October 1986, Marlow and Coffman took a bus to Fontana, where they again stayed with Marlow's cousins, the Schwabs. During that visit, Marlow tattooed Coffman's buttocks with the words "Property of Folsom Wolf" and her ring finger with the letters "W-O-L-F" and lightning bolts, telling her it was a wedding ring. Leaving the Schwab residence in late October, they hitchhiked to the house of Rita Robbeloth and her son Curtis, who were friends of Marlow's sister, Veronica. From there, Veronica brought Coffman and Marlow to the home she shared with her husband, Paul, and his brother, Steve. At the Robbeloth residence one day, Coffman, Marlow and Veronica were sharing some methamphetamine, and Marlow became enraged over Coffman's request for an equal share. Although Coffman quickly backed down, Marlow began punching her and threatened to leave her by the side of the road. Later, back at the Koppers residence, Marlow continued to beat, kick and threaten to kill her, forced her to consume four pills he told her were cyanide, extinguished a cigarette on her face and stabbed her in the leg, rendering her unconscious for a day and unable to walk for two days.

Coffman recounted how she and Marlow, along with Veronica, left the Koppers residence and came to stay at the Drinkhouse residence the night before they abducted Novis. On the morning of November 7, 1986, Marlow

told her to put on a dress, saying they would not be able to rob anyone if they were not dressed nicely. Marlow borrowed a suit from Curtis Robbeloth and told Coffman they had to "get a girl." She testified she did not understand he intended to kill the girl. After dropping Veronica off at her job, Coffman and Marlow drove around in Veronica's car looking for someone to rob. Eventually they parked in front of the Redlands Mall. When they saw Novis's white car pull up in front of them and Novis enter the mall, Marlow said, "That is the one we are going to get," despite Coffman's protests that the girl was too young to have money. He directed Coffman to get out of the car and ask Novis for a ride when the latter returned to her car. Coffman complied, asking Novis if she could give them a ride to the University of Redlands. When Novis agreed, Marlow got in the two-seater car with Coffman on his lap. As Novis drove, Marlow took the gun from Coffman, displayed it and told Novis to pull over. Then Coffman drove while Novis, handcuffed, sat on Marlow's lap. He told Novis they were going to a friend's house and directed Coffman to the Drinkhouse residence, where they arrived between 7:00 and 7:30 p.m. When Novis told them she had something to do that evening, Marlow assured her, "Oh, you'll make it where you are going. Don't worry."

As Marlow went in and out of the bedroom at the Drinkhouse residence, Coffman sat with Novis. When Novis asked if she was going to be allowed to leave, Coffman told her to do what Marlow said and he would let her go. Showing Novis the stab wound on her leg, Coffman told her Marlow was "just crazy." Marlow dispatched Coffman to make coffee and proceeded to try to get Novis to disclose her personal identification number (PIN). Finally Novis gave him a number. Marlow then taped Novis's mouth and said, "We are going to take a shower." He removed Novis's clothes and put her, still handcuffed, into the shower. Coffman testified he told her (Coffman) to get into the shower, but she refused. Thinking Marlow was going to rape Novis, Coffman testified she "turned around" and "walked away" into the living room. There she retrieved her jeans and returned to the bedroom to get dressed. Coffman denied either arousing Marlow sexually or having anything to do with anything that happened in the shower. When Marlow told her to dress Novis, Coffman responded that if he uncuffed her, she could do so herself. He removed the handcuffs to permit Novis to dress, then handcuffed her again to a bedpost.

Around this time, Veronica arrived at the Drinkhouse residence. Marlow took Novis's purse, directed Veronica to get his bag out of her car, and told Coffman and his sister to go to the store, where they bought sodas and cigarettes. Back at the Drinkhouse residence, Veronica departed and, soon thereafter, Marlow, Coffman and Novis left, with Coffman driving and Novis, duct tape on her mouth, handcuffed, and covered with blankets, in the back of the car. Marlow told Coffman to drive to their drug connection in Fontana, but directed her into a vineyard. There, Marlow and Novis got out of the car,

and he removed her handcuffs and tape. He explained they could not bring a stranger to the drug connection's house, so he would wait there with Novis while Coffman scored the dope. They walked off, with Marlow carrying a blanket and a bag containing a shovel.

Coffman testified she felt confused at that point because she possessed only $15, insufficient funds for a drug purchase. Believing Marlow intended to rape Novis, she backed the car out of the vineyard, parked down the street and smoked a cigarette. When she returned, no one was there. She could hear the sound of digging. Some 10 to 15 minutes later Marlow reappeared, alone. Without speaking, he threw some items into the back of the car and, after Coffman had driven for a while, began to hit her and berated her for driving away.

They returned to the Robbeloth residence, house, where Marlow changed clothes. Next they drove to a First Interstate Bank branch, but were unable to access Novis's account because she had given them the wrong PIN. From there, around 9:30 p.m., they went to Novis's apartment and, after a search, found a card on which Novis had written her PIN. They also took a typewriter, a telephone answering machine and a small amount of cash. They returned to the Robbeloth residence, where Marlow spoke with Veronica, who then drove them around unsuccessfully looking for a friend to buy the answering machine. Leaving Veronica around 3:00 or 4:00 a.m., Coffman and Marlow tried again to access Novis's account, only to learn there was not enough money in the account to enable them to withdraw funds using the automated teller. They returned to the Drinkhouse residence.

The next morning, Veronica joined them around 8:00 or 9:00. After trying again to sell the answering machine, they pawned the typewriter for $50 and bought some methamphetamine. That afternoon Coffman and Marlow went to Lytle Creek to dispose of Novis's belongings. Coffman had not asked Marlow what had happened to Novis; she testified she did not want to know and thought he had left her tied up in the vineyard. They returned to the Drinkhouse residence around 5:00 p.m. Later that evening, after trading the answering machine for some methamphetamine in the transaction described in Irene Cardona's testimony, Coffman and Marlow went with Veronica to the Koppers residence, where they "did some speed" and developed a plan to go to the beach in Orange County on Marlow's theory that "it would be easier to get money down there because all rich people live down at the beach." Veronica drove Coffman and Marlow back to Novis's car, which they drove to Huntington Beach, arriving at sunrise.

After lying on the beach for several hours, they looked unsuccessfully for people to rob. Marlow berated Coffman for their inability to find a victim,

held a gun to her head and ordered her to drive. After threatening to shoot her, he began to punch the stab wound on her leg. That night, they slept in the car in front of some houses near the beach. The next day, Coffman cashed a check on Novis's account, receiving $15. They continued their search for a potential victim and eventually bought dinner at a Taco Bell, where Marlow discarded their identification, along with Novis's. They drove up into the hills and spent the night. The next day, they resumed their search for someone to rob. Seeing a woman walking out of Prime Cleaners, Marlow commented that she would be a good one to rob. They continued to drive around, however, and spent the night in the car behind a motel on Pacific Coast Highway after removing the license plates from another car and putting them on Novis's car.

The following afternoon, Coffman and Marlow entered Prime Cleaners and committed the robbery, kidnapping, rape and murder of Lynell Murray detailed below (see *post*, at pp. 32–34).

Coffman also presented the testimony of several witnesses suggesting her normally outgoing personality underwent a change and that she behaved submissively and fearfully after she became Marlow's girlfriend. Judy Scott, Coffman's friend from Page, Arizona, testified that when Coffman and Marlow visited her in October 1986, Coffman, who previously had been talkative and concerned about the appearance of her hair, avoided eye contact with Scott, spoke tersely and had extremely short hair that she kept covered with a bandana. Lucille Watters testified that during the couple's July 1986 visit to her house, Coffman appeared nervous, rubbing her hands and shaking. Linda Genoe, Lyons's ex-wife, testified she met Coffman in June 1986 when she and Marlow visited her at her home in Kentucky. Genoe observed that whenever Marlow wanted something, he would clap, call "Cynful" and tell her what to do. Coffman would always sit at his feet. On one occasion, Genoe saw Coffman lying on the floor of the bedroom in which she was staying, naked and crying; Coffman did not respond when Genoe asked what was wrong. The next morning, Genoe saw scratches on Coffman's face and bruises around her neck, and Coffman seemed afraid to talk about it. Once Genoe observed Coffman cleaning between the spokes on Marlow's motorcycle with a toothbrush while Marlow watched. While at Genoe's house, Coffman and Marlow got "married" in a "biker's wedding."

Coffman also presented the testimony of Psychologist Lenore Walker, Ph.D., an expert in battered woman syndrome. Dr. Walker opined that Coffman was generally credible and suffered from battered woman syndrome, which she described as a collection of symptoms that is a subcategory of posttraumatic stress disorder. Certain features of defendants' relationship fit

the profile of a battering relationship: a pattern of escalating violence, sexual abuse within the relationship, jealousy, psychological torture, threats to kill, Coffman's awareness of Marlow's acts of violence toward others, and Marlow's alcohol and drug abuse. Dr. Walker administered the Minnesota Multiphasic Personality Inventory to Coffman and diagnosed her as having posttraumatic stress disorder and depression with dysthymia, a depressed mood deriving from early childhood.

Officer Lisa Baker of the Redlands Police Department testified that on November 15, 1986, she took Coffman to the San Bernardino County Medical Center and there observed various scratches and bruises on her arms and legs, a bite mark on her wrist, and a partly healed inch-long cut on her leg. Coffman told Baker the bruises and scratches came from climbing rocks in Big Bear.

Gene Kelly, formerly Marlow's supervisor in his employment with a company that erected microwave towers, testified that one evening in June 1986 he saw Marlow, who believed Coffman had been flirting with another man, yank her out of a restaurant door by her hair.

### 4. *Prosecution's Rebuttal*

Jailhouse informant and convicted burglar Robin Long testified that in January 1987[4] she met Coffman in the San Bernardino County jail. Coffman told Long that when Marlow took Novis into the shower, she got in with them, and Marlow fondled both of them. Coffman also told Long that Novis was alive and at the Drinkhouse residence when Marlow and Coffman went to Novis's apartment to look for her PIN. Coffman said she told Novis they would have to kill her because they could not leave any victims alive. After Marlow killed Novis, Coffman told Long, he came back to the car and got the shovel, whereupon Coffman went with him into the vineyard and was present when Novis was buried. Coffman told Long that killing Novis made her feel "really good." Coffman also said they had taken a number of items from Novis, including a watch, earrings and makeup.

With respect to Lynell Murray, Coffman told Long (contrary to Coffman's trial testimony) that she had gotten into the shower with Marlow and Murray. Coffman never told Long that Marlow had beaten her or that the only reason she had participated in the killings was because she was afraid for her son's safety.

The prosecution presented the testimony of several police officers regarding Coffman's prior inconsistent statements. Odie Lockhart, an officer with

---

[4] Long actually stated she met Coffman while in custody in January 1986, but clearly she misspoke.

the Huntington Beach Police Department, and other officers accompanied Coffman to the vineyard where Novis was buried. Contrary to her testimony, Coffman did not tell Lockhart that when Marlow took Novis into the vineyard, she had backed her car out; rather, Coffman told him she stayed in the same location. When Lockhart asked Coffman how Marlow had killed Novis, she said she "guessed" he strangled her, but indicated she was only supposing. Contrary to Coffman's testimony that she did not know Novis was dead when she and Marlow went to Novis's apartment to search for her PIN, Coffman told Sergeant Thomas Fitzmaurice of the Redlands Police Department in a November 17, 1986, interview that the reason they did not ask Novis for the correct PIN after the number Novis initially gave them did not work was that "she was already gone by then." Despite Coffman's trial testimony that Marlow had beaten her while they were holding Lynell Murray at the motel in Huntington Beach, Fitzmaurice testified that Coffman never mentioned such a beating during a formal interview at the Huntington Beach Police Department and, indeed, said Marlow "wasn't mean" to her.

Finally, to rebut Coffman's claim that she continued to fear Marlow after her arrest, Deputy Blaine Proctor of the San Bernardino County Sheriff's Department testified that he was working courthouse security during September and October of 1987, and while preparing Coffman and other inmates for transportation to court on one occasion he noticed Coffman had left her holding cell and gone to the area where Marlow was located. When he next saw Coffman, she was in front of Marlow's cell; Marlow was standing on his bunk with his hips pressed against the bars and Coffman was facing him with her head level with his hips. When Coffman and Marlow observed Proctor, Coffman stepped back and Marlow turned, revealing his genitals hanging out of his jumpsuit. Marlow appeared embarrassed and told Proctor that "nothing happened."

### 5. *Marlow's Rebuttal*

Clinical Psychologist Michael Kania testified, based on Coffman's psychological test results and Dr. Walker's notes and testimony, that Coffman was exaggerating her symptoms, was possibly malingering, and did not suffer from posttraumatic stress disorder, although she met most of the criteria for a diagnosis of antisocial personality disorder.

Various individuals acquainted with both defendants testified that Marlow and Coffman seemed to have a normal boyfriend-girlfriend relationship and, although Coffman wore a bikini on many occasions, the witnesses had never observed cuts or bruises on her.

Veronica Koppers testified that when she was around Coffman, Coffman was under the influence of methamphetamine almost every day. Coffman

never expressed fear of Marlow for herself or her son; instead, she wanted Marlow to get her son back for her by taking the boy and "getting rid" of her ex-husband and former in-laws. Coffman frequently nagged Marlow to acquire more money. With one exception, all of the arguments between defendants that Veronica witnessed were verbal and nonphysical. The one exception was an argument that occurred while Veronica was driving defendants to a drug connection to purchase methamphetamine. Coffman, in the front seat, kept telling Marlow they needed to get more money to score speed and to get Joshua; Marlow told her to shut up. Coffman kept it up and Marlow slapped her. Veronica told both to get out of her car; they complied. After defendants continued to argue for a few minutes, Marlow got back into the car and told Coffman that if she wanted to leave, she could. She begged him not to leave her. He said, "Okay, get in [the car] and get off my back." Coffman got back into the car and was silent. Veronica acknowledged that one day, after she had returned home following work, Marlow told her he had accidentally stabbed Coffman; the wound was a small puncture-type wound that did not bleed a lot and, contrary to Coffman's testimony, Coffman did not seem to have any trouble walking the next day.

Veronica testified that, at the Drinkhouse residence on the night Novis was abducted, she saw Coffman going through Novis's purse. She also saw Coffman coming out of the bedroom wearing jeans and with wet hair.

Marlow testified he was not a member of or affiliated with any prison gang and had never told Coffman he had been a member of such a gang or had killed anyone while in prison. He acknowledged to the jury that he had had several disciplinary write-ups while in prison but claimed they were for verbal disrespect toward the staff. He denied telling Coffman she would be killed if she ever left him or threatening to have her son killed. He admitted he and Coffman had had physical fights. He had never forced her to have sex, and Coffman never told him she disliked oral sex. Contrary to Coffman's testimony, they had had sex on the occasion when they first met.

Marlow acknowledged that during their stay in Newberry Springs, he and Coffman had had two real arguments, but he denied, contrary to Coffman's testimony, that on the first occasion he kicked her, tore off her clothes, tied her up or threatened to kill her. Instead, he had merely pushed her to the ground with an open hand. On the second occasion, Coffman had rebuffed several of Marlow's requests for assistance in painting a trailer, claiming she was busy gluing together a broken nail; finally, Marlow claimed, he had bitten off the broken nail and trimmed her other nails with a nail clipper. Marlow testified that on their trip east in June 1986, Coffman had declined to visit her mother on the morning following their arrival in St. Louis. A few days after they reached Kentucky, Lyons and another man approached

Marlow about killing one Gregory Hill; Marlow testified that, although he had told Coffman he would rather wait for an expected job opening with his former supervisor, Gene Kelly, Coffman told him the hit would be faster money. Finally, he agreed to do the killing, and Lyons gave him a .22-caliber pistol to do the job. Marlow testified he had never killed anyone before and, when he and Coffman had parked their truck on a hill overlooking Hill's house, he expressed reservations centering on whether Hill might have a wife and children and whether in fact he might not have snitched as he was alleged to have done. Coffman told him he was going to have to deal with that and, when he said he could not, she demanded the gun and told him she would deal with it. After Coffman got Hill to come and take a look at the truck, Marlow, who had secreted himself in the woods, noticed that Hill had a gun in his back pocket. Marlow emerged and demanded to know what Hill was doing with his sister. When Hill pulled out his gun, Marlow grabbed his arm and the gun went off in the course of the struggle.

Later, Coffman expressed interest in a second contract killing proposed to them, but Marlow balked at the idea. During the ensuing argument, Coffman revealed that her ex-husband and former in-laws had legal custody of her son, and she wanted them to "pay" with their lives for taking him away from her. When Marlow refused to kill them, she threatened to inform the police about the Hill killing; the argument became heated, and he pushed her down; she got up and slapped him, and he slapped her. Contrary to Coffman's testimony, he did not kick her or hit her in the face with a clutch plate.

In Atlanta, after a few days of working for Gene Kelly, Marlow agreed to Kelly's offer to take him and Coffman out for dinner and drinks; Marlow felt reluctant, however, because Coffman had been flirting with other men, and he was afraid of getting into another argument with her in which the subject of the killing might come up. They first went to a pool hall where, after drinking a lot of tequila, Marlow got involved in an argument over Coffman with two other men. Marlow told Coffman he wanted to leave the pool hall. Entering a restaurant as the argument continued, Marlow became angry when Coffman told him she was going to sleep with Kelly. He pulled her out of the restaurant by the hair, and they went back to their motel room. In the past, Marlow had threatened to cut her hair when she had flirted with other men; this time, he did it. He denied Coffman's accusations that he had threatened to put out her eye and had beat and sodomized her.

Marlow testified he and Coffman returned to Kentucky, where he was offered $20,000 to kill a pregnant woman in Phoenix, Arizona; Marlow was not interested, but Coffman wanted him to take the job or to get her to Arizona so that she could do it. They traveled as far as Page, Arizona, before running out of money and heading to Newberry Springs, where they stayed

with the Schmitts for a week. There, at Coffman's request, Marlow tattooed her ring finger and buttocks.

In early October, Marlow and Coffman arrived at Veronica's house. Marlow described the incident in which Coffman was stabbed: High on methamphetamine, they had been arguing about money and her son, Joshua; Coffman wanted him to take the contract to kill the woman in Phoenix, but Marlow was unwilling. Coffman threatened to "tell on [him] for Kentucky" if he did not, and said she would do the job herself. Coffman was in bed, under the covers. Marlow stabbed the bed, wounding Coffman's leg. Marlow asked one of the Kopperses if they had anything for pain, and they gave him Dilantin, which he in turn gave to Coffman. Marlow denied Coffman's claim that he told her the pills were cyanide and threatened to kill her.

Marlow recounted his version of the offenses against Novis. On November 7, 1986, after moving to the Drinkhouse residence, Marlow and Coffman discussed committing a robbery for money to get Coffman to Arizona. After donning borrowed clothes that afternoon, while they were waiting to pick up Veronica at the Redlands Mall, Coffman noticed Novis pull up alongside their car and commented that she wanted that car for the trip to Arizona. When Novis came out of a store, Coffman asked her for a ride. She and Marlow got into the car, and Novis started driving. Coffman nudged him several times to pull out the gun. He did so and told Novis to pull over. Coffman took over the wheel and, without any prompting from Marlow, drove to the Drinkhouse residence. Marlow testified his intention at that point was to take the car and get Novis to obtain money from her ATM.

At the Drinkhouse residence, they went straight into the bedroom, where Coffman handcuffed Novis to the bed, took her purse to the living room and searched it, finding an ATM card. Coffman took Novis into the shower and asked Marlow to join them, saying she wanted to see him have sex with Novis. Marlow entered the shower but was not aroused by the prospect, and Coffman performed oral sex on him. After getting out of the shower, Marlow took some money from Novis's purse and asked Coffman to go to the store and get cigarettes. She and Veronica did so. While they were gone, Drinkhouse asked Marlow for $1,000 for bringing Novis to his house and told Marlow he could not simply let her go because she would bring the police to his house. Upon her return, Coffman too told him he could not just let Novis go.

Marlow, Coffman and Novis left the Drinkhouse residence. Coffman was driving and, with no direction from Marlow, drove to the vineyard. They argued and, Marlow testified, Coffman insisted he "do something." He told her, "You do something." Coffman said she wanted to get some speed.

Marlow took a sleeping bag out of the car and sat down with Novis while Coffman drove off. She returned some 15 minutes later and commented, "You still haven't done anything." Marlow told her to kill the lady if she wanted the lady killed. After Coffman continued to insist, he put his arm around Novis from behind and began choking her. Marlow testified he told Novis to lie down, remain still until they left, and then get up and run away. He then let go of her; she was lying on her side and still breathing. He spread a little dirt over her, avoiding her head. Shown pictures of the grave site, Marlow testified it did not look like that when he left her. When he returned to the car, Coffman asked if he was sure Novis was dead. He told her he was not sure and they left. When they stopped by a field near the Drinkhouse residence, Marlow got out of the car and waited in the field while Coffman took off. When she returned, she asked him if he was okay.

Later, after an unsuccessful attempt to use Novis's ATM card, Marlow and Coffman went to Novis's house. As they approached the apartment, Marlow told Coffman they should not go in because he did not think Novis was dead and the police might be watching; Coffman told him not to worry.

Dr. Michael Kania testified about an interview he had had with Marlow in January 1987. In that interview, Marlow expressed a desire to protect Coffman and said he would do anything to help her. Marlow told him that killing Novis was a response to his wanting to "do good" and to hear Coffman tell him he "did good." Marlow had only killed Novis, he told Kania, because of pressure from Coffman and Drinkhouse.

### 6. *Prosecution Surrebuttal*

To impeach Marlow's testimony, Sergeant Fitzmaurice recounted statements obtained from him without waiver of the rights described in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). Marlow told Fitzmaurice, among other things, that the killing of Novis was "a 50-50" thing, and Coffman "got the ball rolling." Marlow indicated both he and Coffman took Novis into the shower, but he was unable to perform sexually despite Coffman's attempting to help him maintain an erection. He also said that they had tried to use Novis's ATM card after she was dead, that he did not tell Novis what was going to happen to her, and that he had dug a hole for Novis's body with the shovel the police later found at the Bavarian Lodge.

### B. *Penalty Phase*

### 1. *Prosecution's Case in Aggravation*

In addition to the guilt phase evidence of the offenses defendants committed against Corinna Novis, the prosecution's case in aggravation included

evidence that, on November 12, 1986, Marlow and Coffman committed murder, rape and other offenses against Lynell Murray, a young college student, in Orange County.[5] The prosecution also presented evidence that Marlow committed, and was convicted on his plea of guilty to, three robberies in 1979 (§ 190.3, factors (b) & (c)) and that, while incarcerated pending trial in the present case, he committed an act of violence against a jail trusty (*id.*, factor (b)). Aggravating evidence against Coffman consisted of an incident of brandishing a deadly weapon and possessing a concealed weapon, and an act of violence against her former boyfriend, Doug Huntley.

### a. *Murder of Lynell Murray*

On November 12, 1986, Lynell Murray failed to return home from her job at Prime Cleaners in a Huntington Beach mall. Around 6:00 p.m. that evening, a half-hour before Murray was to get off work, Lynda Schafer drove into the parking lot of the mall and noticed Coffman, dressed in tight jeans, walking in front of various businesses in the mall. Schafer entered Prime Cleaners and left some clothing with Murray, who was alone at the time. As Schafer left the parking lot, she noticed Coffman passionately embracing a man, later identified as Marlow, near an alley behind the cleaners.

About 6:30 p.m. that evening, Linda Whitlake was leaving her health club, located near Prime Cleaners. As Whitlake walked to her car, Coffman, cursing profanely, approached her, claiming her new car would not start. When Whitlake agreed to give Coffman a ride to her motel, down Pacific Coast Highway, Coffman said she would go tell her boyfriend that Whitlake would drive them. Seeing a man in a small white car with its hood up, Whitlake had misgivings, locked her purse in her car and started over to tell them she had changed her mind. Coffman met her halfway and said her boyfriend had decided to telephone the auto club instead.

Around 7:00 p.m., a half-hour after Murray was scheduled to get off work, her boyfriend, Robert Whitecotton, arrived at Prime Cleaners, which appeared to have been burglarized and ransacked. Murray's car was parked in the store's back lot. Whitecotton called the police.

At 7:13 p.m., Coffman, wearing a black and white dress, checked into room 307 of the Huntington Beach Inn. She registered under the name of

---

[5] On March 10, 1992, Marlow pleaded guilty to the murder of Lynell Murray in Orange County and thereafter was sentenced to death. (See *People v. Marlow* (2004) 34 Cal.4th 131 [17 Cal.Rptr.3d 825, 96 P.3d 126].) In a separate trial, Coffman was convicted of Murray's murder, with special circumstances, and received a sentence of life without possibility of parole. On January 31, 1995, the Court of Appeal for the Fourth District, Division Three, affirmed that judgment, and this court denied a petition for review.

Lynell Murray, using Murray's credit card to pay for the room. At 8:19 p.m., a balance inquiry regarding Murray's Bank of America checking account and a withdrawal of $80 from that account were made at an ATM located at a Corona del Mar branch of the bank. One minute later an additional $60 was withdrawn, leaving a balance of $4.41.

Later that night, Coffman checked into the Compri Hotel in the City of Ontario, again using Murray's credit card. Around midnight on November 13, Coffman and Marlow dined on shrimp and steak at the Denny's restaurant across the street from the hotel. The two were seen embracing in the restaurant. Coffman, wearing a skirt and blouse, did all the ordering and paid for the meal using Murray's credit card; Marlow, in a three-piece suit, neither smiled nor said anything to restaurant staff.

Around 3:00 p.m. on November 13, an employee of the Huntington Beach Inn entered room 307 and found Murray's body. The cause of death was determined to be ligature strangulation. Murray's head was in six inches of water in the bathtub; her head and face were bound with towel strips, and two gags were in and over her mouth. Her right arm was secured to a towel binding her waist. Her right leg lay across the toilet, and her left leg rested on the floor in front of the toilet. Her ankles apparently had been bound with duct tape, although most of the tape had been removed. Murray's bra, pantyhose and one earring were missing; evidence suggested she had been raped and possibly urinated on.[6] She had suffered premortem blunt force trauma to the head, midsection injuries, bruising of the legs and two black eyes consistent with having suffered blows before death. A footprint on a bathmat near the body was consistent with prints made by boots belonging to Marlow.

After visiting the Koppers residence on the morning of November 13, Marlow and Coffman drove to the City of Big Bear and checked into the Bavarian Lodge. Coffman registered using Murray's credit card. Further attempts to purchase clothing at a sporting goods store using Murray's credit card alerted authorities to defendants' whereabouts and led to their arrest on November 14 while they walked along a road near Big Bear. When officers seized Coffman's purse, they found it contained Murray's identification cards and wallet, an earring matching the lone leaf-shaped earring Murray was wearing when her body was discovered at the Huntington Beach Inn, a loaded .22-caliber revolver and .22-caliber ammunition, credit card receipts bearing Murray's forged signature, and a brown paper bag, similar to those used at Prime Cleaners, containing coins. A search of the room defendants had occupied at the Bavarian Lodge yielded clothing stolen from Prime

---

[6] Serological testing of the semen on a vaginal swab taken from Murray could not conclusively demonstrate that either Marlow or Whitecotton was its source.

Cleaners and a gray suit jacket matching the one Marlow earlier had been seen wearing, with a set of handcuffs (later determined to be the ones Marlow had taken from Paul Koppers) in the pocket, identification in the name of James Gregory Marlow, a ladies' blue wallet and various single earrings. Novis's white Honda was found parked off a highway near Santa's Village, an amusement park in San Bernardino County, bearing license plates stolen from a vehicle parked at the Huntington Beach Inn. Inside a trash can in Santa's Village, a maintenance worker found a pillowcase with, among other items, a maroon bra identified as belonging to Murray and laundry receipts from Prime Cleaners.

### b. *Marlow's 1979 Robberies and 1988 Assault*

#### i. *Upland Robbery*

On November 5, 1979, Jeffrey Johnson lived in an apartment upstairs from sisters Lori and Kathy Liesch on Silverwood Avenue in Upland. At 6:45 that morning, Johnson answered a knock at his door. Marlow and one Allen Smallwood, at the time both heroin addicts, asked Johnson if he worked in construction. When Johnson answered affirmatively, Smallwood hit him in the face, causing him to fall to the floor. Entering the apartment, the two men asked where the drugs were, and Marlow starting beating Johnson with a chain. Smallwood restrained Johnson while Marlow searched the apartment. Johnson was then told to put his shoes on and was taken downstairs to the Liesches' apartment.

Smallwood, holding a knife to Johnson's back, and Marlow entered the Liesches' apartment, where Lori was still in bed. Smallwood ordered her to get out of bed and, when she said she had no clothes on, Marlow attempted to pull the covers off her. After Smallwood told Marlow to stop, Marlow started searching the apartment for drugs over Lori's protests that she knew nothing about any drugs. While searching, Marlow surprised Kathy, who was returning to the apartment after taking her boyfriend to work. He brought Kathy to the bedroom, where she, Lori and Johnson were tied up with electrical cord. Marlow and Smallwood warned them not to contact the police because they had taken all their identification and would come back for them. At one point during the ordeal, when Lori would not stop crying after Smallwood demanded she stop, Marlow grabbed his crotch and told her he had "something to shut her up." The Liesch sisters each found that a small amount of cash was missing from their wallets, as well as Kathy's keys, while Johnson found $180 was missing from his dresser.

### ii. *Robbery at Leather Goods Store*

On November 6, 1979, Joanne Gilligan owned a leather goods store in Upland. On that day, while she was helping a customer in the store, Marlow walked in and came to the counter. When Gilligan asked if she could help him, Marlow told her he had a gun and she should lie down on the floor. Marlow's hand was in the pocket of his sweatshirt and it appeared to Gilligan that he could have had a gun, although she did not actually see one. Gilligan and the customer she had been helping each got down on the floor, while Marlow removed money from the register, grabbed a couple of coats and fled. Gilligan identified Marlow at the preliminary hearing and at the present trial.

### iii. *Robbery at Methadone Clinic*

On November 20, 1979, Gertrude Smith and Wilson Lee were working at a methadone clinic in the City of Ontario in San Bernardino County. At 10:00 a.m. that day, Marlow, armed with a sawed-off shotgun, and Smallwood, carrying a pistol, entered the clinic. Marlow ordered clinic employees not to move. Marlow and Smallwood demanded methadone but were told the drug was locked in the safe. As Marlow held the shotgun on Smith, Smallwood went down a hallway with Wilson and confronted an employee, demanding he open the safe where the methadone was kept. When the employee had difficulty opening the safe, Marlow urged Smallwood to shoot him in the head. After the safe was opened, Marlow and Smallwood fled with methadone having a street value of $10,000.

At the time of his arrest, on November 26, 1979, Marlow had a bottle containing methadone in his jacket pocket and was carrying a loaded sawed-off shotgun wrapped in a shirt. He claimed to have recently purchased the methadone, but refused to identify who sold it to him or to discuss the clinic robbery.

### iv. *Assault Against Jail Trusty*

On February 17, 1988, Gary Hale, a jail trusty facing charges of driving under the influence, was bringing breakfast to other inmates at the San Bernardino County jail. When Marlow complained, Hale assured him he had been given the same quantity of potatoes as everyone else. Shortly afterward, Hale noticed Marlow was pointing a blow gun at him. As Hale walked away, he was hit by a paper blow dart with a pin at the end. Marlow later bragged to Deputy Carvey that "It was a lucky shot through the bars."

### c. *Evidence Against Coffman*

California Highway Patrol Officer Robert W. Specht testified that about 4:00 a.m. on April 5, 1986, he detained Doug Huntley for driving erratically

and at high speed. The car, in which Coffman was a passenger, stopped at an apartment complex in Barstow. While officers attended to the irate Huntley, Coffman, yelling obscenities at the officers, ran toward a house carrying her purse. Specht, who had received a radio report of an earlier incident linked to Huntley and Coffman, in which Coffman had brandished a gun at several men who were engaged in an altercation with Huntley at a 7-Eleven store, ordered her to come out of the house with her purse. When she complied, Sergeant James Lindley of the Barstow Police Department retrieved a bindle of cocaine or methamphetamine from her purse; a silver derringer was recovered from the house where Coffman had hidden it.

Doug Huntley testified that at the 7-Eleven store, three men had followed him to the parking lot, and one had assaulted him. After Huntley threw his assailant to the ground, Coffman pulled the derringer from her purse and held it on the other two men. Huntley also testified about an incident that had occurred about a year before the 7-Eleven incident. Huntley was walking down the street after arguing with Coffman, who drove up beside him and asked him to get in the car. When he told her he would rather walk home, she drove down the street, turned around and drove in his direction, coming up on the sidewalk and forcing him to move out of the way.

### 2. *Marlow's Case in Mitigation*

Marlow's sister, Veronica Koppers, testified she was born in 1959 and spent her early childhood in rural Stearns, Kentucky, with Marlow, who was some four years older; her mother, Doris Hill; her father (Marlow's stepfather), Wendell Hill; and Doris's mother, Lena Walls. Her parents fought constantly; her father shot her mother, and she stabbed him seven times.

In 1963, Doris, Lena, Marlow, Veronica, an aunt and uncle, and their five children all moved to California to get away from Wendell Hill. They first lived in East Los Angeles and then moved to El Monte, Azusa and San Dimas. Doris developed a pattern of not staying with her children on a regular basis, frequently leaving them for extended periods in Lena's care. Neither Doris nor Lena worked and, while Lena received Social Security and AFDC payments for the children, Veronica did not know how Doris supported herself at this time. Doris customarily had parties, with drinking and marijuana smoking, going on in her house around the clock. Doris neglected the children, never taking them to the doctor or dentist and often leaving no food for them. One Thanksgiving, Veronica recalled, Doris took her and Marlow to dinner at their uncle's house; Doris said she was going to the liquor store and did not return for several months. From time to time, Marlow was sent to stay with his father, Arnold Marlow; he also spent time in foster homes. Doris enjoyed many types of drugs, became addicted to heroin, and

openly used drugs in front of her children. She also brought home many different men. Veronica recalled visiting her mother at the Sybil Brand Institute for Women and at the state prison in Frontera.

When Doris got out of prison in 1972, she introduced Veronica to drugs, as she had Marlow and their cousins Pam and Clel. When Marlow was 15, Veronica saw Doris administer heroin to him by tying his arm and injecting it. Doris, who was then supporting herself with prostitution and stealing from her "tricks," also taught Veronica how to burglarize houses.

Ray Saldivar testified that he met Doris in 1964, when she bought drugs from him. As of the time of trial, Saldivar had conquered his drug habit and was working as a tree trimmer. In 1965, Saldivar moved in with Doris and, after living there for several days, first discovered that Doris had children, despite the fact he had visited her house numerous times before moving in. She was not a loving mother, frequently having to be reminded to feed the children. Marlow was constantly afraid his mother was going to leave him, to the point that he sometimes slept on the floor next to her bed. In their household, people came and went all day long to buy drugs. In Saldivar's opinion, Marlow was an "innocent child" who "didn't [ask] to grow up" in "that abnormal home" and "grew up around nothing but dope fiends all his life."

Lillian Zamorano testified that she met Doris in the mid-1960's at a bar in Pico Rivera where the two women came to spend a good part of their time. They became good friends, and Doris eventually moved into Zamorano's house. Doris did not mention to Zamorano that she had children until at least six months after they met. Zamorano never saw Doris display any affection toward her children. Zamorano's daughter, Rosemary Patino, met Marlow on Christmas 1966 and remembered him as a "good," "normal," "playful" child. On that occasion, she testified, they expected a family holiday, but Doris and Lillian left to go to a bar despite Marlow's crying and pleading with Doris to stay.

Doris died in a fire in 1975.

Sue Warman, formerly the wife of Arnold Marlow, testified she first met Marlow when he was six and a half years old and was sent to live with his father. Marlow's "mouth had sores all around it and his teeth were rotten." Warman took Marlow to the dentist and the doctor, bought him new clothes and enrolled him in school. Although initially positive about Marlow's arrival, Arnold soon began giving Marlow frequent "whippings" "if everything wasn't done . . . just right." In Warman's view, Marlow was "a lonely, lost little boy wanting somebody to love him." Marlow stayed with his father

and Warman for about three months, until Doris came to his school, unannounced, and took him away. Because Doris had legal custody of Marlow, Warman was told nothing could be done. Warman did not see Marlow again for another seven years. In 1969, California welfare officials contacted Arnold, asking if he could take care of Marlow. At 13, Marlow appeared in better condition than the first time Warman had seen him, but he "still looked like that little, lost, lonely boy." Marlow got along well with his half siblings, and Warman never had any problems with him. Arnold, however, continued to beat his children, including Marlow.[7] After about a year, Warman—tired of Arnold's drinking and abusive behavior—made plans to leave him. Knowing she would not get custody, she took Marlow to a foster home so that he would not have to stay with his father. Warman asked the jury to spare his life, commenting that his death "won't bring those people back. And Greg never had a chance from the day he was born either. And I love him. I always loved him."

Allen Smallwood, who at the time of trial was serving a sentence at Folsom State Prison for a series of robberies, testified that he met Marlow at a party when Marlow was 23 years old; Smallwood was 35 and had already been convicted of two robberies and two escapes. Smallwood was then a heroin addict with a $700 per day habit; Marlow had a somewhat lesser habit. Smallwood testified he recruited Marlow, who was undergoing heroin withdrawal, to rob a man named Johnson, who Smallwood had heard was a police informant. Smallwood and Marlow robbed Johnson of several thousand dollars in cash and about six ounces of cocaine. Smallwood denied that Marlow had a chain during the robbery. Later, Smallwood traded some of the cocaine for heroin and some for weapons he planned to use in robbing the methadone clinic, for which effort he again recruited Marlow, who was again going through withdrawal. Smallwood testified he did not think Marlow would have committed those robberies without his importunings. Smallwood had to "show him the ropes," as Marlow, whose criminal experience was limited to "stuff like" "petty shoplifting," was "kind of naive."

Clinical Psychologist George Askenasy testified that in 1975, when he conducted a psychological examination of Marlow for the California Youth Authority, he had found him "a pathetic young man with a chaotic life history," whose father showed no interest in him and whose mother exhibited a "smothering" "possessiveness" toward him. Marlow, the witness stated, was "caught in an approach-avoidance conflict with many guilt feelings about his relationship with his mother," "anxious, feeling of inadequacy, sexual confusion, [and] unmet dependency needs . . . ."

---

[7] Michael Marlow and Tina Marlow Allen likewise described their father as an abusive alcoholic who used to beat Marlow severely; Tina testified her father raped her when she was 10.

### 3. *Coffman's Case in Mitigation*

Katherine Davis, Marlow's former wife, testified regarding Marlow's violence and jealousy and its emotional and physical effects on her. Her testimony is summarized below in connection with a related claim of error (see *post*, at p. 112). Marlene Boggs, Davis's mother, confirmed much of her daughter's testimony and described observing her daughter's scars and bruises, as well as a 75-pound weight loss and hair loss, during Davis's relationship with Marlow.

Coffman's former employers testified she was a good worker when employed as a waitress and bartender in Arizona.

Carol Maender, Coffman's mother, testified about the marital, financial and other difficulties she encountered in raising Coffman and sons Robbie and Jeff, the latter of whom was given up for adoption. As an infant, Coffman had suffered from a painful double inguinal hernia that required surgical repair while she was still in early infancy.[8] Maender testified to a lack of closeness with Coffman, progressing to irritability and aggression on Coffman's part toward her mother. Coffman bonded well, however, with her stepfather, Bill Maender. Coffman went through Catholic grammar school and public junior high school without major difficulty, but once in high school she encountered problems with grades, truancy and drugs. At one point, she ran away and stayed at the home of her boyfriend, Ron Coffman, for a couple of months; the Maenders did not know where she was. Coffman returned to her own home when she discovered she was pregnant. Their son was born after Coffman graduated from high school; the couple married and, with the baby, moved into a bungalow on Ron's parents' property. The marriage was not a happy one; Ron was mean, abused her physically and cheated on her with other women. Eventually Coffman left him, moving into an apartment and working while Ron's mother took care of the baby. Then Coffman left Missouri for California, planning ultimately to have her son with her, but Ron's parents obtained custody of the child. Bill Maender, Coffman's stepfather, testified Coffman did not abandon her son when she moved west.

Clinical Psychologist Craig Rath, Ph.D., examined Coffman and opined that Coffman's relationship with Marlow was precipitated by impaired bonding in her early life. He felt she was not malingering and discounted the possibility that she suffered from antisocial personality disorder catalyzed by Marlow.

---

[8] Clinical Psychologist Craig Rath testified the hernia impaired bonding between Coffman and her mother.

#### 4. *Prosecution's Rebuttal*

Sergeant Richard Hooper of the Huntington Beach Police Department testified that Chuck Coffman, Ron Coffman's father, told him Cynthia Coffman's personality was aggressive when he knew her in St. Louis.

## II. PRETRIAL AND JURY SELECTION ISSUES

### A. *Denial of Severance Motion*

Before and at various points during trial, each defendant unsuccessfully moved for severance. Defendants now contend the denial of their motions requires reversal of the judgment.

Section 1098 expresses a legislative preference for joint trials. The statute provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." (See *People v. Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25], affd. on other grounds *sub nom. Boyde v. California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190] [acknowledging legislative preference].) Joint trials are favored because they "promote [economy and] efficiency" and " 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' " (*Zafiro v. United States* (1993) 506 U.S. 534, 537 [122 L.Ed.2d 317, 113 S.Ct. 933].) When defendants are charged with having committed "common crimes involving common events and victims," as here, the court is presented with a " 'classic case' " for a joint trial. (*People v. Keenan* (1988) 46 Cal.3d 478, 499–500 [250 Cal.Rptr. 550, 758 P.2d 1081].)

The court's discretion in ruling on a severance motion is guided by the nonexclusive factors enumerated in *People v. Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869], such that severance may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (Fns. omitted.) Another helpful mode of analysis of severance claims appears in *Zafiro v. United States, supra,* 506 U.S. 534. There, the high court, ruling on a claim of improper denial of severance under rule 14 of the Federal Rules of Criminal Procedure, observed that severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." (*Zafiro, supra,* at p. 539; see Fed. Rules Crim.Proc., rule 14, 18 U.S.C.) The high court noted that less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice. (*Zafiro, supra,* at p. 539.)

■ A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling. (*People v. Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. (*People v. Keenan, supra,* 46 Cal.3d at p. 503 [250 Cal.Rptr. 550, 758 P.2d 1081].)

Coffman argues that several factors dictated severance of her trial from Marlow's: the antagonistic nature of their defenses, the expected introduction of Marlow's extrajudicial statements implicating her in the offenses (see *People v. Aranda* (1965) 63 Cal.2d 518, 526–527 [47 Cal.Rptr. 353, 407 P.2d 265]), and the risk of prejudicial association with the assertedly more culpable Marlow. Citing, inter alia, *Johnson v. Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981], Coffman also relies on the need for heightened reliability of the determination of guilt and penalty in a capital case. Marlow, in turn, relies on the antagonistic nature of Coffman's defense and the resultant admission of much evidence inadmissible on any theory as to him but relevant to Coffman's state of mind. As will appear, we find no abuse of discretion in the denial of defendants' severance motions.

In *People v. Hardy, supra,* 2 Cal.4th at page 168, we said: "Although there was some evidence before the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair. [Citation.] 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.'* [Citation.] If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' " We went on to observe that "although it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " (*Ibid.,* last italics added.) When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance. (*Ex parte Hardy* (Ala. 2000) 804 So.2d 298, 305.)

In this case, although Coffman's defense centered on the effort to depict Marlow as a vicious and violent man, and some evidence that would have been inadmissible in a separate guilt trial for Marlow[9] occupied a portion of their joint trial, the prosecution presented abundant independent evidence establishing both defendants' guilt. Such evidence showed that Coffman and Marlow, with Novis, came to the Drinkhouse residence around 7:30 on the evening of Novis's disappearance; Marlow indicated to Drinkhouse that they needed to get Novis's PIN in order to rob her. When Drinkhouse asked Marlow if he were crazy and complained about their bringing Novis to his house, Marlow told him not to worry, saying, "How is she going to talk to anybody if she's under a pile of rocks?" When Veronica Koppers arrived at the Drinkhouse residence a while later, Marlow told her he had someone there and "not to freak out on him." Coffman appeared to be going along willingly with Marlow's actions and did not ask for Veronica's help to escape Marlow. Marlow took Novis into the shower, and both left the house with wet hair, along with Coffman. Novis had duct tape over her mouth. Novis's apartment later was found to have been entered and her typewriter and answering machine stolen. Marlow and Coffman traded the answering machine for drugs, and Coffman, using Novis's identification, pawned the typewriter. The day after Novis's disappearance, Marlow, Coffman and Veronica Koppers returned to Paul Koppers's home; Marlow asked him if he could get any "cold," i.e., nontraceable, license plates for the car. Three days later, near a trash receptacle located behind a Taco Bell restaurant in Laguna Beach, where Coffman previously had been seen, a bag was found containing identification and other items belonging to Coffman, Marlow and Novis. Novis's car was found on November 14, 1986, abandoned on a dirt road south of Santa's Village near where Marlow and Coffman were seen walking on Big Bear Boulevard. Coffman's fingerprints were found on the license plate, hood and ashtray of the car; one print on the hood of the car was identified as Marlow's. An earring of Novis's was later found among Coffman's belongings. After defendants were arrested, Novis's body was found in a vineyard in Fontana where she had been strangled and buried. An autopsy revealed sperm in Novis's rectum. Based on the foregoing evidence, we conclude the nature of the defenses here did not compel severance.

Even were we to conclude the trial court abused its discretion in denying severance, the same independent evidence of defendants' guilt would lead us to conclude defendants have not demonstrated a reasonable probability of a more favorable outcome as to either guilt or penalty had severance been granted, as would be required for reversal. That evidence, as recited above,

---

[9] Such evidence included Coffman's recitation of the circumstances of the murder for hire of Gregory Hill in Kentucky, Marlow's alleged affiliation with the Aryan Brotherhood, his prison history and alleged killings of Black people in prison, his alleged abuse of Coffman and his threat to kill her son and family if she left him.

virtually ensured the jury would reach the verdicts it did. In severed trials, moreover, the prosecutor could have introduced evidence of the Orange County offenses to show defendants' intent in committing the crimes against Corinna Novis, further bolstering the People's case. (See Evid. Code, § 1101, subd. (b).) With respect to penalty, we note that in addition to the evidence of the Orange County and Kentucky killings, most if not all of Marlow's violent conduct as described by Coffman and other witnesses potentially was admissible under section 190.3, factor (b), as was Coffman's prior criminality involving violence. In the face of this overwhelming evidence, we see no reasonable probability of a more favorable outcome for either defendant had severance been granted.

■ We further conclude that introduction of defendants' extrajudicial statements implicating each other in the offenses did not dictate severance. Both defendants in this case took the stand and submitted to cross-examination, thus vindicating each codefendant's Sixth Amendment confrontation rights. This procedure satisfied the rule of *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and its progeny, which provides that if the extrajudicial statement of a nontestifying codefendant is to be introduced at a joint trial, either the statement must be redacted to avoid implicating the defendant or severance must be granted. (*Id.* at pp. 135–136; see *Richardson v. Marsh* (1987) 481 U.S. 200, 208–210 [95 L.Ed.2d 176, 107 S.Ct. 1702]; *Nelson v. O'Neil* (1971) 402 U.S. 622, 629–630 [29 L.Ed.2d 222, 91 S.Ct. 1723].) Although California law predating *Bruton* had required severance whenever a codefendant's extrajudicial statement implicating the defendant was to be introduced, barring effective redaction, regardless of whether the codefendant testified at trial (see *People v. Aranda, supra,* 63 Cal.2d at pp. 530–531), since the adoption by the voters in June 1982 of Proposition 8, with its preclusion of state constitutional exclusionary rules broader than those mandated by the federal Constitution (see Cal. Const., art. I, § 28, subd. (d)), the *Aranda* rule is coextensive with that of *Bruton.* (*People v. Boyd* (1990) 222 Cal.App.3d 541, 562 [271 Cal.Rptr. 738].) Consequently, the introduction of defendants' extrajudicial statements did not compel the trial court to grant severance.

We also reject Coffman's contention that severance was compelled by the factor of prejudicial association. The evidence here showed defendants both took an active role in the commission of the crimes; this is not a situation in which a marginally involved defendant might have suffered prejudice from joinder with a codefendant who participated much more actively. Nor is this a situation in which a strong case against one defendant was joined with a weak case against a codefendant.

In sum, given the prosecution's independent evidence of defendants' guilt and the trial court's carefully tailored limiting instructions, which we presume

the jury followed (*People v. Boyette* (2002) 29 Cal.4th 381, 436 [127 Cal.Rptr.2d 544, 58 P.3d 391]), even under the heightened scrutiny applicable in capital cases (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699]), we find no abuse of discretion in the denial of severance. For the same reasons, defendants' claims that the joint trial deprived them of their federal constitutional rights to due process, a fair trial and a reliable penalty determination likewise must fail.

### B. *Denial of Motion for Change of Venue*

Defendants contend the trial court erred in denying their motions for a change of venue and thereby violated various state and federal constitutional guarantees, including those of due process, a fair trial and a reliable penalty determination.

■ "The applicable principles are settled. A trial court should grant a change of venue when the defendant demonstrates a reasonable likelihood that in the absence of such relief, he or she cannot obtain a fair trial." (*People v. Weaver* (2001) 26 Cal.4th 876, 905 [111 Cal.Rptr.2d 2, 29 P.3d 103].) On appeal, "we make an independent determination of whether a fair trial was obtainable" (*People v. Jennings* (1991) 53 Cal.3d 334, 360 [279 Cal.Rptr. 780, 807 P.2d 1009]) and reverse when the record discloses a reasonable likelihood the defendant did not have a fair trial (*People v. Bonin* (1988) 46 Cal.3d 659, 672–673 [250 Cal.Rptr. 687, 758 P.2d 1217] [reasonable likelihood in this context means something less than " 'more probable than not,' " and something more than merely possible], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823 [72 Cal.Rptr.2d 656, 952 P.2d 673]). To make that decision, we examine five factors: the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the status of the defendant in the community, and the prominence of the victim. (*People v. Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640], disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676].)

At the evidentiary hearing on the venue change motion, the defense presented more than 150 articles from regional newspapers and various videos of television coverage of the case. In addition to the Novis homicide, many of the articles referred to the Orange County and Kentucky cases and an alleged contract to kill a pregnant woman in Arizona, and characterized defendants as armed and dangerous transients implicated in serial killings. Some articles recounted Marlow's criminal history and alleged ties to the White supremacist Aryan Brotherhood, and some alluded to defendants' use of methamphetamine. A few articles mentioned Coffman's Roman Catholic upbringing. Many articles referred to defendants' confessions and cooperation

with authorities. Others reported procedural developments in the Novis and Murray cases and the prosecutions of Veronica Koppers and Richard Drinkhouse on lesser charges in the Novis case. The amount of media coverage declined substantially shortly after the discovery of Novis's body.

The defense also presented testimony by two California State University, Chico, professors, Robert S. Ross, Ph.D., an expert in survey methodology, and Edward J. Bronson, Ph.D., who designed a telephone public opinion survey administered to 526 San Bernardino County residents in early 1988, some nine months before trial. The survey was designed to have a margin of error of 4.5 percent. Participants were first asked whether they recalled a November 1986 incident in which a young woman named Corinna Novis was reported missing in Redlands and her body was found a few days later in a shallow grave in a Fontana vineyard, having been sexually molested, strangled and then buried. Of the 282 participants who resided in the judicial district from which the jury in this case was drawn, 70.9 percent responded affirmatively. When provided a few additional facts, the number of participants recognizing the case increased. Over 80 percent of participants who recognized the case from the facts recited in the survey believed defendants were definitely or probably guilty.

The trial court denied the motion to change venue, noting the case had received less publicity than other cases tried without difficulty in the county of original venue. The court distinguished the prejudgments of guilt "glibly" espoused by the telephone survey participants from the "decision made by a jury sworn to abide by the law, carefully voir dired and instructed as to the law and having a tremendous sense of their responsibility for the lives of the defendants." The court found no reason to believe that prospective jurors with "irreversible" opinions as to a defendant's guilt would not disclose them on voir dire, or that jurors who had merely heard of the case could not put aside any knowledge and base their decision on the evidence and the law given to them during the trial.

Independently reviewing the relevant factors, we conclude the trial court did not err in denying the motion. The gravity of the offenses with which defendants were charged weighs in favor of a change of venue, but does not compel it. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) As for the size of the community, while arguing San Bernardino County is like a collection of small towns, defendants acknowledge the county's population is the fourth largest in the state. Venue changes are seldom granted from counties of this size. (See *People v. Fauber* (1992) 2 Cal.4th 792, 818 [9 Cal.Rptr.2d 24, 831 P.2d 249] [Ventura County].) With respect to the status of the victim and the accused, we observe that before her death Novis was not prominent, nor were defendants well known, in the

community. Although some of the media coverage of this case referred to defendants as transients, Marlow in fact had friends and relatives who lived in San Bernardino County, and he had lived in the county for a time. These factors, therefore, do not militate in favor of a venue change. The pretrial publicity, while extensive, substantially predated the trial. (*Jenkins, supra*, at p. 944.) And in the course of the actual voir dire, all of the jurors eventually seated who said they remembered hearing about the case indicated that pretrial publicity would not prevent them from acting as fair and impartial jurors. That neither Coffman nor Marlow exhausted their peremptory challenges strongly suggests the jurors were fair and that the defense so concluded. (*People v. Cooper* (1991) 53 Cal.3d 771, 807 [281 Cal.Rptr. 90, 809 P.2d 865].)

*People v. Williams* (1989) 48 Cal.3d 1112 [259 Cal.Rptr. 473, 774 P.2d 146], on which Marlow relies, is distinguishable. That case involved a county (Placer) of very small population where media coverage of the offense was continuous up to the time of trial and where the victim and her family had long and extensive ties to the community, such that a substantial proportion of prospective jurors acknowledged they knew the victim, her family and her boyfriends, and a smaller but still significant number knew the prosecutor, his investigators or deputy sheriffs who were to testify. (*Id.* at pp. 1126–1131.) Similar circumstances are not present here.

We therefore find no reasonable likelihood the denial of a change of venue deprived defendants of a fair trial or due process of law.

## C. *Restriction on Voir Dire*

Coffman contends the trial court improperly restricted death-qualification voir dire in a way that prevented her from effectively exercising challenges for cause and deprived her of her state and federal constitutional rights to due process of law, a fair trial and an impartial jury, and a reliable determination of guilt and penalty. Specifically, Coffman complains the trial court prevented her counsel from questioning the prospective jurors on their views regarding the circumstances of the case that were likely to be presented in evidence in order to determine how such circumstances might affect their ability to fairly determine the proper penalty in the event of a conviction.

Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Ochoa* (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78].) A challenge for cause may be based on the prospective juror's response when informed of facts or circumstances

likely to be present in the case being tried. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Thus, we have affirmed the principle that either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 720–721 [122 Cal.Rptr.2d 545, 50 P.3d 332]; see CALJIC No. 8.85 (7th ed. 2004).) "Our decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. (See *People v. Jenkins*[, *supra*, 22 Cal.4th at pp.] 990–991 . . . [not error to refuse to allow counsel to ask juror given 'detailed account of the facts' in the case if she 'would impose' death penalty].) In deciding where to strike the balance in a particular case, trial courts have considerable discretion." (*Cash, supra*, at pp. 721–722.)

We conclude Coffman fails to establish an abuse of discretion, in that she cites no trial court ruling precluding her from asking questions necessary to identify jurors unable to discharge their sentencing responsibility consistently with the law. Unlike in *People v. Cash, supra*, 28 Cal.4th at pages 720–722, the trial court did not categorically prohibit inquiry into the effect on prospective jurors of the other murders, evidence of which was presented in the course of the trial. Rather, the trial court merely cautioned Coffman's counsel not to recite specific evidence expected to come before the jury in order to induce the juror to commit to voting in a particular way. (See *People v. Burgener* (2003) 29 Cal.4th 833, 865 [129 Cal.Rptr.2d 747, 62 P.3d 1].) Notably, the trial court invited counsel to draft a proposed question for prospective jurors eliciting their attitudes toward the death penalty and in fact itself questioned a prospective juror whether he could weigh all the evidence before reaching a penalty determination in a case involving multiple murder. Even if counsel believed they were precluded from inquiring into a juror's ability to fairly determine penalty in such a case, Coffman failed to exhaust her peremptory challenges or to express dissatisfaction with the jury as sworn on this ground. Any error, therefore, was nonprejudicial. (*Id.* at p. 866.)

D. *Alleged Juror Bias and Ineffective Assistance of Counsel in Failing to Exercise Challenges*

Coffman argues we must reverse her conviction and sentence because four of the jurors who decided her case were biased in favor of the death penalty.

She acknowledges her trial counsel failed to challenge any of the four, either for cause or by using available peremptory challenges, and thus forfeited any appellate claim of error in the seating of those jurors. (See *People v. Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588].) She asserts, however, that she should be relieved of the consequences of counsel's inaction because they rendered ineffective assistance in this regard. On this record, we conclude her claims lack merit.

 As noted above, a prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would " ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *Wainwright v. Witt, supra*, 469 U.S. at p. 424.) A prospective juror who would be unable conscientiously to consider all of the sentencing alternatives, including, when appropriate, the death penalty, is properly subject to excusal for cause. (*People v. Jenkins, supra*, 22 Cal.4th at p. 987.) Our review of the record confirms that none of the four jurors who defendant asserts were biased would have been properly excused under this standard, as each expressed a willingness to consider all the evidence presented before reaching a decision as to penalty. Counsel therefore did not perform deficiently in not challenging those jurors for cause. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052] [claims of ineffective assistance of counsel entail deficient performance assessed under an objective standard of professional reasonableness and prejudice measured by a reasonable probability of a more favorable outcome in the absence of the deficient performance]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].) Nor can we say counsel rendered ineffective assistance in failing to exercise peremptory challenges with respect to these jurors: " 'Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249], quoting *People v. Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

### E. *Allegedly Improper Excusal of Prospective Juror B.*

Coffman contends the trial court deprived her of her state and federal constitutional rights of due process, equal protection and an impartial jury in granting a challenge for cause, joined by the prosecutor and both defendant Marlow's counsel and her own, to Prospective Juror B. Coffman further contends her counsel rendered ineffective assistance in joining in the challenge. Her contentions lack merit.

Preliminarily, respondent argues Coffman invited any error by joining defendant Marlow's challenge. As articulated in *People v. Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]: "The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake." In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. (See *People v. Catlin* (2001) 26 Cal.4th 81, 150 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Wader* (1993) 5 Cal.4th 610, 657–658 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Hardy*, *supra*, 2 Cal.4th at p. 152.) Here, Coffman's counsel did not merely acquiesce, but affirmatively joined in the challenge to Prospective Juror B., and thus cannot be heard to claim the court erred in excusing her.

█ In any event, the trial court did not err. "On appeal, we will uphold a trial court's ruling on a challenge for cause by either party 'if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 537 [127 Cal.Rptr.2d 802, 58 P.3d 931].) █ Although Coffman urges that Prospective Juror B.'s remarks were, at most, ambiguous and reflected merely hesitancy or reluctance and not outright refusal to impose the death penalty, read in context the prospective juror's comments indicated that, while she favored the death penalty as a sentence for first degree murder, she could not personally impose it owing to her religious background. Because excusal therefore was appropriate, trial counsel did not perform deficiently in joining the challenge.

### F. *Motion to Disqualify Trial Judge*

Pursuant to Code of Civil Procedure section 170.1, Coffman moved to disqualify Judge Don Turner, the superior court judge assigned to preside over her case for all purposes. That statute requires disqualification, inter alia, whenever "a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(C).) In support of the motion, Coffman's counsel, Alan Spears, declared he was a candidate for the office of San Bernardino County Superior Court judge and, as such, was running in opposition to Judge Duane Lloyd. Counsel further declared that Judge Turner was a member of the Committee for Judge Duane Lloyd, had allowed his name to be used on Judge Lloyd's campaign letterhead, and had failed to disclose to counsel his involvement in

Judge Lloyd's reelection effort. As a result of these facts, counsel alleged, Coffman reasonably might entertain a doubt that Judge Turner would be able to remain impartial in her case. Counsel further alleged on information and belief that Judge Turner was biased against him. Judge Turner filed a responsive declaration denying any such bias or grounds for disqualification, stating he "fores[aw] no difficulty in being completely impartial in the trial of this case or any other case in which Mr. Spears is involved," and noting "Mr. Spears has tried many cases (including death penalty cases) in my courtroom. I respect his ability and he is welcome in my department at any time." Judge Turner observed he had "no objections to continuing as the trial judge in this case," nor did he "object to having the case reassigned depending upon the needs of the court."

The motion was assigned to another judge of the San Bernardino County Superior Court, who denied the motion by minute order stating: "Court finds Judge Turner does not have any bias or prejudice toward Mr. Spears, nor will have in the future."

■ Coffman assigns the ruling as error in this appeal, contending it invalidates all of Judge Turner's subsequent rulings in the case and requires reversal of the judgment. She acknowledges that in *People v. Brown* (1993) 6 Cal.4th 322, 334 [24 Cal.Rptr.2d 710, 862 P.2d 710], we held that Code of Civil Procedure section 170.3[10] precludes appellate review of a ruling on a statutory motion for disqualification, but contends her *nonstatutory* claims arising under the due process clause of the Fourteenth Amendment to the federal Constitution and the Eighth Amendment's guarantee of reliability in penalty determinations in capital cases are cognizable on appeal. Respondent contends Coffman failed to articulate a due process claim below and cannot do so for the first time here.

Assuming Coffman's motion alleging judicial bias sufficiently preserved the constitutional claims she advances on appeal, or at least the due process claim (*People v. Brown, supra,* 6 Cal.4th at p. 334; see *People v. Yeoman* (2003) 31 Cal.4th 93, 133 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [objection on grounds of due process and equal protection sufficiently preserved 8th Amend. claim based on same facts]), we conclude her contention lacks merit. The allegations presented in support of her disqualification motion simply do not support a doubt regarding Judge Turner's ability to remain impartial.[11]

---

[10] Code of Civil Procedure section 170.3 provides, in pertinent part: "(d) The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding."

[11] Coffman cursorily argues that her trial counsel rendered ineffective assistance in failing to seek a pretrial writ of mandate to review the denial of her motion to disqualify Judge Turner.

G. *State Action Allegedly Interfering with Coffman's Presentation of a Defense*

Coffman contends that certain actions by the prosecution effectively dissuaded certain witnesses from testifying on her behalf, thus suppressing favorable evidence within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] and depriving her of her federal constitutional rights of compulsory process and to a reliable determination of guilt and penalty. She also contends that the San Bernardino County Superior Court denied her due process by failing to pay on time certain authorized investigative expenses, resulting in the unavailability, during the guilt phase, of witness Katherine Davis, the former wife of defendant Marlow, who would have testified about Marlow's physical and emotional abuse during their marriage.[12] Coffman raised these contentions in an unsuccessful pretrial motion to strike the special circumstance allegations against her and in a motion for new trial. She now reasserts them as a basis for reversal of the judgment. For the reasons that follow, we conclude the contention lacks merit.

As relevant to the claim that the prosecution dissuaded potential witnesses, at an evidentiary hearing on the motion to strike the special circumstance allegations, Coffman's counsel presented defense investigator Barbara Jordan's testimony to the effect that her efforts to obtain witnesses in Page, Arizona, had been hampered by disinformation Redlands Police Sergeant Larry Scott Smith had spread there. Jordan further testified that potential witness Judy Scott, who had roomed with Coffman, reported to Jordan that she felt the police had pressured her not to talk to Coffman's defense team; they told her Coffman was a lesbian and asked her how close she and Coffman were and whether Coffman had brought prostitution customers to the house when the two were living together. According to Jordan, other potential witnesses who had spoken with the police declined to speak with Coffman's investigators and treated them with hostility. Jordan stated that Scott and another witness, Debbie Pugh, denied using words or making statements attributed to them in the Redlands police reports, which omitted information exculpatory as to Coffman. Sergeant Smith acknowledged visiting Page with Detective Dalzell of the Redlands Police Department and interviewing Judy Scott; Smith testified he asked Scott if Coffman was bisexual, but elicited no information in that regard; following up on information received in Page, he also asked Scott about Coffman's possible involvement in prostitution.

Inasmuch as we conclude her motion was properly denied on the record before us, and Coffman fails to identify any additional or different basis on which counsel might have sought writ review, it follows that counsel did not render ineffective assistance in failing to do so.

[12] Davis ultimately testified regarding these matters on behalf of defendant Coffman during the penalty phase.

The trial court denied the motion, commenting: "I have seen nothing, either in the offer of proof or in the questioning of this witness, which substantiates any [allegation of improper conduct by police in relation to prospective witnesses]. All I have heard so far is that witnesses are telling somewhat different stories to different people, and you've been in this business long enough to know that that's not a novel concept."

" 'Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.] [¶] The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.]' (*In re Martin* (1987) 44 Cal.3d 1, 30 [241 Cal.Rptr. 263, 744 P.2d 374].) Threatening a defense witness with a perjury prosecution also constitutes prosecutorial misconduct that violates a defendant's constitutional rights. (*People* v. *Bryant* (1984) 157 Cal.App.3d 582 [203 Cal.Rptr. 733].)" (*People v. Hill, supra,* 17 Cal.4th at p. 835.) Due process also is violated when the prosecution makes a material witness unavailable by, for example, deportation. (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 873 [73 L.Ed.2d 1193, 102 S.Ct. 3440] [due process mandates dismissal of charges when the defendant makes a plausible showing that the deported witness's testimony would have been material and favorable to the defense, in ways not merely cumulative to the testimony of available witnesses].)

■ The record before us contains no evidence that the prosecution engaged in witness intimidation or other conduct depriving Coffman's defense of a material witness. The circumstance that a witness is reluctant to assist one side or the other of a criminal prosecution, or tells different stories to different investigators, is, as the trial court observed, far from unusual and does not, in itself, support a claim that the prosecution interfered with a defendant's right of compulsory process or suppressed material evidence within the meaning of *Brady v. Maryland, supra,* 373 U.S. 83, even if we assume *Brady* applies in this situation, where the prosecution did not control the witnesses. Consequently, the trial court committed no error in denying Coffman's motion to strike the special circumstance allegations, and reversal of the judgment is unwarranted.

Coffman also urges that the court's delay in paying investigative expenses incurred in developing her defense of battered woman syndrome deprived her of a potential witness in the guilt phase of trial, namely, defendant Marlow's former wife Katherine Davis, and thus violated Coffman's right to due process as articulated in *Ake v. Oklahoma* (1985) 470 U.S. 68, 80–83 [84 L.Ed.2d 53, 105 S.Ct. 1087]. Davis did testify in Coffman's case in mitigation during the penalty phase concerning Marlow's abusive conduct during

their marriage some years before the present offenses. Because Coffman made no offer of proof sufficient to enable us to determine that Davis would have given relevant, admissible testimony during the guilt phase, and because Coffman's argument before the trial court focused on the failure to pay the expenses of investigators for trips to such places as Missouri and Kentucky, rather than the delay in paying Davis's expenses in coming to California to testify in this trial, we cannot conclude the trial court erred in denying Coffman's motion to strike the special circumstance allegations.

III. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

### A. Introduction of Allegedly Coerced Statements

Defendants contend their convictions must be reversed because the trial court improperly allowed the prosecutor to impeach them with postarrest statements that each allegedly made involuntarily as a result of police coercion. Although the issue is close, we reject defendants' contentions and conclude the statements were voluntarily made.

### 1. Factual Background

In order to resolve this issue, we find it necessary to recite in some detail the circumstances under which the statements were given. By the time of defendants' arrest on November 14, 1986, seven days after Novis disappeared, Redlands Police Department investigators had become aware of possible connections between the Novis case and the murder of Lynell Murray in Huntington Beach. After defendants' arrest, investigators from both localities interviewed them at the Redlands Police Department.

Officers believed that in light of Marlow's criminal experience, he probably would not be forthcoming during interrogation and that Coffman, by contrast, was more likely to cooperate with them. Accordingly, they first questioned Coffman for some three and a half hours, from about 5:30 p.m. until about 9:00 p.m. During the course of this interview, officers gave Coffman coffee, cigarettes, food and socks for her bare feet. Coffman complained of a wound on her leg, but the record does not reflect that she was provided medical attention during this period. Officers also falsely told Coffman that Marlow was providing police with information and "ratting on her." At the end of this first interview, officers drove Coffman to the area of Lytle Creek, where officers believed defendants had spent time, returning to Redlands in the early morning hours of November 15. Coffman then was questioned further until she agreed to take investigators to Novis's body, which was found, pursuant to her direction, around 4:00 a.m. in a vineyard in Fontana.

Marlow, meanwhile, was questioned for over three hours, from 9:00 p.m. until after midnight. During this interrogation Marlow was provided with food and allowed to smoke. Marlow ultimately agreed to try to take officers to Novis's burial site. Marlow directed officers to the Sierra Street off-ramp in Fontana, but once there he asked that Coffman be brought to the scene so she could show the officers where the body was located. As the officers could not at that time reach Sergeant Smith, who then had custody of Coffman, they returned Marlow to the Redlands Police Department. At 8:30 the same morning, after the discovery of Novis's body, officers resumed interrogating Marlow and informed him that Coffman had told them all about the Novis and Murray homicides. During this portion of the interrogation, Marlow gave a detailed statement about both murders, as well as the Kentucky killing. A further interrogation took place two days later, on November 17.

At the outset of the interviews, defendants each were advised of and invoked their *Miranda* rights. (*Miranda, supra,* 384 U.S. 436.) Investigators nevertheless continued to question each defendant despite their repeated requests for counsel. Sergeant Fitzmaurice told Marlow, numerous times, that because he had invoked his *Miranda* rights, whatever he told officers in the course of the interrogation could not be used in court.

Ruling on defendants' motions to suppress their statements to investigators, the trial court concluded all statements had been made voluntarily and thus could properly be used for impeachment purposes under *Harris v. New York* (1971) 401 U.S. 222, 225–226 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*), despite the officers' noncompliance with *Miranda*. With respect to Coffman's motion to suppress the fruits of her statement, namely the location of Novis's body and testimony relating to its condition, after hearing evidence regarding the grave's shallowness and its proximity, in a working vineyard, to roads and a residential area, the court ruled that testimony regarding the body and its location was admissible pursuant to the doctrine of inevitable discovery.

### 2. *Legal Principles*

Recently, in *People v. Neal* (2003) 31 Cal.4th 63, 67–80 [1 Cal.Rptr.3d 650, 72 P.3d 280], we reviewed certain legal principles governing the admissibility of defendants' custodial statements. "It long has been settled under the due process clause of the Fourteenth Amendment to the United States Constitution that an involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible in a criminal proceeding. (See, e.g., *Brown v. Mississippi* (1936) 297 U.S. 278, 285–286 [80 L.Ed. 682, 56 S.Ct. 461].) In *Miranda v. Arizona*[, *supra,*] 384 U.S. 436 . . . , recognizing that any statement obtained by an officer from a suspect during custodial interrogation may be potentially involuntary because such

questioning may be coercive, the United States Supreme Court held that such a statement may be admitted in evidence only if the officer advises the suspect of both his or her right to remain silent and right to have counsel present at questioning, and the suspect waives those rights and agrees to speak to the officer. The court further held in *Miranda* that if the suspect indicates that he or she does not wish to speak to the officer or wants to have counsel present at questioning, the officer must end the interrogation. In *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] . . . , the high court held that if the suspect invokes the right to counsel, the officer may not resume questioning on another occasion until counsel is present, unless the suspect voluntarily initiates further contact. In *Harris v. New York*[, *supra*,] 401 U.S. 222 . . . , the court held that although a statement obtained in violation of *Miranda* may not be introduced by the prosecution in its case-in-chief, *Miranda* was not intended to grant the suspect license to lie in his or her testimony at trial, and thus if an ensuing statement obtained in violation of *Miranda* is voluntary, the statement nonetheless may be admitted to impeach a defendant who testifies differently at trial.

"In *People v. Peevy* (1998) 17 Cal.4th 1184 [73 Cal.Rptr.2d 865, 953 P.2d 1212], we addressed the issue whether a law enforcement officer's intentional continuation of interrogation of a defendant, in spite of the defendant's invocation of his or her right to counsel—in deliberate violation of *Miranda*—renders the statement obtained by the officer inadmissible even for impeachment purposes. We concluded that in light of the emphasis in *Harris* that *Miranda* should not be interpreted to permit a defendant to testify falsely at trial with impunity, under *Harris* the officer's misconduct in *Peevy* did not affect the admissibility of the statement as impeachment evidence. (*Id.* at pp. 1193–1194, 1203–1205.)" (*People v. Neal, supra*, 31 Cal.4th at p. 67.)

"A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . .' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*People v. Neal, supra*, 31 Cal.4th at p. 79.)

"In reviewing the trial court's determinations of voluntariness, we apply an independent standard of review, doing so 'in light of the record in its entirety, including "all the surrounding circumstances—both the characteristics of the accused and the details of the [encounter]" . . . .' " (*People v. Neal, supra*, 31 Cal.4th at p. 80.) But "we accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence." (*People v. Mayfield* (1997) 14 Cal.4th 668, 733 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

Relevant to this case, too, is the line of judicial decisions, beginning with the pre-*Miranda* decision in *People v. Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753] and finding support in the high court's decision in *New York v. Quarles* (1984) 467 U.S. 649 [81 L.Ed.2d 550, 104 S.Ct. 2626], that recognized an exception to the usual constraints on custodial interrogation in the situation where an overriding need exists to rescue persons in danger or to protect human life. In *Modesto*, the defendant was arrested on suspicion of murdering one young girl, whose body had been found, and harming another, who was missing. This court concluded that the possibility of finding a missing child alive allowed interrogation without advising the suspect of his rights to remain silent and to the assistance of counsel. (*Modesto, supra*, at p. 446.) The Court of Appeal in *People v. Dean* (1974) 39 Cal.App.3d 875 [114 Cal.Rptr. 555], involving custodial questioning of a kidnap suspect concerning a missing victim's whereabouts, concluded that the *Modesto* rule remained viable after *Miranda*. (*Dean, supra*, at p. 882.) Similarly, the Court of Appeal in *People v. Riddle* (1978) 83 Cal.App.3d 563, 574–575 [148 Cal.Rptr. 170], relied on *Modesto* in holding that *Miranda* did not preclude recognition of a limited exception to the normal rules governing custodial interrogation under exigent circumstances involving a possible threat to human life. *Riddle* held that "under circumstances of extreme emergency where the possibility of saving the life of a missing victim exists, noncoercive questions may be asked of a material witness in custody even though answers to the questions may incriminate the witness. Any other policy would reflect indifference to human life." (*Riddle, supra*, at p. 578.) Since in the *Riddle* case the court concluded the defendant's statements were voluntarily made and lawfully obtained, it found no basis on which to exclude them. (*Id.* at pp. 580–581.)

In *New York v. Quarles*, the high court recognized an analogous exception to *Miranda* in situations involving a threat to public safety. In that case, a woman approached police officers to say she had just been raped and that her assailant, who had carried a gun, had entered a nearby grocery store. Officers entered the store and confronted Quarles, who fit the woman's description of her assailant. Frisking him, an officer discovered an empty shoulder holster. After handcuffing him, the officer asked where his gun was located. Quarles nodded toward some empty cartons, saying, "The gun is over there." After retrieving a loaded .38-caliber gun from an empty carton in the area Quarles had indicated, officers read Quarles his *Miranda* rights and questioned him further following his waiver of rights. (*New York v. Quarles, supra*, 467 U.S. at pp. 651–652.) The Supreme Court reversed the state court's decision suppressing the gun and initial statement, concluding that "the need for answers to questions in a situation posing a threat to the public safety

outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*Id.* at p. 657.) The court declined to make the availability of the public safety exception turn on the subjective motivation of the particular officers involved. (*Id.* at p. 656.) The court noted that Quarles was free, on remand, to argue his statement was coerced under traditional due process standards. (*Id.* at p. 655, fn. 3.)

█ Under *New York v. Quarles* and *People v. Modesto*, the circumstances in the present case, involving the rescue of a known individual, were sufficiently exigent to place the initial interrogations, that is, those taking place before the discovery of Novis's body, outside the scope of *Miranda*. Novis had been missing for a week at the time defendants were questioned, this passage of time lessening but by no means eliminating the possibility that she remained alive. (Compare *People v. Manning* (Colo. 1983) 672 P.2d 499, 509 [police concern for rescuing child who had been missing for 14 weeks "had long since ceased to be realistic," hence rescue doctrine inapplicable].) Before the interrogation, Marlow's sister, Veronica Koppers, had told the police that Marlow previously had been known to leave individuals bound and stranded alive in rural areas. Officers did not know whether defendants had done the same with Novis, or whether she was being held in a residence or other structure somewhere. The absence of any blood or other signs of physical trauma in Novis's car supported a reasonable hope that she might be alive and justified questioning defendants despite their invocation of their *Miranda* rights. That officers employed an interrogation technique of referring to Novis alternately as dead and as still alive by no means negated the exigency, as the officers apparently sought to avoid alienating defendants and instead attempted to gain their confidence, whichever circumstance might in fact exist. Under these circumstances, the rescue doctrine applied, and statements defendants made before police discovered the victim's body, if voluntarily made, were admissible despite the officers' noncompliance with *Miranda*.

### 3. *Voluntariness of Marlow's Statements*

As noted, whether the admission of Marlow's statements violated due process depends upon whether they were voluntarily made in the totality of the circumstances. (*People v. Neal, supra*, 31 Cal.4th at pp. 79–80.) Marlow, joined by Coffman, contends his November 14 statement was involuntary because (1) his interrogator, Sergeant Fitzmaurice, ignored his nine requests to speak with an attorney; (2) Fitzmaurice repeatedly assured Marlow that nothing he said could be used in court, a promise that both rendered Marlow's statement involuntary and gave rise to estoppel or use immunity; (3) the statement was induced by a promise of better jail conditions if Marlow cooperated and a threat of worse conditions if he did not; and (4) the

police exercised a coordinated strategy of extracting statements first from Coffman and then from Marlow. We disagree: Marlow's interrogation, while prolonged, was not accompanied by a denial of all creature comforts or accomplished by means of physical or psychological mistreatment, threats of harsh consequences or official inducement amounting to coercion, nor were Marlow's admissions the product of coerced statements by Coffman.

 The record reflects that what Marlow characterizes as a promise of better jail conditions if he cooperated or a threat of worse if he did not simply amounted to Fitzmaurice's acknowledgment that the nature of the crimes of which Marlow stood accused tends to evoke negative feelings, that Marlow's cooperation could be made known to jail authorities, and that the latter might look favorably on such cooperation—all of which Marlow evidently well knew.[13] Any "coordinated strategy" of confronting Marlow with Coffman's statements violated his due process rights only if doing so actually and proximately caused him to make his admissions against his will. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240–1241 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Marlow points to no evidence in the record supporting such a conclusion; his interrogators' comments that Coffman was cooperating with them surely did not render Marlow's statements involuntary. That Sergeant Fitzmaurice repeatedly ignored Marlow's requests for an attorney does give rise to concern, but—given Marlow's maturity and criminal experience (he was over 30 years old and a convicted felon at the time of the interrogation)—it was unlikely Marlow's will was thereby overborne.

Fitzmaurice's assurances that any statements Marlow might make could not be used in court similarly raise the specter of coercion, but after independently reviewing the transcripts of the interrogation and the hearing on Marlow's suppression motion, we see no reason to disturb the trial court's determination that his statements were voluntarily made. Significantly, for a considerable period after Fitzmaurice began to assure Marlow his statements would not be used, Marlow continued to resist disclosing Novis's whereabouts or admitting he committed the offenses. His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information. Marlow's admissions followed and appeared to be precipitated by continued confrontation with the evidence authorities possessed. (Cf. *State v. Walton* (1989) 159 Ariz. 571 [769 P.2d 1017, 1025–1026] [when 45 minutes elapsed between officer's assurance that "it's nothing that can't be worked out" and the defendant's admissions, during which time officer continued to confront the defendant with known evidence, court

---

[13] Marlow repeatedly responded "Yeah" when Fitzmaurice explained the reaction jail authorities likely would have to his offenses and the beneficial impact his cooperation might have.

concluded admissions were not made in reliance on the assurance].) Moreover, Marlow was not promised leniency in exchange for admissions; rather, his interrogators advised him they had sufficient evidence to convict him without them.

 Marlow contends that under *People v. Quartermain* (1997) 16 Cal.4th 600 [66 Cal.Rptr.2d 609, 941 P.2d 788], the use of his statements in court violated due process. In *Quartermain*, this court, relying on the rationales of *Santobello v. New York* (1971) 404 U.S. 257, 262 [30 L.Ed.2d 427, 92 S.Ct. 495] (when a guilty plea rests in any significant degree on the prosecutor's promise or agreement, the promise must be fulfilled), *Doyle v. Ohio* (1976) 426 U.S. 610, 618 [49 L.Ed.2d 91, 96 S.Ct. 2240] (fundamental fairness precludes use of a defendant's post-*Miranda*-warning silence to impeach his trial testimony), and their progeny, concluded that when a prosecutor violated an agreement made with the defendant not to use his statement in any court proceedings against him, fundamental fairness required that the prosecutor honor the agreement, and under the circumstances the introduction of the statement to impeach the defendant resulted in prejudice requiring reversal of the judgment. (*Quartermain, supra,* at pp. 618–622.) We observed that the prosecutor's improper use of the defendant's statements for impeachment purposes and in closing argument, by "paint[ing] defendant as a fabulist," "struck at the heart of his defense," as to which the jury's assessment of his credibility was crucial. (*Id.* at pp. 620, 622.) Assuming the use of Marlow's statements after repeated assurances to the contrary was fundamentally unfair, here the prosecutor presented abundant other evidence of defendants' guilt, enabling us confidently to conclude the verdict was unattributable to any error in admitting the statements. (*Id.* at p. 622, citing *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078]; cf. *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1132–1133 [124 Cal.Rptr.2d 373, 52 P.3d 572] [the defendant's statement not involuntary despite circumstance that investigating officer told him it would not be used in court for any purpose].)

Marlow's further contentions that the officers' representations that any statements he might make would not be used in court estopped the prosecution to introduce them, or resulted in a kind of use immunity, are unpersuasive. The Right to Truth-in-Evidence Law (Cal. Const., art. I, § 28, subd. (d)), added to our state Constitution in 1982 when the voters passed Proposition 8, provides in pertinent part that "relevant evidence shall not be excluded in any criminal proceeding." The provision was intended to abrogate judicially created rules requiring the exclusion of otherwise admissible evidence, such as voluntary admissions. (See *People v. Macias* (1997) 16 Cal.4th 739, 749 [66 Cal.Rptr.2d 659, 941 P.2d 838]; *People v. May* (1988) 44 Cal.3d 309, 318

[243 Cal.Rptr. 369, 748 P.2d 307].) Marlow does not explain how a common law estoppel or immunity theory might avoid the stricture of this constitutional provision.

Even were we to assume, for argument's sake, the trial court erred in finding Marlow's statements were voluntarily made and thus admissible for impeachment purposes, we would conclude the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Cahill* (1993) 5 Cal.4th 478, 487 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) As respondent observes, Marlow did not challenge the prosecution's evidence that, in concert with Coffman, he kidnapped, robbed and killed Corinna Novis, and that he entered her apartment and stole several items of property; his only defense was that he lacked the intent to kill. Yet the evidence of Marlow's intent to kill, apart from his statements, was overwhelming: Marlow, with Coffman, abducted Novis and sodomized her in the shower at the Drinkhouse residence, inducing her to disclose the PIN for her bank card in order to steal her money. Marlow sought to assuage Drinkhouse's anxiety at Novis's presence in his house by saying, "How is she going to talk to anybody if she's under a pile of rocks?" Defendants equipped themselves with a shovel when they drove to the vineyard where Novis was strangled. Sufficient force was employed in the strangulation to permit the pathologist to opine a second person (such as Coffman) might have assisted Marlow in the killing, or the killer might have placed his foot on Novis's back as her face was pressed into the ground, accounting for the soil inside her mouth. On this record, it appears beyond a reasonable doubt the error, if any, did not contribute to the verdict. (*Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 119 S.Ct. 1827]; *Chapman, supra*, at p. 24.)[14]

### 4. *Voluntariness of Coffman's Statements and Admissibility of Evidence Derived Therefrom*

A similar analysis leads to the conclusion that Coffman's statements were voluntary and thus properly admitted. Although Coffman's interrogation was lengthy and officers ignored her requests for an attorney, they provided her with food and coffee, allowed her a cigarette, and brought her socks and other clothing after she complained of feeling cold. Although officers did not immediately provide medical attention for Coffman's leg wound, the injury, approximately two weeks old at the time, clearly was not as serious as that in *Mincey v. Arizona* (1978) 437 U.S. 385, 399–402 [57 L.Ed.2d 290, 98 S.Ct. 2408], in which the high court held that statements resulting from the repeated interrogation of a hospitalized suspect suffering from a gunshot

---

[14] As we have rejected Marlow's contention that his statements were erroneously admitted, it follows that we reject the related claim that his trial counsel rendered ineffective assistance in failing to assert, as bases for their exclusion, the same arguments unsuccessfully advanced on this appeal in support of the same contention.

wound were involuntary. Coffman's admissions occurred after repeated confrontation with the known evidence. She contends that investigators improperly threatened to have her child removed from his home in Missouri, but since she rejected the factual possibility their suggestion clearly had no coercive effect on her. Coffman also contends the officers induced her to involuntarily admit her guilt by falsely telling her Marlow had incriminated her and by making promises of assistance.[15] What the officer meant in asserting he would "help" Coffman is unclear, but we are unpersuaded his comments constituted a promise of leniency that rendered her subsequent statements and conduct involuntary.

The scenario here differs from *Collazo v. Estelle* (9th Cir. 1991) 940 F.2d 411, on which Coffman relies. There, the federal court of appeals found reversible error in the admission of a confession obtained after an interrogating officer attempted to discourage a suspect from talking with a lawyer by predicting a lawyer would direct him not to speak with the police and "it might be worse" for the suspect. (*Id.* at pp. 414, 416, 420.) Here, the officers—questioning Coffman in the midst of authorities' efforts to locate Novis—did not hint she would receive harsher treatment if she failed to cooperate.

Moreover, Coffman continued for a considerable period to resist the officers' requests that she tell them where Novis could be found. Rather than threaten Coffman, interrogators attempted by various techniques to appeal to her sense of moral integrity and any possible sympathy or sensitivity she might have toward the victim's family. The record supports the conclusion that Coffman's statements were the product of her own free will.

Even were we to conclude otherwise, i.e., that the trial court erred in finding Coffman made her statements voluntarily, the record contains overwhelming evidence of her guilt. Specifically, the testimony of Richard Drinkhouse and Veronica Koppers supported the conclusion that Coffman willingly participated in the offenses; Harold Brigham testified Coffman was the person who pawned the stolen typewriter using Novis's identification; Victoria Rotstein placed Coffman near the location where identification belonging to Coffman, Marlow and Novis was found several days after the offenses; and Coffman's (along with Marlow's) fingerprints were found on Novis's car. Any error in the admission of Coffman's statements therefore did not, beyond a reasonable doubt, contribute to the verdict. (*Neder v. United States, supra,* 527 U.S. at p. 15.)

---

[15] In particular, Coffman cites the following portion of the interrogation: "[Detective Smith]: 'Look at me, girl, come here, hey. Are you gonna help me? That's all I want and I'll help you.' [¶] [Coffman]: (Softly sobbing and sniffing.) [¶] [Detective Smith]: 'Hey, I'll help you okay? Fair enough? Is it fair enough I'm giving you a commitment on my part, okay?' "

 Coffman further contends the discovery of Novis's body and the evidence derived from it were the product of her coerced statements and should have been excluded. Having concluded Coffman's statements were voluntarily made, we further conclude the fruits of those statements were properly admitted. Moreover, even had the statements been involuntary, the trial court properly ruled the physical evidence was admissible under the doctrine of inevitable discovery, which recognizes that if the prosecution can establish by a preponderance of the evidence that the information inevitably would have been discovered by lawful means, then the exclusionary rule will not apply. (*Nix v. Williams* (1984) 467 U.S. 431, 443–444 [81 L.Ed.2d 377, 104 S.Ct. 2501].) This is so because the rule is intended to ensure that the prosecution is not placed in a better position than it would have been had no illegality occurred; the rule does not require it be put in a worse one. (*Ibid.*) Novis's body lay, partially exposed, in a shallow grave in a working vineyard near a residential area. Investigators found evidence that bicycles and horses had been ridden nearby. On these facts, the trial court reasonably could find that Novis's body ultimately would have been found regardless of defendants' statements.

### 5. *Failure to Instruct Regarding Impeachment Use of Defendants' Admissions*

When defendants' extrajudicial statements were admitted into evidence, the trial court gave the jury no instruction limiting their use to impeachment of defendants' credibility. Among the instructions the trial court read at the close of the guilt phase was CALJIC No. 2.13, which informs the jury that a witness's prior inconsistent statements may be considered not only as they bear on the witness's credibility, but also as evidence of the truth of the facts as stated by the witness on the prior occasion. Marlow, joined by Coffman, contends the trial court erred in failing to instruct the jury, sua sponte, that statements taken in violation of *Miranda* could be used only for impeachment purposes under the rule of *Harris v. New York, supra*, 401 U.S. 222. They argue that the court's giving of CALJIC No. 2.13 resulted in the jury's improper use of the statements as substantive evidence of guilt.

 In *People v. Nudd* (1974) 12 Cal.3d 204, 209 [115 Cal.Rptr. 372, 524 P.2d 844], overruled on other grounds in *People v. Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272], this court declined to impose on trial courts a sua sponte obligation to give a limiting instruction when admitting *Miranda*-violative statements for impeachment purposes. Marlow, however, contends *Nudd* is, in this respect, no longer good law in light of *Richardson v. Marsh, supra*, 481 U.S. at pages 206–207, in which the high court in dictum observed that "in [*Harris v. New York, supra*, 401 U.S. 222], we held that statements elicited from a defendant in violation of

[*Miranda, supra*, 384 U.S. 436], can be introduced to impeach that defendant's credibility, even though they are inadmissible as evidence of his guilt, *so long as the jury is instructed accordingly*." (Italics added.) The Courts of Appeal have been divided on the question whether such a sua sponte instructional obligation exists. (Compare *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1088–1091 [37 Cal.Rptr.2d 712] [no sua sponte obligation] with *People v. Duncan* (1988) 204 Cal.App.3d 613, 620–622 [251 Cal.Rptr. 355] [imposing sua sponte duty].) Recently, however, in *People v. Gutierrez, supra*, 28 Cal.4th at page 1134, this court rejected a claim that the admission for impeachment of a defendant's *Miranda*-violative statement, without a limiting instruction and notwithstanding the giving of CALJIC No. 2.13, constituted error. The same conclusion obtains here.[16]

### B. *Admission of Evidence That Marlow Requested an Attorney During Police Questioning*

Marlow contends his constitutional rights to counsel and to due process of law were infringed when he was cross-examined by the prosecutor and by Coffman's counsel regarding his request for counsel before police questioning, and when the prosecutor, on rebuttal, examined Sergeant Fitzmaurice concerning the same subject. The contention was forfeited for appellate purposes by the lack of a contemporaneous objection. (*People v. Crandell* (1988) 46 Cal.3d 833, 879, fn. 14 [251 Cal.Rptr. 227, 760 P.2d 423], abrogated on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364 [121 Cal.Rptr.2d 580, 48 P.3d 1136].) Were we nevertheless to consider the merits, we would conclude that although the question is close, any error was harmless. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

The challenged questioning went as follows:

"[Prosecutor:] Q. . . . . It's true that when the police first talked to you they read you your *Miranda* rights, correct?

"[Marlow:] A. I believe so.

---

[16] Marlow also contends his trial counsel rendered ineffective assistance in failing to request that the jury be instructed to consider the *Miranda*-violative statements only for impeachment purposes. To the extent the statements were properly admitted under the rescue doctrine, they could be considered as substantive evidence of guilt as well as for impeachment, although the prosecutor apparently did not seek to introduce them as substantive evidence. (See *Dickerson v. United States* (2000) 530 U.S. 428, 441 [147 L.Ed.2d 405, 120 S.Ct. 2326] [describing the *Quarles* rule (*New York v. Quarles, supra*, 467 U.S. 649) as an exception to the *Miranda* rule].) In any event, because the record on appeal sheds no light on why counsel failed to request such an instruction, and this is not a case in which there could be no satisfactory explanation, the claim of ineffective assistance should be raised in the context of a habeas corpus petition. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

"[Prosecutor:] Q. Well, you asked for a lawyer, didn't you?

"[Marlow:] A. It's been a long time. [¶] I—we went to court a lot of times talking about me asking for a lawyer.

"[Prosecutor:] Q. Okay. Do you remember whether you asked them for a lawyer when you were read your *Miranda* rights?

"[Marlow:] A. I believe I did.

"[Prosecutor:] Q. They ignored that, right?

"[Marlow:] A. I think so."

On recross-examination, Coffman's attorney, Spears, asked Marlow: "But are you able to reconcile how on the one hand you were screwed up on drugs, and how on the other hand you had the sense to ask for a lawyer during the questioning?" Marlow responded: "I couldn't explain it to you, Mr. Spears."

Spears went on to ask: "One of the first things that happened was that you got what's called the *Miranda* advisal; is that correct?" Marlow answered: "I believe so." Spears: "And right after getting that advisal, you told the police that you needed to get hold of a lawyer. You made a request for counsel, didn't you?" Marlow: "If it says I did, I did." After Spears pointed out where, in the transcript of the interrogation, Marlow had requested counsel, he continued: "Do you remember making a subsequent or another request for a lawyer?" When Marlow answered negatively, Spears cited another instance in the interrogation when Marlow said he needed to talk to a lawyer.[17]

Finally, in rebuttal, the prosecutor asked Sergeant Fitzmaurice whether, at the start of Marlow's interview, he had read Marlow his *Miranda* rights and elicited the fact that Marlow had expressed a wish to see an attorney before questioning.

 As we said in *People v. Crandell, supra*, 46 Cal.3d at page 878: "*Wainwright v. Greenfield* [(1986)] 474 U.S. 284 [88 L.Ed.2d 623, 106 S.Ct. 634], concerned a prosecutor's argument to the jury that the defendant's repeated refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension inconsistent with the defendant's claim of insanity. This argument was held to be a denial of federal due

---

[17] During this portion of the cross-examination, Marlow's counsel, Craig, objected several times on grounds of relevancy and as going beyond the scope of the direct examination, but did not assert the impropriety of references to Marlow's request for counsel.

process rights under the reasoning of *Doyle v. Ohio*[, *supra*,] 426 U.S. 610 . . . . [¶] *Wainwright* and *Doyle* are founded on the notion that it is fundamentally unfair to use post-*Miranda* silence against the defendant at trial in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. (*Wainwright v. Greenfield, supra,* 474 U.S. at p. 295].) A similar process of reasoning supports the conclusion that comment which penalizes exercise of the right to counsel is also prohibited. (*People v. Fabert* (1982) 127 Cal.App.3d 604, 610–611 [179 Cal.Rptr. 702]; *People v. Schindler* (1980) 114 Cal.App.3d 178, 188–189 [170 Cal.Rptr. 461].)"

Counsel for a codefendant, like the prosecutor, is bound by this principle and thus is precluded from commenting on the defendant's assertion of the right to counsel. (See *People v. Hardy, supra,* 2 Cal.4th at p. 157 [applying related rule of *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229], barring comment by the codefendant's counsel on the defendant's failure to testify].)

Respondent argues that the questioning quoted above was aimed, at least in part, not at suggesting Marlow's guilt but instead at showing that during his interrogation his faculties were unclouded, contrary to his testimony that he was mentally impaired due to drug usage. Respondent further contends that a defendant who testifies waives the privilege against self-incrimination and is subject to cross-examination on all relevant matters, of which Marlow's mental status during police questioning was one. Respondent also asserts that *Wainwright v. Greenfield* does not preclude examination pertaining to the defendant's demeanor and behavior, suggesting that the challenged questioning may be so characterized. These arguments, which are unsupported by citation to any factually similar cases, are not persuasive. *Wainwright* characterized as *Doyle v. Ohio*'s primary rationale the avoidance of the fundamental unfairness that flows from the state's breach of the implied assurances contained in the *Miranda* warning, stating broadly: "What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." (*Wainwright v. Greenfield, supra,* 474 U.S. at p. 295.) Coffman's attorney directly probed the inconsistency between Marlow's claim of drug-related impairment and his assertion of his right to counsel during questioning; the prosecutor's cross-examination was not so focused, but instead seemed to address Marlow's refusal to help officers find Novis. The questions by Coffman's counsel and the prosecutor, although apparently aimed at different objects, each made evidentiary use of Marlow's assertion of the right to counsel and thus violated *Wainwright*.

Even were the prosecutor's questions somehow indirectly aimed at addressing Marlow's mental state at the time of the interrogation, here other

evidence (such as officers' personal observations) surely would have been directly probative of Marlow's demeanor and behavior without the necessity of penalizing Marlow's assertion of his right to counsel. (*Wainwright v. Greenfield, supra,* 474 U.S. at p. 295 ["the State's legitimate interest in proving that the defendant's behavior appeared to be rational at the time of his arrest could have been served by carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel"]; cf. *People v. Crandell, supra,* 46 Cal.3d at pp. 878–879 [prosecutor referred to the defendant's invocation of right to counsel "primarily as a point of reference within the taped interview to assist the jury in locating an area where the prosecution believed that the *tone* of defendant's statements . . . appeared to be inconsistent with defendant's statements about the events of the preceding night and about his relationships with the two decedents"].)

As in *People v. Crandell, supra,* 46 Cal.3d 833, however, "if the remarks had the objectionable effect of drawing the jury's attention to the exercise of protected rights," the verdicts were certainly not affected by this " 'brief and mild reference' " and, in view of the overwhelming evidence, any error was harmless beyond a reasonable doubt. (*Id.* at p. 879.) Thus, even assuming Marlow had properly preserved this claim for appeal, any error flowing from questioning him about his invocation of his right to counsel was harmless. Moreover, this lack of prejudice defeats Marlow's claim that counsel rendered ineffective assistance in failing to object.

### C. *Alleged Massiah Error*

Coffman contends her statements to jailhouse informant Robin Long, including her admissions that she had gotten into the shower with Novis and Marlow, that Novis was still alive when Marlow and Coffman went to her apartment to find her PIN, and that Novis had to be killed because they could not leave any victims alive, were obtained in violation of her right to counsel and thus improperly admitted over her motion to suppress.[18] She further contends Long's testimony infected the sentencing process with unreliability, in violation of the Eighth Amendment to the federal Constitution. As will appear, Coffman's contentions lack merit because she fails to demonstrate that the government did anything more than accept information that Long elicited from Coffman on her own initiative.

In *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], the high court held that once a judicial proceeding has been

---

[18] Coffman also contends (pt. III.D., *post,* at pp. 68–69) that the presentation of Long's testimony in rebuttal, rather than in the prosecution's case-in-chief, was improper and resulted in a denial of due process.

initiated against an accused and the Sixth Amendment right to counsel has attached, any statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant. (*Id.* at pp. 206–207; *In re Neely* (1993) 6 Cal.4th 901, 915 [26 Cal.Rptr.2d 203, 864 P.2d 474].) To prevail on a *Massiah* claim, a defendant must show that the police and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364, 106 S.Ct. 2616]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1007.) "Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements." (*Neely, supra,* at p. 915.) The requirement of agency is not satisfied when law enforcement officials "merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance." (*Ibid.*) A preexisting arrangement, however, need not be explicit or formal, but may be inferred from evidence of the parties' behavior indicative of such an agreement. (*Ibid.*) ▮ A trial court's ruling on a motion to suppress informant testimony is essentially a factual determination, entitled to deferential review on appeal. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247–1248 [69 .Cal.Rptr.2d 784, 947 P.2d 1321].)

During the hearing on Coffman's motion to suppress statements she made to Robin Long while Long was in jail on a parole violation, San Bernardino County Deputy Sheriff Bobbi New testified officials were aware of Long's practice, while in custody, of engaging in mock fortunetelling with playing cards as a means of eliciting from incarcerated suspects statements that Long would then communicate to law enforcement officials. New testified that Long was placed in protective custody, where she met and talked with Coffman, for reasons other than her alleged status as a police agent. (According to Long's later testimony, because of a prior child endangerment charge she was placed in protective custody whenever she was incarcerated.) Long's parole agent, Frank Mamone, testified at the same hearing that no official had contacted him to arrange any deal for Long's testimony or to change her parole status, and that Long had been released around February 6, 1987, as a normal procedure due to the minor nature of her parole violation (absconding and failing to report to her parole agent). Long herself testified she wanted to learn the details of Coffman's case because two of Long's friends had been murdered and she wondered if there was a connection between those killings and Coffman's case. Long also testified she did not like being incarcerated and acknowledged she had given information to authorities in an unrelated case in order to get out of jail, but insisted she had been promised nothing in

connection with the present case and her testimony would have no bearing on how long she would spend in custody on her current parole violation.

Coffman essentially argues that because Long was a known informant, the circumstance that she was housed near Coffman compels the inference that she was a police agent. The trial court reasonably concluded otherwise, given the testimony showing Long had acted on her own initiative and the absence of any evidence that authorities had encouraged her to supply information or insinuated that to do so would be to her benefit, or that her release from jail was other than in the normal course for a minor parole violation. Consequently, the admission of Long's testimony did not violate Coffman's Sixth or Eighth Amendment rights.

### D. *Long's Testimony as Assertedly Improper Rebuttal*

Coffman contends that Long's testimony was improper rebuttal because it failed to contradict particular elements of the defense case. Instead, she argues, it merely supported a conviction generally and thus should have been presented in the prosecution's case-in-chief. She contends the error violated her state and federal constitutional rights to effective assistance of counsel, against self-incrimination, to a fair trial, to confrontation, to nonarbitrary and reliable determinations of guilt, death eligibility and penalty, and to present a defense. She further contends the error constituted an arbitrary denial of a state-created liberty interest and thus violated her federal due process rights. She acknowledges her trial counsel failed to object to the order of proof, thus forfeiting the issue for appellate review, but contends this omission represents ineffective assistance of counsel.

On the merits, Coffman's argument is unpersuasive. The order of proof rests largely in the sound discretion of the trial court, and the fact that the evidence in question might have tended to support the prosecution's case-in-chief does not make it improper rebuttal. (*People v. Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659], disapproved on another ground in *People v. Ray* (1975) 14 Cal.3d 20, 29–30 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People v. Warner* (1969) 270 Cal.App.2d 900, 906 [76 Cal.Rptr. 160]; Evid. Code, § 320; Pen. Code, §§ 1093, subd. (d), 1094.) It is improper for the prosecution to deliberately withhold evidence that is appropriately part of its case-in-chief, in order to offer it after the defense rests its case and thus perhaps surprise the defense or unduly magnify the importance of the evidence. Nevertheless, when the evidence in question meets the requirements for impeachment it may be admitted on rebuttal to meet the evidence on a point the defense has put into dispute. (*People v. Harrison* (1963) 59 Cal.2d 622, 629 [30 Cal.Rptr. 841, 381 P.2d 665].) Because Coffman testified she had nothing to do with what happened in the shower

between Marlow and Novis and denied knowing that Marlow had killed Novis in the vineyard, the prosecutor was entitled to rebut her testimony with prior inconsistent statements and admissions to Long. Because an objection would not have been well taken, counsel did not render ineffective assistance by failing to make one.

### E. Marlow's Invocation of the Fifth Amendment

Both defendants challenge the propriety of the process by which Marlow, on cross-examination after his direct testimony in rebuttal to Coffman's testimony, as described below, invoked his privilege against self-incrimination some 44 times when questioned about the Orange County crimes. Respondent acknowledges error occurred, but argues neither defendant suffered any prejudice thereby. Marlow also contends that comment by the prosecutor and Coffman's counsel in their respective closing arguments concerning his failure to testify about the Orange County offenses violated his privilege against self-incrimination and the rule in *Griffin v. California, supra,* 380 U.S. 609.

#### 1. Factual Context

We first place these contentions in context. Before trial, the prosecutor informed the court and defendants that he would not seek to introduce evidence of the Orange County offenses against Lynell Murray. Accordingly, neither in his opening statement nor in his case-in-chief did he refer to or present evidence of those crimes. In Coffman's counsel's opening statement and Coffman's testimony; however, she informed the jury about the Orange County killing. The trial court instructed the jury that Coffman's testimony about the Orange County offenses was being admitted only to show Coffman's state of mind and was not to be considered as evidence against Marlow, either as reflecting on his character or as demonstrating a probability that he committed the San Bernardino County offenses.

After Coffman rested, Marlow testified in rebuttal. Just before Marlow took the stand, his counsel sought a ruling precluding cross-examination on the Orange County crimes. The trial court declined to make a ruling at that time. During the course of Marlow's direct examination, his counsel asked him if he had intended to kill Novis. Marlow denied so intending. When his counsel asked him if Novis was still alive at the point when, after choking her, he laid her on the ground in the vineyard, Marlow replied: "I know she was alive. I didn't want to kill her *or anybody else.*" (Italics added.) Just before the start of cross-examination, the court held an in limine hearing on the scope of the proposed cross-examination. The prosecutor argued that Marlow's response

as quoted above opened the door to cross-examination on the Orange County homicide. Marlow's counsel contended his client's answer was nonresponsive and ambiguous as to what incident he was referring to and that he retained a privilege to refuse to answer questions relating to the Orange County homicide.

The trial court noted that although defendants were currently on trial only for the charged offenses against Novis, Coffman's defense had raised the issue of her relationship with Marlow in an effort to show she acted only under duress and coercion; and Marlow, for his part, had testified to the contrary, namely, that he had not manipulated her, she had manipulated him. The Orange County crimes, the court believed, were highly relevant to the nature of defendants' relationship in connection with the murder of Novis. And, said the court, because Marlow had denied having the intent to kill anybody at any time, the People had "the right to show the relationship in connection with this other murder in Orange County."

Thereafter, Coffman's counsel cross-examined Marlow, asking him various questions about his actions in Orange County. Rather than answer, Marlow stated he was "taking the Fifth" on those questions. Finally, Coffman's counsel asked the court to direct Marlow to answer, stating, "[W]e've had a ruling on that and this is an area I am seemingly entitled to probe." The court disagreed: "The ruling is you could ask questions. I didn't rule on whether or not he could take the 5th Amendment. That issue was not raised." In further discussion outside the presence of the jury, Marlow's counsel clarified that "[Marlow] is not testifying on my advice because he has not come to trial and will not come to trial in Orange County until these proceedings are concluded." The court stated: "[I]n any event, the court has to honor his reliance upon his Fifth Amendment privilege not to testify concerning the Orange County thing. [¶] That was not gone into at all on his direct. [¶] It is true that there are a lot of overlapping things, such as intent to kill, which flow from one case to the next that give the District Attorney a great interest in inquiring into the details of that case. [¶] But there is no way you can force him to answer as against his reliance on the Fifth Amendment." The prosecutor responded: "I know we can't force him to answer. You could instruct him to. I know it wouldn't do any good. We have no control over him, but you legally, as you know, can instruct him that he is required to answer." The court answered: "Yes. I think in view of the fact that he does have a trial pending in Orange County and he has avoided that testimony on the stand here, justice requires that we honor his Fifth Amendment privilege." The court continued: "[A]s a practical matter we all know that taking the Fifth Amendment in view of all the evidence that's come out in this case is a tacit admission to the jury that the worst is true. [¶] And since nobody is trying to convict him of the Orange County case, why, we don't have the problems of the burden of proof. [¶] So far as the information which the jury

will—whether we like it or not, consider his refusal to answer is one of the things which is in their heads. [¶] They will be instructed very carefully not to consider that, but it's—." The prosecutor responded: "I'm not sure taking the Fifth this way isn't something they shouldn't be able to consider. That's part of what I'm trying to make my point. [¶] Procedurally, will the court at least permit me to force him to take the Fifth on these issues?" The court acknowledged the prosecutor was "entitled to get his answer."

Before the jury, the prosecutor asked a succession of questions to which Marlow responded with an assertion of his Fifth Amendment privilege. After the 27th such assertion, the court interjected: "I'd better clarify the record on that, counsel. Mr. Marlow, when you say I have to take the Fifth on that, are you intending to say that you refuse to answer the question on the ground that the answer may tend to incriminate you?" Marlow responded in the affirmative. The court then told the jury: "The record may show that when the defendant refers to taking the Fifth, he is in effect stating that he refuses to answer the question on the ground that the answer may tend to incriminate him. [¶] On that basis, he does not have to answer the question." The court also informed the jury that the questions as to which Marlow asserted a privilege were not themselves evidence and were not to be considered as such. The court later instructed jurors with CALJIC No. 2.25, directing them to draw no adverse inference from Marlow's invocation of the privilege.

## 2. *Marlow's Contentions*

Marlow contends the trial court erred in permitting any cross-examination concerning the Orange County offenses because no evidence had been admitted against him, and he had not testified, concerning that incident. Marlow further contends that once the trial court ruled his invocation of the privilege against self-incrimination regarding the Orange County crimes was proper, it erred in requiring him to assert the privilege in front of the jury and informing the jury that he did so each time because the answer would tend to incriminate him. (See *People v. Mincey* (1992) 2 Cal.4th 408, 440–442 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Finally, the instruction advising the jury to draw no adverse inference from Marlow's invocation of the privilege did not, he contends, eliminate the prejudice stemming from these circumstances. Respondent contends Marlow waived his Fifth Amendment privilege as to the Orange County crimes by testifying, on direct examination, that he did not want to kill "anybody," inferentially including Lynell Murray, and that he therefore actually no longer had a privilege to assert before the jury. Consequently, respondent urges, Marlow received the benefit of an instruction (CALJIC No. 2.25, telling the jury to draw no adverse inference from the assertion of the privilege) to which he was not entitled. Moreover, respondent

points out, the jury was instructed regarding the limited purpose of evidence of the Orange County murder, an offense for which he was not on trial in the present proceeding.

We conclude that Marlow's direct examination response denying he ever wanted to kill Novis "or anybody else" did "open the door" to questioning regarding the Orange County murder, and the trial court abused its discretion in implicitly ruling to the contrary. "A defendant who takes the stand to testify in his own behalf waives the privilege against self-incrimination to the extent of the scope of relevant cross-examination. [Citations.] 'It matters not that the defendant's answer on cross-examination might tend to establish his guilt of a collateral offense for which he could still be prosecuted.' " (*People v. Thornton* (1974) 11 Cal.3d 738, 760–761 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1], and abrogated on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 234 [83 Cal.Rptr.2d 533, 973 P.2d 512]; *Jenkins v. Anderson* (1980) 447 U.S. 231, 236, fn. 3 [65 L.Ed.2d 86, 100 S.Ct. 2124].) "None of [the] fundamental principles [underlying the rule precluding the prosecution from cross-examining a testifying defendant beyond the scope of direct examination, upon the case generally] . . . imply that when a defendant voluntarily testifies in his own defense the People may not fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People v. Schader* (1969) 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841]; see also *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331, 1340–1341.) In the context of the trial, following Coffman's testimony that Marlow killed Murray, Marlow's testimony denying he wanted to kill "anybody" reasonably would have been understood as referring to Murray, and it would have been unfair not to permit Coffman and the prosecutor to amplify it. Cross-examination of Marlow concerning the events in Orange County, we conclude, thus was relevant and proper, and his purported assertion of the privilege was ineffective.[19] From this conclusion it follows that the trial court did not commit *Griffin* error (see *Griffin v. California, supra,* 380 U.S. 609) in explaining to the jury the meaning of Marlow's purported assertions of the

---

[19] Marlow contends the prosecutor's questioning concerning the events in Orange County was undertaken in bad faith because, following his assertion of the privilege, the prosecutor failed to call witnesses to prove he did intend to kill Lynell Murray. (*People v. Chojnacky* (1973) 8 Cal.3d 759, 766 [106 Cal.Rptr. 106, 505 P.2d 530].) But not only did Marlow fail to object on this basis at trial, he does not suggest such proof was lacking, and how he might have been prejudiced by the prosecutor's nonpresentation of the proof at this stage of the trial is difficult to conceive.

privilege. The trial court should not then have instructed the jury with CALJIC No. 2.25, or perhaps, on request, should have stricken Marlow's direct testimony regarding his lack of desire to kill anybody. Nevertheless, we see no reasonable probability of a more favorable outcome in the absence of these irregularities, for Marlow was not charged in this proceeding with the Orange County offenses, and we presume the jury followed the instruction to draw no adverse inferences from his assertion of the privilege. (*People v. Boyette, supra*, 29 Cal.4th at p. 436.)[20]

Marlow further contends that both the prosecutor and Coffman's counsel violated his right against self-incrimination by commenting, in their respective summations, on his failure to testify about the Orange County homicide. (*Griffin v. California, supra*, 380 U.S. 609; *People v. Hardy, supra*, 2 Cal.4th at p. 157 [*Griffin* rule applies to comment by codefendant as well as prosecutor].) Specifically, the prosecutor commented: "Now the abduction out of that cleaners—and we have only heard Miss Coffman's version of it—is that they are starting to be a good team." Coffman's counsel stated: "When you compare what Miss Coffman did, and starting at the beginning and recounting and answering questions, to what Mr. Marlow did, including picking and choosing what he wanted to talk about, I think that the differences are very extreme. [¶] And I offer that as a suggestion to you. [¶] I do not want to suggest that by exercising his right under the Fifth Amendment, that for that reason, you should disregard Mr. Marlow's testimony, because instruction 2.25 indicates that a person has a right to rely on that." Finally, in his penalty phase closing argument, Coffman's counsel stated: "Greg Marlow never told the police anything about Lynell Murray. And he took the Fifth Amendment, as I remember, here in court when he was asked about what occurred in Orange County."

---

[20] Marlow contends his trial counsel rendered ineffective assistance in failing to object to the trial court's insistence that Marlow assert his Fifth Amendment privilege in front of the jury. Although permitting the jury to learn that a witness has asserted his Fifth Amendment privilege generally serves no legitimate purpose (*People v. Cudjo* (1993) 6 Cal.4th 585, 619 [25 Cal.Rptr.2d 390, 863 P.2d 635]), we have concluded that Marlow in fact waived his privilege, insofar as the Orange County homicide was concerned, by denying any wish to kill anybody. Marlow further contends counsel rendered ineffective assistance in failing to object to the trial court's informing the jury that, each time Marlow asserted the privilege, it was because his answer would tend to incriminate him. Of course, given our conclusion that Marlow waived his privilege, the jury properly could have drawn adverse inferences from his refusal to answer. That counsel's failure to object deprived Marlow of the chance to have the trial court make an error in his favor does not constitute prejudice within the meaning of *Strickland v. Washington, supra*, 466 U.S. 668. (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 369–371 [122 L.Ed.2d 180, 113 S.Ct. 838].)

Marlow also contends that any beneficial result of the giving of CALJIC No. 2.25 with respect to his responses to cross-examination concerning the Orange County offenses was negated by the instruction on adoptive admissions, CALJIC No. 2.71.5. The latter instruction, however, expressly applies only to offenses for which the accused is currently on trial and thus has no direct bearing on the issue under discussion.

 Marlow forfeited any appellate challenge to the foregoing comments by failing to make a contemporaneous objection at trial or to ask that the jury be appropriately admonished. (*People v. Memro* (1995) 11 Cal.4th 786, 873–874 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) As he contends counsel's failure to do so constitutes ineffective assistance, we turn to the merits of the claim. Because Marlow's direct testimony that he did not want to kill "anybody" opened the door to cross-examination concerning the Orange County offenses, as discussed above, the Fifth Amendment no longer shielded him from cross-examination thereon, and both the prosecutor and his codefendant's counsel were free to comment on his silence or failure to explain the evidence. (See *Jenkins v. Anderson, supra,* 447 U.S. at p. 236; *People v. Schader, supra,* 71 Cal.2d at pp. 770–771; Pen. Code, § 1127; Evid. Code, § 413.) Moreover, the remarks by Coffman's counsel seem aimed not at implying that Marlow's failure to testify concerning Orange County signaled his guilt, but rather at suggesting Coffman's credibility was comparatively strong because she took the stand and submitted to cross-examination. In any event, brief and mild references to a defendant's failure to testify, unaccompanied by any suggestion that the jury should draw an inference of guilt from it, are, like the comments Marlow cites, generally held to be harmless. (*People v. Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250].) We see no reason to reach a different conclusion here.

### 3. *Coffman's Contentions*

Coffman contends the prosecutor's cross-examination causing Marlow to invoke, in front of the jury, his privilege against self-incrimination regarding the Orange County crimes, and the prosecutor's closing argument urging the jury to find both defendants guilty on the basis of Marlow's testimony, improperly invited the jury to infer *her* guilt and thus deprived her of state and federal constitutional rights, including those to confrontation, due process and a fair trial. Coffman's argument is curious, for absent her testimony about the events in Orange County, the Murray homicide would not have been mentioned in the guilt phase of this trial; Marlow then never would have had occasion to assert his privilege in this connection, *as he did, moreover, 11 times in response to cross-examination by Coffman's counsel,* in addition to numerous instances during cross-examination by the prosecutor. In any event, we conclude any error in Marlow's cross-examination was harmless as to Coffman; the jury was instructed, whether or not appropriately, with CALJIC No. 2.25, and instructed that questions themselves are not evidence. Presumably, therefore, the jury did not infer that Marlow was effectively admitting every incriminatory fact about which her counsel and the prosecutor asked him. We further conclude the portion of the prosecutor's closing argument

that Coffman contends was *Griffin* error[21] (see *Griffin v. California, supra,* 380 U.S. 609; *People v. Hardy, supra,* 2 Cal.4th at p. 154) is reasonably understood not as a request to infer that Coffman was guilty because Marlow had asserted his Fifth Amendment privilege, but as fair comment on the evidence as it related to Coffman.

## F. *Admission of Jailhouse Correspondence*

Overruling Coffman's objection on grounds of Evidence Code section 352, the trial court granted Marlow's motion to admit into evidence seven letters Coffman wrote to him while both were incarcerated before trial. Coffman contends the court abused its discretion and violated her state and federal constitutional rights in so ruling. She argues the correspondence, in which she expressed love and erotic desire for Marlow and which she occasionally illustrated with swastikas, lightning bolts and drawings of a sexual nature, as well as a map showing the location of her son's residence, was so prejudicial as to require reversal of her conviction. We find no abuse of discretion and no denial of constitutional rights in the admission of the letters.

Evidence Code section 352 permits a trial court, in its discretion, to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The court's ruling is reviewed for abuse of discretion. (*People v. Arias* (1996) 13 Cal.4th 92, 155 [51 Cal.Rptr.2d 770, 913 P.2d 980].) As the trial court reasoned, the letters were probative of the nature of defendants' relationship and relevant to rebut Coffman's defense that she participated in the offenses only because of her fear that otherwise Marlow would harm her or her son. That the letters might have been, as Coffman argues, cumulative of Dr. Walker's testimony pertaining to the cyclic nature of a battering relationship does not mean their introduction into evidence necessarily would take up too much time or confuse the issues. Consequently, the trial court did not abuse its discretion in admitting the letters. Inasmuch as Coffman fails to identify a meritorious ground for their exclusion, she fails to establish that her trial counsel rendered ineffective assistance in this regard.

---

[21] The prosecutor argued: "[I]nstead of taking the Fifth Amendment, she just can't remember anything she doesn't want to talk about. [¶] I think I keep coming back to the two sociopath theories and their synergistic [e]ffect on each other, because that['s] what it looks like was going on here. [¶] These two had an [e]ffect on each other, and they appear to have brought out the worst in each other when you look at them. [¶] That's the dynamics of the relations here. [¶] Two sociopaths put together bring out the worst in each other."

### G. *Marlow's Testimony Regarding Coffman's Participation*

Coffman contends that in response to the prosecutor's cross-examination, Marlow gave inadmissible opinion testimony on the central question of her guilt and thereby violated her constitutional rights to a fair trial by an impartial jury on every element of the charges, to confrontation and cross-examination of adverse witnesses, and to a fair and reliable determination of the facts upon which the guilt and penalty verdicts were based. (See Evid. Code, § 800.) The claim is, in substance, one of erroneous admission of evidence, subject to the standard of review for claims of state law error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Coffman forfeited this contention by failing to make a contemporaneous objection. (*People v. Brown* (2003) 31 Cal.4th 518, 545 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [routine application of state evidentiary law does not implicate the defendant's constitutional rights]; Evid. Code, § 353, subd. (a).) For the reasons that follow, had Coffman preserved the claim, we would conclude the challenged testimony represented not Marlow's opinion of Coffman's guilt, but rather his own concessions and recollection of events.

The prosecutor began his cross-examination of Marlow by reading from count 2 of the information, which charged Marlow and Coffman with kidnapping Corinna Novis, and asking if the charge were true. Marlow acknowledged he intentionally kidnapped Novis. The prosecutor continued: "And your testimony is Miss Coffman went along with it all the way and helped you kidnap her, correct?" Marlow answered, "That was the reason, to get a car and money to go to Arizona." The prosecutor then read count 3, charging defendants with kidnapping for robbery, and asked if the allegation were true. Marlow's counsel then objected on the basis the question asked for a legal conclusion. The court overruled the objection, noting: "It is not a legal proposition. He didn't ask him if he was guilty, he just asked if that statement was true. [¶] That's a question of fact. [¶] Now, if he asked was he guilty, that's fine. You have a good objection. [¶] But he is just asking a question of fact whether that . . . is a true statement." Continuing his cross-examination of Marlow, the prosecutor asked: "Your testimony is that when Corinna Novis was kidnapped for purpose of robbery, Miss Coffman went along freely and voluntarily; is that correct?" Marlow answered, "She is the one who approached Miss Novis to start with." Without objection, the prosecutor asked: "Okay. In other words, she was an active, willing participant in that crime?" Marlow answered in the affirmative. The prosecutor then inquired about count 4 charging robbery. "On or about November 7, 1986, in the above named judicial district, the crime of robbery in violation of Penal Code section 211, a felony, was committed by James Gregory Marlow and Cynthia Lynn Coffman, who did willfully, unlawfully and by means of force and fear take personal property from the personal possession and immediate presence of Corinna D. Novis. [¶] That's true also, isn't it?" Marlow assented. "You

robbed Corinna Novis, correct?" Marlow demurred: "I didn't rob her. I didn't take nothing from her." The prosecutor asked: "A purse, a wallet, a car?" "Well, a car." "And a purse?" "I never took her purse." The prosecutor clarified: "I mean, if you and Miss Coffman were operating as a team and she actually took the purse instead of you, well——." "Well, then we both took it," Marlow replied. The court then sustained Marlow's counsel's objection on the basis that the question called for a legal conclusion. The prosecutor resumed: "During all these crimes, were you and Miss Coffman acting as a team?" Marlow responded affirmatively.

A witness may not express an opinion on a defendant's guilt. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47 [39 Cal.Rptr.2d 103]; *People v. Brown* (1981) 116 Cal.App.3d 820, 827–829 [172 Cal.Rptr. 221].) The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. (*Torres, supra,* at p. 47; *Brown, supra,* at pp. 827–828; see Evid. Code, § 805.) "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*Torres, supra,* at p. 47.) Coffman contends the admission of Marlow's testimony regarding her culpability violated these long-standing principles. She asserts there was no foundational showing that Marlow understood the legal definitions of the crimes about which he was questioned. She also asserts Marlow had no basis upon which to make any admission or confession of *her* guilt, and for these reasons his testimony was irrelevant. Coffman further contends that Marlow's status as the only living witness to the crimes, besides herself, rendered his testimony highly prejudicial.

We conclude Coffman's argument lacks merit. In context, the prosecutor was attempting, with some success, to get Marlow to concede the truth of the allegations against him and to describe, as a percipient witness, the degree of defendants' coparticipation during the commission of the offenses against Novis. We see in Marlow's testimony the expression of an opinion regarding neither Coffman's guilt nor her credibility or state of mind.

### H. *Impeachment of Veronica Koppers*

#### 1. *Admission of Prior Inconsistent Statements*

Marlow's sister, Veronica Koppers, testified for the prosecution concerning events leading up to and immediately following Novis's murder. Before defendants' trial, Koppers was herself tried and convicted of being an accessory to the kidnapping and robbery of Novis. While in custody during her own trial, Koppers took medications for depression and difficulty sleeping

(Elavil and Sinequan, respectively); in the present trial, she testified she had problems recalling what happened during the period of her incarceration, including the substance of her testimony at her own trial. Finding Koppers was being deliberately evasive in stating she did not recall what Marlow was wearing and what he had said at the Drinkhouse residence on the night of the offenses and in claiming that the transcript of her prior testimony did not refresh her recollection, the trial court permitted the prosecutor, over Marlow's objection, to read Koppers's former testimony to the jury.

Marlow contends the trial court erred in permitting the prosecution to impeach Koppers with her former testimony, because the court's finding of willful evasiveness was not supported by substantial evidence. We find no error.

■ Evidence Code sections 770 and 1235 except from the general rule against hearsay evidence a witness's prior statement that is inconsistent with the witness's testimony in the present hearing, provided the witness is given the opportunity to explain or deny the statement. (Evid. Code, § 770, subd. (a).)[22] "Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219 [14 Cal.Rptr.2d 702, 842 P.2d 1].) When, however, "a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied." (*Ibid.*) The trial court had the opportunity to view Koppers's demeanor and therefore was in the best position to assess the credibility of her claimed nonrecollection. Marlow asserts that short-term memory loss is a known side effect of Elavil, but no such medical evidence was presented to the trial court in this case. We find no error in the trial court's ruling in this regard. Marlow's derivative claims of constitutional error likewise fail.

## 2. *Trial Court's Refusal to Admit Koppers's Prior Testimony*

Coffman contends the trial court erred in refusing to permit her to impeach Koppers with prior inconsistent statements she had made in the course of her own criminal trial, and that the error deprived Coffman of her state and federal constitutional guarantees including the rights to a fair trial, to confront

---

[22] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with section 770." Evidence Code section 770, in turn, provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

witnesses and to reliable determinations of guilt and penalty. As framed, the contention distorts the trial court's actual ruling. The court found that Koppers was not unavailable as a witness. It consequently refused to allow a wholesale reading of Koppers's prior testimony, but pledged to continue allowing her impeachment as appropriate on further findings that she was feigning loss of memory. Additionally, although the court was not then addressing an instance where Koppers's current testimony was directly inconsistent with her prior testimony, nothing in its comments suggests it meant to preclude appropriate impeachment in such a situation.[23]

 We see no error in the trial court's ruling. Coffman fails to establish that Koppers's failures of recollection rendered her unavailable as a witness so as to except her former testimony from the operation of the rule against hearsay. (See Evid. Code, § 1291.) Subject to an exception not relevant here, Evidence Code section 240, subdivision (a) defines " 'unavailable as a witness' " to mean "that the declarant is any of the following: (1) [e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant[;] [¶] (2) [d]isqualified from testifying to the matter[;] [¶] (3) [d]ead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity[;] [¶] (4) [a]bsent from the hearing and the court is unable to compel his or her attendance by its process[; and] [¶] (5) [a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Plainly, Koppers fit none of these categories. As Coffman observes, "California courts have not interpreted Evidence Code sections 240 and 1291 so strictly as to preclude unlisted variants of unavailability. Rather, courts have given the statutes a realistic construction consistent with their purpose, i.e., to ensure that certain types of hearsay, including former testimony, are admitted only

---

[23] The court stated: "Incidentally, while we are in session out of the sight and hearing of the jury, Mr. Craig had made an objection to the reading of the transcript of the testimony of . . . Veronica Koppers. And I had overruled the objection. [¶] On further thought, I'm going to sustain the objection. [¶] I do not feel in the first place that Miss Veronica Koppers is unavailable as a witness. She did testify to a great many things. I did [find] previously that her declarations as to certain selected questions that she had forgotten or didn't remember anymore was not—were not—those statements were not made in good faith; that she was feigning loss of memory; and that it was a very selective loss of memory. [¶] And I did permit impeachment on those particular points and I would continue to permit impeachment on any particular point where she has feigned a loss of memory, and I find that she was feigning it. [¶] But, the reading of the transcript from her own trial into evidence would not be admissible under any circumstances, either for impeachment or were she indeed to be declared an unavailable witness. In neither [sic] case it would not be available, so the objection is sustained." Coffman's counsel stated: "We'll be introducing substantial parts of that, I suppose, now in Miss Coffman's case." The court responded: "If it is offered for impeachment of some statement that her response to some question that was asked previously, why, I'll consider that at the time."

when no preferable version of the evidence, in the form of live testimony, is legally and physically available." (*People v. Reed* (1996) 13 Cal.4th 217, 226–228 [52 Cal.Rptr.2d 106, 914 P.2d 184].) From this principle, Coffman argues Koppers's failure to qualify under the specific statutory requirements for unavailability does not necessarily compel the conclusion she was not unavailable. Coffman, however, cites no decision approving wholesale admission of former testimony in a case like this, where the declarant was present on the stand, responded to questions, and was appropriately subject to impeachment with prior inconsistent statements from her former testimony when she feigned loss of memory. Indeed, Coffman acknowledges the trial court permitted her to impeach Koppers with portions of her former testimony, but complains that "due to its brevity, its presentation out of context, and the lack of continuity, its meaning was obscured and its import to the jury was lost." Nothing in the trial court's ruling, however, foreclosed Coffman from using appropriate questions to set context and impart continuity in impeaching Koppers's testimony.

Coffman also complains the trial court erred under Evidence Code sections 770 and 1235, and the rule in *People v. Green* (1971) 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998], by failing to admit Koppers's prior testimony for the truth of the matters asserted therein. Since she cites no specific ruling to this effect, the contention is apparently derivative of her broader argument that she should have been allowed to read into the record the whole of Koppers's prior testimony. It lacks merit for the reasons previously discussed.

I. *Testimony of Dr. Lenore Walker*

1. *Marlow: Admissibility of Opinions; Adequacy of Limiting Instruction*

Marlow contends the trial court erred in permitting the jury to consider Dr. Walker's opinion that Coffman was a battered woman in arriving at its verdict against him and in failing to instruct, sua sponte, that such opinion was inadmissible as to him. Marlow notes the trial court had instructed the jury, during Coffman's testimony, that all testimony about her relationship with Marlow that was not directly related to the offenses against Novis was admissible only with respect to Coffman's state of mind. When Dr. Walker took the stand, the trial court instructed the jury that the *evidence* Walker had taken into account in forming her opinion that Coffman was a battered woman was hearsay as to Marlow and therefore inadmissible against him. Marlow complains, however, that the court did not similarly restrict the admissibility of Dr. Walker's *opinions*, leaving the jury to use those opinions in deciding his guilt or innocence. Walker's opinions, he argues, as to him

essentially constituted bad character evidence, which was inadmissible because he had proffered no favorable character evidence. (See Evid. Code, §§ 1101, 1102.)

We disagree. Marlow points to nothing in the court's instructions expressly or impliedly permitting the use of Dr. Walker's opinions against him. Even in the absence of a contrary instruction, the court repeatedly instructed the jury that Coffman's evidence pertaining to defendants' relationship that was not directly related to the Novis offenses was admissible only as to Coffman's state of mind. Therefore, that the jury employed Dr. Walker's opinions as a form of bad character evidence against Marlow is not reasonably probable. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) Any possible inadequacy in the court's instructions in this regard, moreover, appears harmless in light of other instructions the jury received, cautioning it as to the limited purpose for which evidence of battered woman syndrome was admitted, that the facts underlying hypothetical questions asked expert witnesses were not necessarily true, and that the jury could disregard any expert opinion it found unreasonable. (CALJIC Nos. 2.09, 2.80, 2.82 and 3.32.)

Marlow further contends the admission of Dr. Walker's opinion that Coffman was credible in her accusations against him, and the trial court's failure specifically to instruct the jury that expert testimony is inadmissible to establish credibility, violated his rights to due process of law and a reliable penalty determination as guaranteed by the federal Constitution. Marlow enumerates some 10 instances in which he asserts Dr. Walker testified that, in her professional opinion, Coffman was truthful.[24] Trial counsel failed to object to or move to strike all but one of these instances, however, and as to the remaining instance the objection was on the ground of lack of foundation rather than that the witness was impermissibly rendering an opinion as to Coffman's credibility.[25] Thus, Marlow forfeited the claim he now seeks to

---

[24] Marlow appears to contend that Dr. Walker also improperly rendered an opinion as to Coffman's credibility while testifying about the results of standardized psychological testing she had administered to Coffman. In that context, however, Dr. Walker clearly was commenting only on the validity of Coffman's test results, not her general credibility.

[25] On one additional occasion, Marlow's counsel joined in an objection by Coffman's counsel to the prosecutor's asking Dr. Walker, concerning an incident at the Taco Bell restaurant described differently by Coffman and another witness, "In your expert opinion, who is telling the truth?" Coffman's counsel asked, "Your honor, isn't that . . . something that this jury is here to perform, to determine the credibility and veracity of witnesses?" The trial court overruled the objection, commenting: "Most everything this witness has said is something the jury is here to determine." Whether Coffman's objection was founded on the principle that an expert may not express an opinion on a witness's veracity, or instead on the long-abrogated rule that an opinion may not be received on the ultimate issue before the jury, is unclear. (See Evid. Code, § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"].) Absent a better understanding of the basis for the court's ruling, we find it difficult to accept

raise on appeal. (Evid. Code, § 353, subd. (a); *People v. Holt* (1997) 15 Cal.4th 619, 666 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Because, however, he asserts counsel rendered ineffective assistance in failing to preserve the point, we address its substance.

■ On the merits, the challenged opinion that Coffman was credible should have been excluded on a proper objection. The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful. (Evid. Code, § 801, subd. (a); see *People v. Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854].) Thus, we have held that a psychological expert may not testify about rape trauma syndrome, a condition analogous to battered woman syndrome, in order to prove that a rape actually occurred, although such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped. (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248, 251 [203 Cal.Rptr. 450, 681 P.2d 291]; see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563] [expert testimony pertaining to failure of parent of child molestation victim to report abuse].) On a number of occasions in the present case, rather than merely explaining, with reference to her expert knowledge, certain aspects of Coffman's behavior that a layperson might find irreconcilable with her claim to have been battered, Dr. Walker testified she believed Coffman's claims of abuse and domination by Marlow were true.[26] To this extent, a timely and specific objection probably should have been sustained.

---

Marlow's contention that to have repeated the objection upon other instances of Dr. Walker's expressing an opinion on Coffman's credibility would have been futile.

[26] Examples include the following statements and exchanges:

"Q. [Prosecutor:] Do you believe Coffman was telling you the truth during your interviews? [¶] A. Well, again, in the way I [*sic*] that I measure truth, I think she told them as she knew it."

"[I]n my professional opinion, Mr. Marlow was indeed in control of Cindy Coffman, and I think that's what she told. She told it consistently to the police, to me, to this jury, and I believe it."

"[P]sychologists are trained to look for whether people are lying or are telling you the truth . . . . [¶] We're looking for reliability, we're looking for validity and of that kind of consistency in the patterns, and then compare that with what I know and studied about human behavior. And that's the way I make those kinds of judgments. [¶] And in my judgment, she was not lying about what happened to her."

"Q. [Coffman's counsel:] [D]o you feel that Miss Coffman was, generally speaking, a credible reporter to you as to really what was going on about the things that you were asking her about Mr. Marlow? [¶] . . . [¶] A. Yes. I do."

Assuming error in the admission of Dr. Walker's opinions concerning Coffman's credibility, we nevertheless conclude Marlow did not suffer prejudice. Marlow, of course, was not charged with any offense against Coffman, nor was Dr. Walker's testimony offered to vouch for the credibility of Coffman's testimony regarding Marlow's role in the offenses against Corinna Novis; rather, her testimony was offered to support Coffman's defense that, by virtue of the coercion exerted by Marlow's physical and psychological abuse, as reflected in the diagnosis of battered woman syndrome, she lacked the intent to kill. The trial court, moreover, instructed the jury during Dr. Walker's direct testimony that it could consider the evidence concerning battered woman syndrome only in evaluating Coffman's defense, not against Marlow. We presume the jury followed this instruction. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129] [jury presumed to follow instruction pertaining to sentencing factors].) We see no reasonable likelihood the jury would have understood the instruction to preclude it from considering against Marlow only the facts underlying Dr. Walker's opinion, not the opinion itself. (*People v. Cain* (1995) 10 Cal.4th 1, 48 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) For these reasons, and because the jury was instructed with CALJIC No. 3.32, cautioning that evidence of battered woman syndrome could be considered only for the limited purpose of showing Coffman's mental state, we reject Marlow's additional contention that Dr. Walker's opinion that Coffman was a battered woman and incapable of forming the intent to kill was improper bad character evidence against Marlow. (See Evid. Code, § 1101, subd. (a).) The jury, moreover, also received the standard instructions that it was not bound by an expert's opinion and could disregard any opinion found to be unreasonable, and that it was the sole judge of the credibility of a witness and the weight to be accorded his or her testimony. (CALJIC Nos. 2.80, 2.20.) Marlow acknowledges that a trial court generally has no sua sponte duty to give an instruction limiting the purpose for which evidence is received (see *People v. Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534]); he fails to persuade us to hold to the contrary with respect to an instruction that Dr. Walker's opinion should not be used in assessing Coffman's credibility.

In sum, despite the admission into evidence of Dr. Walker's opinion concerning Coffman's credibility, reversal is not required. Marlow's related claim of ineffective assistance of counsel and his derivative claims of federal constitutional error likewise must fail.

### 2. *Coffman: Prosecutorial Misconduct in Cross-examination of Dr. Walker*

Coffman contends the prosecutor improperly cross-examined Dr. Walker, over objection and a motion for mistrial, by using hypothetical questions

contrary to the evidence, by applying unreasonable, prejudicial assumptions regarding Robin Long's statements, and by asking a prejudicial question regarding an excerpt of a draft report that implied Coffman was malingering. Acknowledging these asserted errors implicate state evidentiary rules in the first instance, Coffman contends they also violated her federal and state constitutional rights to due process, equal protection and a fair trial before an impartial jury, as well as the rights to present a defense, to the effective assistance of counsel and to a reliable determination of guilt and penalty. We conclude the challenged questions constituted proper cross-examination as to the bases of Dr. Walker's opinions (Evid. Code, § 721, subd. (a)); hence, the trial court did not abuse its discretion in allowing the questioning, and Coffman's derivative claims of constitutional error likewise fail. (See *People v. Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836].)

Coffman first contends the prosecutor engaged in misconduct by asking Dr. Walker whether convincing physical evidence that it took more than one person to kill Novis would alter her opinion regarding Coffman's mental state at the time of the offense. After Coffman's counsel unsuccessfully objected that the question assumed facts not in evidence, Dr. Walker denied that such evidence, without more, would change her opinion. We see no impropriety in the hypothetical question, which was predicated on the forensic evidence showing dirt in the back of Novis's mouth, which in turn suggested that two persons might have participated in the killing (one strangling the victim while the other held her prone on the ground). Because the trial court instructed the jury on the definition of a hypothetical question and reminded it of its role as the arbiter of fact and its obligation to consider whether the facts supporting the question had been adequately proven, Coffman could not have been prejudiced by any lack of foundation for the question.

Coffman asserts a further instance of misconduct in the prosecutor's cross-examination of Dr. Walker, to whom Coffman had denied being present while Marlow was killing Novis, regarding Coffman's inconsistent statements to Robin Long, who had not yet testified at the time of Walker's testimony. The trial court overruled Coffman's objection, admonishing the jury not to consider the evidence unless it ultimately found the foundational facts had been proven. Dr. Walker again denied that such evidence, without more, would alter her opinion, specifically noting she viewed Long's reliability as questionable. For the same reasons why the hypothetical question discussed above was proper, we conclude the prosecutor engaged in no misconduct in asking Dr. Walker about statements Robin Long was expected to testify Coffman had made to her, statements that were inconsistent with those Coffman had made to Dr. Walker and on which Walker testified she had relied in forming her opinion.

█ We see no abuse of discretion in the trial court's rulings. An expert witness may be cross-examined on, among other subjects, the matter upon which his or her opinion is based and the reasons for the opinion, including any statements by the defendant that formed the basis for the expert's opinion. (Evid. Code, § 721, subd. (a); *People v. Coleman* (1989) 48 Cal.3d 112, 151–152 [255 Cal.Rptr. 813, 768 P.2d 32].) Because Dr. Walker acknowledged that she had relied on Coffman's own statements about the abuse Marlow allegedly inflicted on her and her involvement in the charged offenses in forming her opinion concerning Coffman's mental state, the prosecutor was entitled on cross-examination to explore Coffman's inconsistent statements to others, including Long. And because forensic evidence, including the pathologist's testimony that dirt was found in the back of Novis's mouth, suggested that more than one person may have participated in the actual killing, contrary to Coffman's testimony that she did not take part in or witness the killing, we reject Coffman's argument that the prosecutor's hypothetical questions were merely designed to inflame the jury without regard to the evidence. Coffman's purely derivative constitutional claims likewise must fail.

Finally, Coffman complains of misconduct in the prosecutor's cross-examination of Dr. Walker concerning Coffman's expressed desire, noted in Walker's draft report to Coffman's counsel, to marry Marlow so they could die together in the gas chamber holding hands. No objection was made at the time; later, after the jury was dismissed for the day, Coffman's counsel stated he had refrained from objecting at the time in order to avoid drawing attention to the comment and because he acknowledged the comment was part of Walker's interview with Coffman and thus a proper subject of cross-examination. Counsel suggested, however, that the jury be admonished not to consider penalty at that point. The following morning, outside the presence of the jury, counsel for both defendants moved for a mistrial, contending the prosecutor had misused the excerpt from Dr. Walker's report by inappropriately injecting the question of penalty into the guilt phase. The trial court denied the motion, reasoning the circumstances surrounding the comment and the purpose of the question were clear to the jury: "[T]o again probe the expert witness as to her reasons for her testimony as to Miss Coffman's intentions and feelings in this case. [¶] It was one of the things that was considered by the expert and I think was an appropriate thing to inquire about. [¶] It was not emphasized in any way. There was no undue importance given to it. Just one of the things indicating her close relationship and feelings about Mr. Marlow at the time she was being questioned and also her sense of guilt or remorse or lack of either." Counsel for defendants apparently did not pursue their suggestion that the jury be instructed to give

no consideration whatsoever to penalty at this phase of the trial, as such an instruction was not given despite the prosecutor's and the court's acquiescence therein.

There was nothing improper about the challenged cross-examination. As respondent points out, Dr. Walker acknowledged relying on Coffman's statements in forming her opinion regarding Coffman's mental state at the time of the offense, and the prosecutor therefore was entitled to question her regarding the bases of that opinion. (Evid. Code, § 721, subd. (a).) Nor were the prosecutor's questions unduly prejudicial.

### J. Other Asserted Instance of Ineffective Assistance of Counsel (Coffman)

In addition to the instances of alleged ineffective assistance of counsel addressed above in connection with other substantive claims of error, Coffman contends her trial counsel rendered ineffective assistance in putting before the jury, during the guilt phase, otherwise inadmissible evidence of her involvement in the Kentucky and Orange County murders. Although she acknowledges counsel had a purpose for introducing the evidence—to show that Marlow had compelled Coffman to participate in murders for which she lacked criminal intent or malice aforethought, and in which she participated only as a result of battered woman syndrome—Coffman now urges this court to hold that, under the circumstances of this case, "this totally misguided tactical decision" constituted ineffective assistance of counsel, requiring reversal of the judgment.

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." ' " (People v. Jones (2003) 29 Cal.4th 1229, 1254 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

Introducing, in Coffman's defense case, the evidence of her involvement in the Kentucky and Orange County murders was a tactic that, while not risk-free, offered the hope of countering the prosecution's strong proof that Coffman was guilty of intentionally murdering Corinna Novis. To hold that counsel rendered ineffective assistance in doing so would merely be to second-guess this decision with the benefit of hindsight. We will not do so.

### K. Sufficiency of Evidence

Defendants each challenge the sufficiency of the evidence to support the verdicts and findings as to various charges and special circumstances. "In reviewing the sufficiency of the evidence to support a judgment of conviction, we examine the entire record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376].) State and federal due process requirements are identical in this regard. (*People v. Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

We examine defendants' arguments individually.

### 1. Sufficiency of Evidence That Marlow Committed Burglary Special Circumstance, Sodomy, and Sodomy Special Circumstance

Marlow first contends that no evidence supported the prosecution's theory of burglary, namely that Novis was alive when defendants entered her apartment or that they formed the intent to commit burglary before she died. The prosecutor noted the absence of any signs of forced entry into Novis's apartment, arguing based on this circumstance that defendants must have entered using a key while Novis was still alive. Marlow argues the argument lacks any foundation in logic. Therefore, Marlow contends, the burglary special-circumstance finding must be reversed.

The felony-murder special circumstance applies to a murder committed while the defendant was engaged in, or was an accomplice in the commission of, the attempted commission of, or the immediate flight after committing or attempting to commit, various enumerated felonies, including, as relevant here, burglary. (§ 190.2, subd. (a)(17).) A strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the defendant intended to commit the felony at the time he killed the victim and that the killing and the felony were part of one continuous transaction. (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1141; *People v. Hayes, supra,* 52 Cal.3d at pp. 631–632.) Additionally, in this *Carlos*-era case, the prosecution was required to prove that defendants intended to kill the victim. (See *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 135 [197 Cal.Rptr. 79, 672 P.2d 862]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1139–1140 [240 Cal.Rptr. 585, 742 P.2d

1306] [overruling *Carlos*]; *People v. Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131] [holding *Anderson* could not be applied retroactively].)

The jury in this case easily could conclude that defendants had formed the intent to commit burglary before Novis was killed. In particular, the evidence showed that Novis's apartment was difficult to find, and the glove box of her car contained a map of the area where she lived, with the location of her apartment circled. This suggested that Novis told defendants where she lived (and, likely, that she lived alone, enabling defendants to enter without fear of discovery by a roommate). Evidence concerning the answering machine stolen by defendants also supports the jury's verdict on the burglary charge: Coffman and Marlow left the Drinkhouse residence with Novis around 9:00 p.m., and a friend of Novis's who telephoned her around 10:00 p.m. testified the answering machine failed to pick up her call, suggesting that the machine had been disconnected and stolen by that time. Defendants' theory was that, in less than an hour after leaving the Drinkhouse residence, they left Novis in a Fontana vineyard, then drove to the Robbeloth residence in Colton where Marlow changed his clothes, then went to a First Interstate Bank branch and discovered they were unable to access Novis's account because she had given them the wrong PIN, whereupon they for the first time decided to go to Novis's apartment in Redlands to search for the correct PIN. The jury was not required to accept defendants' version of these events. Rather, from the objective evidence before it, the jury rationally could conclude defendants formed the intent to commit burglary before murdering Novis and committed both crimes as part of a continuous transaction.

Marlow also contends the evidence was insufficient to establish the element of penetration necessary to sustain the sodomy conviction and related special circumstance. (§ 286.) The evidence bearing on sodomy came in part from the testimony of the pathologist, Dr. Gregory Reiber. Dr. Reiber's examination discovered sperm heads in the victim's rectum. The sperm could have been placed there from 24 hours to perhaps as long as 96 hours prior to the victim's death. There was no evidence of injury or tearing of the outside of the anus, which although not dispositive was consistent with consensual as opposed to forcible sodomy. No ABO typing or other testing was done to compare Marlow's blood or genetic characteristics with those of the sperm found in the victim. Marlow's expert pathologist, Dr. Robert Bucklin, testified, based on his review of the medical records and other testimony, that the lack of trauma to the victim's anus tended to indicate that no penetration had taken place and that the sperm had been deposited through some other means, such as withdrawal of the penis from the vagina after ejaculation.

The pathologists' testimony regarding the presence of sperm in the victim's rectum was sufficient to establish the element of penetration. Their testimony,

moreover, cannot be read in isolation from the circumstances surrounding the offense. Corinna Novis was abducted and forced to accompany defendants to the Drinkhouse residence. When Drinkhouse protested and expressed concern about his own liability, Marlow told him not to worry, stating, "How is she going to talk to anybody if she's under a pile of rocks?" Drinkhouse heard the shower running and then stop, after which Marlow emerged from the bedroom dressed only in trousers. Later, a wet-haired Novis was led, hand-cuffed and with duct tape across her mouth, from the Drinkhouse residence by Marlow and Coffman. Thus, the evidence—reflecting that defendants maintained control over an unwilling Novis and that Marlow took her into the shower and later killed her, coupled with the pathologists' testimony, clearly supported the jury's conclusion that Marlow committed a forcible sodomy. Moreover, the sodomy special circumstance is satisfied by an attempt to commit sodomy, which in turn consists of acts falling short of actual penetration so long as the perpetrator has done more than mere preparation. (*People v. Hart* (1999) 20 Cal.4th 546, 610 [85 Cal.Rptr.2d 132, 976 P.2d 683]; see *People v. Kipp* (1998) 18 Cal.4th 349, 377 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [attempted oral copulation].) We have no doubt the evidence here supported the jury's finding on the sodomy special circumstance.

> 2. *Sufficiency of Evidence of Special Circumstances as to Coffman at Close of Prosecution's Case-in-chief; Trial Court's Failure to Dismiss Felony-murder Charge on Coffman's Motion Pursuant to Section 1118.1*

Coffman moved for acquittal at the close of the prosecution's case on the ground of insufficient evidence to support the sodomy and burglary special-circumstance allegations. (§ 1118.1.) She now asserts error in the trial court's adverse ruling and its failure to dismiss the felony-murder and *all* special circumstance allegations. The test applied by the trial court in ruling on a motion for acquittal is the same test applied by the appellate court in reviewing a conviction for sufficiency of the evidence, namely, to determine whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged. (*People v. Cuevas* (1995) 12 Cal.4th 252, 261 [48 Cal.Rptr.2d 135, 906 P.2d 1290]; *People v. Trevino* (1985) 39 Cal.3d 667, 695 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) Coffman first contends there was no substantial evidence that she intended to kill Novis, as required in this *Carlos*-era case (see *Carlos v. Superior Court, supra,* 35 Cal.3d at p. 135; *People v. Anderson, supra,* 43 Cal.3d at pp. 1139–1140 [overruling *Carlos*]; *People v. Duncan, supra,* 53 Cal.3d at p. 973, fn. 4 [holding *Anderson* could not be applied retroactively]), and that the trial court therefore erred in failing to dismiss the special

circumstance allegations pursuant to section 1118.1.[27] We are unpersuaded. The prosecution's evidence of Coffman's participation in the crimes was sufficient to permit the trial court to reasonably find that Coffman knew of and shared Marlow's intent to kill Novis in order to eliminate the witness to their crimes. The evidence included, among other acts, Coffman's leading Novis into a bedroom at the Drinkhouse residence; standing guard while Novis was handcuffed to a bedpost; alerting Marlow to Drinkhouse's behavior suggesting he might be trying to leave the house while defendants were holding Novis and trying to obtain her PIN; emerging, in changed clothing, from the bedroom where Novis was being held, which was adjacent to the bathroom in which the shower had been heard to run during this period; leading the handcuffed Novis, whose hair was wet and whose mouth was taped shut, from the Drinkhouse residence; and driving Marlow and Novis in Novis's car to the vineyard where the body was found. Testimony that the date of Novis's death could be estimated only within a five- or six-day span, and the evidence that sperm can be preserved in a living person for up to 96 hours, neither undermined the prosecution's case nor dictated a contrary verdict. The record at the conclusion of the prosecution's case thus contains substantial evidence of Coffman's participation, with the required intent, in the murder and each of the felonies underlying the special circumstance findings. Even were we to agree with Coffman that the trial court erred in denying her motion to dismiss the sodomy special circumstance for insufficient evidence at the close of the prosecution's case, reversal of the remainder of the judgment would not be required, as the evidence more than sufficed to support the remaining special circumstance allegations at the time of the court's ruling.

---

[27] Section 1118.1 provides in pertinent part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." At the conclusion of the prosecution's case, Coffman moved, under section 1118.1, to dismiss only the sodomy and burglary special circumstances. On appeal, Coffman renews her challenge to the sufficiency of the evidence of the special circumstances and contends her trial counsel was ineffective in not also seeking dismissal of the robbery and kidnapping special circumstances. Coffman further contends the trial court has a sua sponte obligation, whenever counsel makes a limited motion under section 1118.1, to review the prosecution's case at its conclusion for evidentiary sufficiency and to dismiss *any* inadequately supported charge or special allegation, regardless of whether the defendant specifically moved for dismissal of that particular charge or allegation. Because, as we shall conclude, the record at the close of the prosecution's case adequately supported each of the special circumstance allegations, we need not address whether the trial court has such an obligation, and trial counsel was not ineffective in failing to move for dismissal of the robbery and kidnapping special circumstances. (See *People v. Smith* (1998) 64 Cal.App.4th 1458, 1464 [76 Cal.Rptr.2d 75].)

Coffman further argues the evidence showed two kidnap offenses, one involving bringing Novis from the mall to the Drinkhouse residence and the other taking her from the residence to the vineyard. She urges that the first kidnapping was not part of a continuous transaction with the killing because it was a kidnapping for robbery completed at the time of their arrival at the residence and that the second kidnapping was incidental to the killing and thus cannot support a felony-murder-kidnap special circumstance. To the contrary: Based on the evidence presented to it, the jury could reasonably conclude that defendants murdered Novis to advance the underlying felonious purposes of kidnapping, robbery, burglary and sexual assault, none of which was merely incidental to the murder. Although Coffman relies on *People v. Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132], overruled on other grounds in *People v. Satchell* (1971) 6 Cal.3d 28, 35 [98 Cal.Rptr. 33, 489 P.2d 1361], that case is not on point. In that case, the defendant shot a deputy sheriff who had stopped his car, which the defendant had been driving aimlessly for several hours after a reported robbery. This court concluded that insufficient evidence supported a conviction of felony murder because the robbery and escape from it did not motivate the defendant's conduct in killing the officer. (*Ford, supra,* at p. 57.) Here, as respondent argues, the evidence clearly showed the murder was committed to facilitate and conceal the other offenses.

Coffman additionally contends that the prosecution's theory of the case, supported by the testimony of Robin Long, was that the robbery and burglary were complete before the commission of the murder, that after committing the robbery and burglary, but before the killing, defendants had reached a place of temporary safety, and that the robbery and burglary hence were not part of one continuous transaction with the killing for purposes of the felony-murder rule. (See *People v. Hayes, supra,* 52 Cal.3d at pp. 631–632.) As discussed above in connection with Marlow's similar claim, we reject Coffman's initial premise. On the evidence presented to it, the jury could reasonably have believed defendants formulated the intent to commit burglary before killing Novis and carried out the burglary after doing so.

### L. *Asserted Prosecutorial Misconduct in Guilt Phase Argument*

Coffman contends the prosecutor engaged in a pattern of misconduct during his guilt phase summation by misstating the law, impugning the integrity of defense counsel, and arguing that evidence of other bad acts by Coffman, indicating her criminal disposition, proved her guilt of the present charges. The misconduct, she asserts, denied her due process, a fair trial and a reliable determination of the facts in a capital trial in violation of her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and their state constitutional analogues. The claim is, in substance, one of deprivation of due process under the Fourteenth Amendment.

A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392] [addressing prosecutorial duty of disclosure].) A prosecutor's conduct " 'that does not render a criminal trial fundamentally unfair' " violates California law " 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

Turning to the specific claims of misconduct, we note that, at trial, Coffman failed to object or seek an admonition with respect to four of the five instances of improper argument she cites in her brief. As to those four instances, she therefore has forfeited her claims for purposes of this appeal. (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183].) She asserts, however, that counsel's failure to object constituted ineffective assistance. In any event, we find no prejudicial misconduct.

First, Coffman claims the prosecutor misstated the law of robbery in arguing he had proven defendants guilty of murder committed in the course of that crime. Responding to defendants' arguments that Novis was killed after the underlying felonies were completed, the prosecutor sought to convey that the evidence sufficed for a finding that defendants had formed the intent to commit those felonies, as required for the special circumstances alleged in this case, before the murder. As the prosecutor argued: "The essence of these special circumstances is that the murder itself must be to facilitate the underlying crimes of burglary, robbery, kidnapping, but it doesn't have to happen simultaneously. [¶] If the decision was in the mind of the perpetrator of the crimes that it would help them get away with the crime by murdering this person, the special circumstances is [*sic*] satisfied. It doesn't matter when they are murdered." The prosecutor proceeded to give a hypothetical example of a murder committed during the course of a robbery and went on to argue: "If you determine, as the evidence makes abundantly clear, that Corinna Novis was killed to eliminate her as a witness, to kidnap for robbery[,] for burglary and for sodomy, that is a murder during the course of those crimes. [¶] Pure and simple. You can't have a purer example of killing somebody to facilitate the commission of the crime. [¶] . . . [¶] We had kind of an example of that in this case and it related to Corinna Novis's checks. [¶] From the evidence, when Corinna is kidnapped they probably take her purse with the checks in them pretty quickly. You can assume the checks were in her purse.

[¶] Corinna gets killed the night they take her. But when is the robbery involving the checks actually completed? Isn't it actually completed days later when the checks are forged and they pass the checks to get the money? That is what they really want. [¶] You see, here is a case where they have killed Corinna a couple of days before they actually complete that part of the robbery they were intending. But because the thought was we are going to take all of her money, it doesn't matter they killed her a couple of days before the checks were cashed. Same principle applies to the burglary."

The prosecutor's remarks, taken in context, somewhat inartfully urged the jury to find that defendants formed the intent to rob Novis before killing her, even though they did not obtain all the fruits of the crime until after the killing. The jury, moreover, was correctly instructed with the elements of robbery and with the proposition that any statement by an attorney inconsistent with the court's instructions as to the law must be disregarded. Consequently, there was no reasonable likelihood any juror would have applied the prosecutor's comments erroneously. (*People v. Frye, supra,* 18 Cal.4th at p. 970.)

Next, Coffman complains the prosecutor improperly urged the jury to categorically refuse to consider defendants' testimony and to summarily convict them because their respective testimony was mutually irreconcilable. She further contends the prosecutor's argument for conviction illogically relied on admissions contained in the very testimony he was urging the jury to disregard. Contrary to Coffman's argument, no misconduct appears, as the prosecutor was merely asking the jury to conclude that both defendants had been willfully false in a material part of their testimony and therefore the jury should reject their conflicting testimony and rely on the objective evidence supporting a determination of their guilt of the charged offenses. We see no reasonable likelihood any juror would have misunderstood the argument in the manner Coffman suggests. (*People v. Frye, supra,* 18 Cal.4th at p. 970; see CALJIC No. 2.21.2.)

Coffman further argues that the prosecutor engaged in misconduct by urging conviction based on defendants' other bad acts, as reflected in the uncharged Kentucky and Orange County killings.[28] Both she and Marlow objected to the prosecutor's reference to the other crimes on the basis the evidence of those crimes had been admitted, and the jury had been instructed to consider it, only as it related to Coffman's defense of coercion. Marlow moved for a mistrial; Coffman joined in the motion, which the court denied, reasoning: "The only use of argument was for the purpose of showing the relationship between the two parties and how they worked together, rather

---

[28] In essence, the prosecutor argued that neither defendant coerced the other; rather they were two sociopaths "whose synergetic effect on each other produced a violent crime spree."

than one under the influence of the other. [¶] That was the purpose for which that evidence was introduced. The argument was appropriate." As the trial court reasoned, the prosecutor's remarks, in context, did not urge a finding of guilt based on defendants' other bad acts or criminal disposition, but instead properly suggested that each defendant bore responsibility for the crimes because neither acted under the other's coercion.

Coffman additionally cites as misconduct the prosecutor's reference to the testimony of the Taco Bell employee who testified Coffman had reacted violently when told the restaurant was closed; the prosecutor commented that Coffman on that occasion appeared "mad, angry, violent, pushy." Contrary to Coffman's argument, the quoted characterization of her behavior hardly amounts to an implication that she was of a criminal disposition. And the prosecutor's reference to Coffman's antisocial conduct before she met Marlow (carrying a gun and trying to run down Doug Huntley while living in Arizona) clearly comprised part of his argument that she was not the sort who is "dominated by any man as she's suggesting. [¶] She can take care of herself." Because there is no reasonable likelihood the jury would have misapplied the prosecutor's argument in the manner Coffman contends, no misconduct appears.

Coffman also asserts the prosecutor impugned the integrity of defense counsel by depicting the duress and battered woman syndrome defense as manufactured by defense counsel together with the defense expert, Dr. Walker. The prosecutor commented: "If you look at statements to the police, all of Miss Coffman's conduct before Mr. Jordan [her defense counsel] and Dr. Walker come on the case, you just don't see the picture of this battered woman, desperately battered woman. [¶] Once Dr. Walker and Mr. Jordan come on the case—. . . . That's when Miss Coffman decides she is the battered woman." Respondent argues, to the contrary, the prosecutor's point was that Coffman, "on her own, amplified her claims of abuse" when she learned in the course of preparing a defense that it would be advantageous to do so. In our view, the prosecutor's argument is susceptible of either interpretation. Nevertheless, were we to address the merits of the contention despite the want of an objection below, we would conclude any misconduct was harmless, given the fleeting nature of the comment and the overwhelming weight of the evidence against Coffman.

Coffman additionally argues the prosecutor misstated to the jury crucial items of evidence. Specifically, she complains, the prosecutor attributed planning activity, including donning attractive clothing before going to the Redlands Mall to abduct Novis and securing a gun and handcuffs from the Koppers residence and Paul Koppers's truck, to both Coffman and Marlow although, Coffman asserts, it was Marlow alone who engaged in or directed

that activity. The prosecutor also allegedly misstated the evidence when he asserted, in support of the burglary special circumstance, that defendants intended to burglarize Novis's apartment before they killed her when, according to Coffman, no evidence supported the assertion. The prosecutor further allegedly misstated the testimony of the pathologist, Dr. Reiber, in urging the jury to conclude that three hands were needed to strangle Novis and inaccurately stated "they" (inferentially, *both* defendants) participated in burying Novis, when the only evidence in the record bearing on the point was Marlow's statement to detectives that *he* had done so.

A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but he or she enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom. (*People v. Hill, supra,* 17 Cal.4th at pp. 819, 823, 827–828.) In our view, the challenged comments generally fall within the permitted range of fair comment on the evidence. The thrust of the prosecutor's argument was that defendants jointly engaged in the offenses against Corinna Novis, regardless of whose idea it was to dress up or procure a gun and handcuffs. Although Coffman characterizes the burglary of Novis's apartment as an afterthought that arose when defendants' efforts to obtain cash from her bank account initially proved unavailing, the jury was entitled to infer that defendants entertained a broader purpose in abducting and murdering her. Dr. Reiber's testimony supported the prosecutor's argument that both defendants participated in the act of strangling Novis; the prosecutor's suggestion that defendants acted together in covering Novis's grave, even if unsupported by the testimony, could not have prejudiced Coffman in view of the relatively insignificant nature of the comment and the overwhelming weight of the evidence against her. Consequently, Coffman is not entitled to reversal of her conviction on this basis. Because any possible misconduct was harmless on this record, Coffman's claim of ineffective assistance of trial counsel lacks merit.

M. *Asserted Instructional Error*

1. *Instruction on Forcible Sodomy as Supporting First Degree Felony Murder; Failure to Instruct on Second Degree Murder*

Coffman contends, and respondent concedes, that the trial court erred in instructing the jury in this case that forcible sodomy could support a finding of first degree murder. Under California law as it existed in 1986 when Novis was killed, and until the approval of Proposition 115 by the voters in the general election of June 1990, forcible sodomy was not included in section 189's enumeration of felonies supporting a first degree felony-murder conviction. The error, however, was harmless, because the jury's verdicts on the

robbery and burglary charges and related special circumstance allegations reflect that the first degree murder conviction was grounded upon other, valid legal theories of felony murder. (*People v. Hughes* (2002) 27 Cal.4th 287, 368 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Coffman argues, to the contrary, that the submission to the jury of the natural and probable consequences theory of aider and abettor liability meant the jury did not necessarily find she had the requisite specific intent to commit robbery, burglary and sodomy. Given, however, that the jury was instructed that aider and abettor liability required knowledge of the perpetrator's criminal purpose and acting with the intent or purpose of committing, encouraging or facilitating the commission of the crime (see CALJIC No. 3.01), her argument lacks merit.

Coffman further argues the trial court erred in failing to instruct the jury on second degree felony murder based on sodomy. Any error in this regard clearly was harmless in light of the jury's findings on the robbery and burglary charges and related special circumstances, including its findings of intent to kill as to each special circumstance allegation. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], overruled in part on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 149 [77 Cal.Rptr.2d 870, 960 P.2d 1094], and disapproved on other grounds in *People v. Flannel, supra*, 25 Cal.3d at p. 684, fn. 12 [error in omitting instruction harmless when factual question posed by that instruction was necessarily resolved adversely to the defendant under other, properly given instructions].)

Coffman also contends the trial court erred in failing to instruct the jury, sua sponte, on second degree murder as a lesser included offense of either premeditated and deliberate first degree murder or first degree felony murder. She theorizes that defendants completed their robbery of Novis when they arrived at the Drinkhouse residence, at which point the kidnapping became one for extortion (of Novis's PIN) rather than robbery. Coffman further suggests that when she and Koppers took Novis's purse and drove her car to a 7-Eleven store, while Marlow remained at the Drinkhouse residence with Novis, Coffman had reached a place of temporary safety definitively terminating the prior robbery as to her, even though Novis remained captive under Marlow's control. She contends that, had she been the actual perpetrator of the robbery, once away from the victim, she would at that point have reached a place of temporary safety and that, as an aider-abettor, her liability for robbery could not exceed what it would have been had she been the perpetrator. She contends further that the sodomy, assuming it occurred, was solely for Marlow's sexual gratification, not as part of a conditional threat to extract information. She asserts that the prosecutor's theory of the crimes— that, from the moment they accosted Novis, defendants must have had a plan to take all of her property—is "at variance with the way in which common criminals happen to commit crimes."

We disagree with Coffman's premise that the robbery terminated at the point when defendants brought Novis to the Drinkhouse residence; far from being a place of safety, the residence was the home of another person whom the evidence showed defendants felt the necessity of monitoring and impliedly threatening, lest he reveal their criminal activity, during the period of their occupation while they maintained control over the captive Novis. Nor did the robbery terminate as to Coffman during her temporary absence from the house. Rather, the evidence shows all of defendants' offenses against Novis to have been part of a continuous transaction for purposes of felony-murder liability. Because no evidence supported the theory that defendants murdered Novis in the course of some lesser included felony rather than robbery, the trial court had no obligation to instruct on second degree felony murder. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [94 Cal.Rptr.2d 396, 996 P.2d 46].) And any error in failing to instruct on second degree implied-malice murder as a lesser included offense of premeditated and deliberate first degree murder was harmless, because the factual question posed by the omitted instruction necessarily was resolved unfavorably to Coffman under the instructions on the special circumstance allegations, which required a finding of intent to kill. (*People v. Sedeno, supra,* 10 Cal.3d at p. 721.) Finally, to the extent Coffman argues that evidence of her use of drugs around the time of the offenses supported an instruction on second degree murder on the theory that intoxication precluded formation of the specific intent to kill as necessary for first degree murder, we observe the jury was instructed that if it found defendants were intoxicated at the time of the offenses, it should consider that fact in determining whether they had the intent or mental state required for the crimes of murder, kidnapping, kidnapping for robbery, robbery and residential burglary. That the jury convicted Coffman of all of the charged offenses and found true the special circumstance allegations, which required it to find intent to kill, indicates it found she was not so intoxicated as to be unable to form the required mental states; consequently, a more favorable outcome had a second degree murder instruction been given was not reasonably probable. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)[29]

### 2. *Asserted Error in Instructions Concerning Battered Woman Syndrome and Related Defenses*

Coffman contends the trial court erred in refusing her request for certain instructions pertaining to her defense based on battered woman syndrome. She further contends the instructions the court actually gave on battered

---

[29] The lack of any prejudice from these asserted instructional errors dooms Coffman's related claim of ineffective assistance of counsel in failing to object to the inclusion of the reference to sodomy in the trial court's first degree murder instruction and to request correct instructions on second degree felony murder.

woman syndrome and its relation to the mental states required to prove the charged offenses were prejudicially deficient. For the reasons that follow, we disagree.

Consistent with her defense that she participated in the offenses against Novis because she feared Marlow would harm her or her son, Coffman asked the trial court to instruct the jury that battered woman syndrome evidence, if believed, might negate any intent to kill; that battered woman syndrome evidence might be sufficient, by itself, to raise a reasonable doubt whether Coffman had the intent to kill Novis; that battered woman syndrome evidence could support a reasonable doubt whether Coffman had the intent required to "encourage or facilitate" Marlow in killing Novis; that a defense of duress may be based on threats of harm to persons other than the accused; and that a defendant is not an accomplice if he acted under threats or menaces sufficient to give him cause to believe his life would be endangered if he refused to help.

The trial court refused the requested instructions. Instead, the court instructed the jury that it could consider evidence of battered woman syndrome solely for the purpose of determining whether Coffman had actually formed the mental state required for the charged offenses of murder, kidnapping, kidnapping for robbery, robbery, residential burglary and sodomy by the use of force, and for the special circumstance allegations. The court further instructed that a person is not guilty of a crime when he or she engages in conduct that is otherwise criminal, when the person is acting under threats or menaces that would cause a reasonable person to fear that his or her life would be in immediate danger if he or she did not engage in the conduct charged, and the person then believed that his or her life would be so endangered. The court instructed that this rule does not apply to threats, menaces and fear of *future* danger to the person's life, or when the person commits a crime punishable with death.[30] The court also instructed, however, that such evidence, if believed by the jury, might still be relevant in determining whether or not the defendant had formed the intent or mental state required for the crimes charged. The court also instructed that an act committed by a person who is in a state of voluntary intoxication is no less criminal by virtue of the person's having been in such a condition, that voluntary intoxication was no defense to the charge of sodomy by force, and that evidence of intoxication could be considered in determining whether defendants had the mental state or specific intent required for the crimes of murder, kidnapping, kidnapping for robbery, robbery and residential burglary.

---

[30] The trial court did not specifically identify which crime of those with which Coffman was charged was punishable with death. Although Coffman asserts the instruction's lack of specificity in this regard must have been confusing and misleading to the jury, nothing on the face of the record indicates the jury was confused, nor is it reasonably probable the jury inferred that any offense other than murder was punishable with death.

Coffman complains the instructions given were incomplete, inaccurate and erroneous with respect to (1) the relationship between battered woman syndrome and coercion; (2) the crimes to which the defense of coercion applies and the applicability of coercion to aider-abettor liability; (3) the principle that coercion, as shown by battered woman syndrome, can negate intent to kill, which was an element of first degree murder and the special circumstances; (4) the defense of necessity; and (5) the relationship between battered woman syndrome and Coffman's credibility. More specifically, she complains the instructions failed to inform the jury that it could consider evidence of battered woman syndrome in evaluating the defense of coercion, in determining whether Coffman perceived herself or any of her family members to be in imminent peril from Marlow, and in assessing her credibility and conduct pertaining to her jailhouse exchange of letters with Marlow.

■ Under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden, supra,* 29 Cal.4th at p. 558.)

■ We conclude the instructions given here correctly and (with one exception)[31] adequately informed the jury that it could consider the evidence of battered woman syndrome in determining whether Coffman had formed the mental state or specific intent required for the charged offenses, and the trial court therefore did not err in refusing Coffman's proposed instructions. At least one of the requested instructions properly could have been refused as argumentative because it would have directed the jury to draw inferences favorable to Coffman from specific evidence on a disputed question of fact.[32]

---

[31] After the trial in this matter, in *People v. Anderson* (2002) 28 Cal.4th 767, 784 [122 Cal.Rptr.2d 587, 50 P.3d 368], we held that duress can, in effect, provide a defense to murder on a felony-murder theory by negating guilt of the underlying felony. Thus, because the prosecution in this case tried the murder charge on the alternative theories of felony murder and premeditated and deliberate murder, the trial court should have instructed the jury to consider evidence of duress with respect to felony murder (and the underlying felonies) but not premeditated and deliberate murder. Nevertheless, we perceive no prejudice from this omission because the jury's complete rejection of Coffman's duress theory of defense is evident in their verdicts of guilty on all charges, including those on which they impliedly were instructed to consider duress.

[32] "Evidence has been introduced by Defendant Coffman tending to show that said defendant was a battered woman suffering from the battered woman syndrome and that as a result

(*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [248 Cal.Rptr. 600, 755 P.2d 1049].) The instruction on threats of harm to a third person was also properly refused under the evidence presented. Because the defense of duress requires a reasonable belief that threats to the defendant's life (or that of another) are both imminent and immediate at the time the crime is committed (*People v. Lo Cicero* (1969) 71 Cal.2d 1186, 1191 [80 Cal.Rptr. 913, 459 P.2d 241], disapproved on another point in *Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1301, fn. 6 [276 Cal.Rptr. 49, 801 P.2d 292]; *People v. Condley* (1977) 69 Cal.App.3d 999, 1012 [138 Cal.Rptr. 515]), threats of future danger are inadequate to support the defense. Because any danger to Coffman's child (who was living in Missouri) was not shown to be immediate, the trial court correctly rejected Coffman's proposed instruction on this point.

■ Contrary to Coffman's argument, the trial court did not err in failing to instruct on the defense of necessity, which Coffman never raised at trial and which finds no support in the evidence in this case. The defense of necessity generally recognizes that " 'the harm or evil sought to be avoided by [the defendant's] conduct is greater than that sought to be prevented by the law defining the offense charged.' " (*People v. Richards* (1969) 269 Cal.App.2d 768, 777 [75 Cal.Rptr. 597].) The defendant, who must have possessed a reasonable belief that his or her action was justified, bears the burden of proffering evidence of the existence of an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent. (*People v. Patrick* (1981) 126 Cal.App.3d 952, 960 [179 Cal.Rptr. 276]; *People v. Condley, supra,* 69 Cal.App.3d at pp. 1011–1013.) As respondent rightly points out, "[i]t is not acceptable for a defendant to decide that it is necessary to kill an innocent person in order that he [or she] may live, particularly where, as here, Coffman's alleged fear related to some future danger." Our observations in *People v. Anderson, supra,* 28 Cal.4th at pages 777–778, although referring specifically to the duress defense in the context of gang-related killings, are pertinent here. "A person can always choose to resist rather than kill an innocent person. The law must encourage, even require, everyone to seek an alternative to killing. Crimes are often committed by more than one person; the criminal law must also, perhaps especially, deter those crimes. California today is tormented by gang violence. If duress is recognized as a defense to the killing of innocents, then a street or prison gang need only create an internal reign of terror and murder can be justified, at least by the actual killer. Persons who know they can claim duress will be more likely to follow

thereof she did not intend that Victim Corinna Novis be killed, nor did she intend to encourage or facilitate Defendant Marlow in killing said victim. This evidence is sufficient in [and] of itself to raise a reasonable doubt as to whether Defendant Coffman had such intent. If you have a reasonable doubt as to whether Defendant Coffman possessed such intent, she is entitled to the benefit of the doubt and you must find that she did not have any such intent to kill."

a gang order to kill instead of resisting than would those who know they must face the consequences of their acts. Accepting the duress defense for any form of murder would thus encourage killing." (*Ibid.*)

Finally, with respect to Coffman's contention that the instructions given were deficient because they failed to inform the jury that it could consider the evidence of battered woman syndrome in assessing her credibility or her conduct in sending letters to Marlow while in jail or in determining whether she perceived imminent peril to herself from Marlow, we note her proffered instructions failed to convey these concepts, which are not shown to fall in the category of general principles of law so closely and openly connected with the facts before the court as to come within the court's sua sponte instructional obligations. (See *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) Accordingly, the contention must fail.

### 3. *CALJIC No. 2.15*

Defendants contend the trial court erred in instructing the jury, according to CALJIC No. 2.15, that the jury could infer from defendants' conscious possession of stolen property their guilt of the "crimes alleged," without limitation to theft-related offenses. They are correct. (*People v. Prieto* (2003) 30 Cal.4th 226, 248–249 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) In view of the overwhelming evidence of defendants' guilt, however, and the panoply of other instructions that guided the jury's consideration of the evidence (e.g., CALJIC Nos. 2.90 [presumption of innocence and reasonable doubt standard of proof], 2.00 [defining direct and circumstantial evidence], 2.02 [sufficiency of circumstantial evidence to prove specific intent], 3.31 [requirement of union of act and specific intent], 1.01 [duty to consider instructions as a whole]), we see no reasonable likelihood of a more favorable outcome for either Marlow or Coffman had the instruction not been given.[33] (*Prieto, supra,* at p. 249.)

### 4. *CALJIC Nos. 2.04, 2.06*

Coffman contends the trial court erred by instructing the jury that it could infer she harbored a consciousness of guilt if it found certain predicate facts. CALJIC No. 2.04, as given in this case, provides: "If you find that a defendant attempted to or did persuade a witness to testify falsely or attempted to or did fabricate evidence to be produced at the trial, such

---

[33] In view of this conclusion, we need not address Coffman's related claim of ineffective assistance of counsel in failing to object to the giving of this instruction and defendants' other arguments why the giving of this instruction was error. We, however, previously have rejected the contention that CALJIC No. 2.15 is an unconstitutional mandatory or permissive presumption. (*People v. Yeoman, supra,* 31 Cal.4th at pp. 131–132.)

conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your determination." And, as given here, CALJIC No. 2.06 provides: "If you find that a defendant attempted to suppress evidence against himself or herself in any manner, such as by the intimidation of a witness, by destroying evidence [or] by concealing evidence, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration." She contends these instructions denied her a fair trial by irrationally permitting an inference of guilt of *all* of the charged offenses based on evidence of her consciousness of guilt of only *some* offense or offenses less than capital murder. (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315 [85 L.Ed.2d 344, 105 S.Ct. 1965].) She also may be understood to contend that the evidence was insufficient to support a finding that she committed the requisite predicate acts (i.e., attempting to persuade a witness to testify falsely, to fabricate evidence, or to conceal or destroy evidence).

We disagree. First, unlike CALJIC No. 2.15, CALJIC Nos. 2.04 and 2.06 do not direct the jury to infer guilt of the "crimes alleged" and thus do not give rise to an irrational presumption of guilt of all charges, without limitation, from evidence relevant only to a theft-related offense. Coffman merely speculates that the evidence of her consciousness of guilt present in this case might relate only to the less serious charges against her. Because CALJIC Nos. 2.04 and 2.06 instructed the jury to infer a consciousness of guilt only if it first found from the evidence that defendants had engaged in the described conduct, and further informed the jury such evidence was not, in itself, sufficient to prove guilt, the instructions properly guided the jury's consideration of the evidence and did not lessen the prosecution's burden of proof. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

Second, to the extent Coffman contends that facts giving rise to an inference of consciousness of guilt must be conclusively established before CALJIC Nos. 2.04 and 2.06 may be given, she is incorrect; there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. (*People v. Hannon* (1977) 19 Cal.3d 588, 597–598 [138 Cal.Rptr. 885, 564 P.2d 1203]; see also *People v. Pensinger* (1991) 52 Cal.3d 1210, 1246 [278 Cal.Rptr. 640, 805 P.2d 899].) The evidence in this case clearly warranted the giving of these instructions. Relevant to CALJIC No. 2.04, for example, defendants' jailhouse correspondence included references to "Jack," a fictitious actual perpetrator of the crimes, suggestive of an effort to persuade each other to testify falsely or to

fabricate evidence. As for CALJIC No. 2.06, the evidence showed that defendants discarded their own identifying documents together with Novis's near a Taco Bell restaurant in Laguna Beach, that Coffman switched license plates on Novis's car, and that she wiped fingerprints from the car before abandoning it in Big Bear. The trial court, therefore, did not err in giving CALJIC Nos. 2.04 and 2.06. Additionally, as objections to these instructions would not have been well taken, Coffman's trial counsel did not render ineffective assistance in failing to make them.

### 5. *Accomplice Instructions*

Defendants challenge several aspects of the accomplice instructions given in this case. Coffman complains the trial court incorrectly defined the term "accomplice" for the jury. She also contends witnesses Richard Drinkhouse and Veronica Koppers were accomplices as a matter of law, and the jury should have been instructed accordingly. She further asserts that the modified version of CALJIC No. 3.18 given in this case forced the jury to perform the "impossible mental gymnastic" of simultaneously distrusting (when offered against Marlow) and not distrusting (when offered in her own behalf) her testimony. Marlow (joined by Coffman) similarly urges error in the instruction directing the jury to apply the general rules of credibility when weighing his testimony in his own defense, but distrusting his testimony against Coffman if it found him to be her accomplice.[34] We conclude defendants' contentions lack merit.

The relevant principles governing accomplice testimony are well settled. No conviction can be had upon the testimony of an accomplice unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense, an "accomplice" being one who is liable to prosecution for the identical offense charged against the defendant on trial. (§ 1111.) Accessories, therefore (defined as persons who, after a felony has been committed, harbor, conceal or aid a principal in the felony with the intent that the principal avoid criminal liability therefor and knowing that the principal has committed the felony or been charged with or convicted thereof), are not accomplices as to whose testimony corroboration is required. (§§ 31, 32; *People v. Fauber, supra,* 2 Cal.4th at pp. 833–834.) Whether a person is an accomplice is a question of fact for the jury unless the facts and the inferences to be drawn therefrom are undisputed. (*Fauber, supra,* at p. 834.)

---

[34] Respondent contends defendants are precluded from challenging these instructions on appeal due to their failure to object below. Defendants, however, may assert on appeal instructional error affecting their substantial rights. (§ 1259; *People v. Brown, supra,* 31 Cal.4th at p. 539, fn. 7; *People v. Prieto, supra,* 30 Cal.4th at p. 247.) We therefore address the merits of their claims.

Here, the jury was instructed that "[a]n accomplice is a person who was subject to prosecution for the identical offense charged in any count against the defendant on trial by reason of aiding and abetting."[35] Coffman contends the instruction was erroneous because only if the jury found Marlow was an aider and abettor of the crimes, not the perpetrator, could it apply the instruction to him. Because the evidence showed Marlow was the perpetrator, Coffman reasons, the jury would have concluded it could convict her on the strength of his testimony without the required corroboration. Viewing the instructions as a whole, we do not think the jury would have misunderstood its charge along the lines Coffman suggests. As respondent points out, Marlow was entitled to a presumption of innocence, and it was obvious to the jury that defendants stood accused of being accomplices to each other and that its task was to determine whether one had acted as an aider and abettor to the other or whether the two had acted in concert. That any deficiency in this instruction affected the verdict is not reasonably probable. (*People v. Heishman* (1988) 45 Cal.3d 147, 163–164 [246 Cal.Rptr. 673, 753 P.2d 629].)

■ The jury also was instructed as follows: "You are to apply the general rules of credibility when weighing Cynthia Coffman's testimony in her own defense. [¶] But if you find her to be an accomplice, then in weighing her testimony against James Gregory Marlow you ought to view it with distrust. [¶] This does not mean that you may arbitrarily disregard such testimony. [¶] But give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case. [¶] You are to apply the general rules of credibility when weighing James Gregory Marlow's testimony in his own defense. [¶] But if you find him to be an accomplice then in weighing his testimony against Cynthia Coffman you ought to view it with distrust. [¶] This does not mean that you may arbitrarily disregard such testimony. [¶] But give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case." Marlow essentially contends the artificiality of the distinction between defensive and offensive testimony in the context of this case rendered the instruction virtually impossible for the jury to follow and undermined the presumption of innocence. We disagree. Because the evidence abundantly supported an inference that each defendant acted as an accomplice to the other, and because each testified and, to some extent, sought to blame the other for the offenses, the court was required to instruct the jury that an accomplice-defendant's testimony should be viewed

---

[35] The jury was also instructed on the sufficiency of the evidence needed to corroborate an accomplice (CALJIC No. 3.12); that one accomplice may not corroborate another (CALJIC No. 3.13); and on the criminal intent necessary to make one an accomplice (CALJIC No. 3.14). The parties raise no challenge to the propriety of these instructions.

with distrust to the extent it tended to incriminate the codefendant.[36] (*People v. Alvarez* (1996) 14 Cal.4th 155, 217–218 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Such, essentially, is what the foregoing instruction did. The instruction correctly informed the jury that, insofar as it assigned one accomplice-defendant's testimony any weight in determining the codefendant's guilt, it must view such testimony with distrust and find sufficient corroboration, as elsewhere defined for the jury. We see no reason to believe this relatively straightforward task was beyond the jury's capabilities. Contrary to Marlow's argument, the instruction did not undermine the presumption of innocence or deprive defendants of due process. As we have observed: "[T]he testimony of a defendant ought not to be viewed *without distrust* simply because it is given by a defendant. Under the law, a defendant is surely equal to all other witnesses. But, under that same law, he is superior to none." (*Id.* at p. 219; see *ibid.*, fn. 23.)[37]

We reject Coffman's further contention that the trial court erred in failing to instruct the jury that Richard Drinkhouse and Veronica Koppers were accomplices as a matter of law. As noted above, an accomplice is one who is subject to prosecution for the identical offense charged against the defendant. (§ 1111.) Although both Drinkhouse and Koppers suffered convictions for their role in the offenses against Novis (Drinkhouse by a plea of guilty to false imprisonment and Koppers, following a jury trial, for being an accessory and for receiving stolen property), the record lacks evidence from which the jury could have found that either Drinkhouse or Koppers aided or abetted, or otherwise facilitated, *with the requisite intent*, any of defendants' criminal actions. Consequently, neither was, at least as a matter of law, an accomplice whose testimony the jury should have been instructed to view with distrust.[38]

Finally, we reject Coffman's complaint that the trial court erred prejudicially in omitting, from the accomplice instruction pertaining to defendants' testimony, the requirement that the burden is on a defendant to prove by a preponderance of the evidence that the codefendant is an accomplice, as was correctly stated in the general accomplice instructions pertaining to

---

[36] We have more recently prescribed a modification of the standard instruction, by which the testimony of an accomplice that is unfavorable to the defense is to be viewed with care and caution. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

[37] Unlike in the cases on which Marlow primarily relies, this jury was not misinstructed to distrust everything an accomplice-defendant testified to (*People v. Fowler* (1987) 196 Cal.App.3d 79, 87 [241 Cal.Rptr. 571]) or given contradictory instructions both to distrust an accomplice-defendant's testimony and to treat it like any other testimony (see *People v. Dail* (1943) 22 Cal.2d 642, 653 [140 P.2d 828]; *People v. Hartung* (1950) 101 Cal.App.2d 292, 295 [225 P.2d 614]). Instead, the court harmonized the principles by which the jury was to evaluate defendants' testimony.

[38] As we have found no deficiency in the accomplice instructions given in this case, Coffman does not persuade us that her trial counsel rendered ineffective assistance by failing to object to them.

Drinkhouse and Koppers, to trigger the corroboration requirement. First, to the extent the instruction failed to impose on Coffman the burden of proving Marlow was an accomplice as a prerequisite to applying the corroboration rule to his testimony and to being directed to view it with distrust, she was not prejudiced. Second, because the court's instruction directed the jury to view Marlow's testimony with distrust *if it found him to be an accomplice*, the jury implicitly was told to make a finding in this regard, and in doing so most likely, and correctly, would have applied the preponderance standard as it was instructed to do with respect to Koppers and Drinkhouse. Thus, it is not reasonably probable Coffman would have received a more favorable outcome had the instructions been modified to include the omitted language.

### 6. *Instruction on Natural and Probable Consequences Doctrine; Refusal of Coffman's Requested Limiting Instruction*

The trial court instructed the jury with CALJIC No. 3.02, on the natural and probable consequences doctrine of aider and abettor liability.[39] Using CALJIC No. 3.01, the court defined aiding and abetting and, pursuant to CALJIC No. 8.81.17, informed the jury that, in order to return a true finding on any special circumstance allegation, the jury had to find that the defendant had the specific intent to kill or to aid another in the killing of a human being. Coffman voiced no objection to these instructions as given. On appeal, however, she contends the instruction on natural and probable consequences was prejudicially defective in failing to inform the jury that "natural and probable" means "reasonably foreseeable," thereby permitting the jury to convict her of murder without sufficient evidence of the required mental state. Coffman contends she suffered further prejudice by the court's refusal to instruct the jury that it must not use evidence of the Kentucky and Orange County killings in arriving at any verdict and that such evidence was admitted solely on the question of whether she intended to kill or to encourage or facilitate Marlow's killing the victim. Finally, Coffman contends the natural and probable consequences doctrine is unconstitutional in capital cases because it predicates criminal liability on negligence, in violation of due process. We find no merit in her contentions.

 Elaborating on the natural and probable consequences doctrine, in *People v. Prettyman* (1996) 14 Cal.4th 248, 261 [58 Cal.Rptr.2d 827, 926 P.2d 1013], and *People v. Croy* (1985) 41 Cal.3d 1, 12, footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392], we observed that an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any

---

[39] The instruction told the jury that "[o]ne who aids and abets is not only guilty of the particular crime that to his or her knowledge his or her confederates are contemplating committing, but he or she is also liable for the natural and probable consequences of any criminal act that he or she knowingly and intentionally aided and abetted. You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether the crimes charged were a natural and probable consequence of such originally contemplated crime."

reasonably foreseeable offense committed by the person he aids and abets." As the Court of Appeal in *People v. Brigham* (1989) 216 Cal.App.3d 1039 [265 Cal.Rptr. 486] noted, although variations in phrasing are found in decisions addressing the doctrine—"probable and natural," "natural and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability. (*Id.* at pp. 1050, 1054; see *People v. Roberts* (1992) 2 Cal.4th 271, 316–322 [6 Cal.Rptr.2d 276, 826 P.2d 274].) "A natural and probable consequence is a foreseeable consequence" (*People v. Fabris* (1995) 31 Cal.App.4th 685, 698 [37 Cal.Rptr.2d 667], disapproved on another ground in *People v. Atkins* (2001) 25 Cal.4th 76, 90, fn. 5 [104 Cal.Rptr.2d 738, 18 P.3d 660]); the concepts are equivalent in both legal and common usage. Coffman cites no authority for the contention that the term "natural and probable consequences" is one having a meaning peculiar to the legal context and that, therefore, the term must be expressly defined for the jury. (See *People v. Cox* (2003) 30 Cal.4th 916, 967 [135 Cal.Rptr.2d 272, 70 P.3d 277].) Indeed, in *People v. Nguyen* (1993) 21 Cal.App.4th 518, 535 [26 Cal.Rptr.2d 323], the Court of Appeal found sufficient, without inclusion of the phrase "reasonably foreseeable," the instruction Coffman challenges here. We agree with the *Nguyen* court that CALJIC No. 3.02 correctly instructs the jury on the natural and probable consequences doctrine. To the extent Coffman contends that imposition of liability for murder on an aider and abettor under this doctrine violates due process by substituting a presumption for, or otherwise excusing, proof of the required mental state, she is mistaken. Notably, the jury here was also instructed with CALJIC No. 3.01, advising that an aider and abettor must act with the intent of committing, encouraging or facilitating the commission of the target crime, as well as CALJIC No. 8.81.17, which required, for a true finding on the special circumstance allegations, that defendants had the specific intent to kill the victim. These concepts fully informed the jury of applicable principles of vicarious liability in this context.

Nor did the trial court err in refusing Coffman's requested instruction that it was not to use evidence of the Kentucky and Orange County killings, which had been admitted solely on the issue whether Coffman entertained the intent to kill or to encourage or facilitate Marlow in killing the victim, in reaching its verdict in this case. The requested instruction was duplicative of CALJIC Nos. 2.09, instructing the jury about evidence admitted for a limited purpose, and 2.50, advising it to use such evidence not to find criminal propensity but rather to determine whether the necessary element of intent was proven. (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224].) When Coffman introduced evidence of the Kentucky and Orange County killings, moreover, the jury was specifically instructed as to its limited purpose. We presume it followed these instructions. (*People v. Boyette, supra,* 29 Cal.4th at p. 436.)

■ Finally, we reject the premise of Coffman's argument that the application of the natural and probable consequences doctrine in capital cases unconstitutionally predicates murder liability on mere negligence. Liability as an aider and abettor requires knowledge that the perpetrator intends to commit a criminal act together with the intent to encourage or facilitate such act; in a case in which an offense that the perpetrator actually commits is different from the originally intended crime, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted. (See *People v. Nguyen, supra,* 21 Cal.App.4th at p. 531.) Moreover, by finding true the special circumstance allegations against Coffman, the jury in this case necessarily found she possessed the intent to kill. Having found no error in these instructions as given in this case, we perforce reject Coffman's claim that her trial counsel rendered ineffective assistance in failing to object to them.

## IV. Penalty Phase

### A. Adequacy of Notice of Aggravating Evidence and Asserted Boyd Error as to Coffman

Coffman contends the trial court erred in admitting certain evidence that she had in the past engaged in nonviolent criminal and noncriminal conduct, in violation of the rule in *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] and her rights to due process, equal protection and a fair trial before an impartial jury, as well as her rights to present a defense and to have a reliable determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and analogous provisions of the state Constitution. She further contends the prosecutor provided inadequate (or no) notice of such evidence, thereby violating section 190.3 and the same state and federal constitutional provisions. We conclude the challenged evidence was properly admitted, some as properly noticed aggravating evidence and the remainder as rebuttal to Coffman's evidence in mitigation.

■ Governing principles may be summarized as follows. Except for evidence in proof of the offense or special circumstances that subject a defendant to the death penalty, the prosecution may present no evidence in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. (§ 190.3.) ■ Any aggravating evidence not relating to the sentencing factors enumerated in section 190.3 is inadmissible in the penalty phase. (*People v. Boyd, supra,* 38 Cal.3d at pp. 773–776.) Aggravating evidence must pertain to the circumstances of the capital offense (§ 190.3, factor (a)), other violent criminal conduct by the defendant (*id.,* factor (b)) or prior felony convictions (*id.,* factor (c)); only

these three factors, and the experiential or moral implications of the defendant's age (*id.*, factor (i)), are properly considered in aggravation of penalty. (See *People v. Wader, supra,* 5 Cal.4th at p. 657 [a majority of statutory sentencing factors can only be mitigating, citing cases so holding as to factors (d), (e), (f), (g), (h) and (k), and noting that whether factor (j) is exclusively mitigating is undecided]; *People v. Stanley* (1995) 10 Cal.4th 764, 831 [42 Cal.Rptr.2d 543, 897 P.2d 481] [factor (i)].) ▉▉▉ Evidence offered as rebuttal to defense evidence in mitigation, however, is not subject to the notice requirement of section 190.3 and need not relate to any specific aggravating factor. (*In re Ross* (1995) 10 Cal.4th 184, 206–207 [40 Cal.Rptr.2d 544, 892 P.2d 1287]; § 190.3.)

First, Coffman complains that although the notice of aggravation specified, with respect to the brandishing incident, only that the prosecution intended to introduce evidence concerning her possession and brandishing of a loaded handgun and the surrounding facts and circumstances, in Barstow on April 5, 1986, the prosecution improperly presented evidence that Coffman possessed, and was under the influence of, either cocaine or methamphetamine on that date; she evaded arrest; she was verbally abusive, rude and loud in speaking with the police; she was arrested for possession of a derringer, possession of a drug and being under the influence of the drug; and, about one year before the April 5, 1986, incident, she was angry at Huntley and drove a car close enough to him to force him to move out of the way. Second, Coffman complains that the prosecution presented unnoticed, nonstatutory aggravating evidence that after the murder of Lynell Murray, Coffman behaved in a celebratory manner at a Denny's restaurant, embracing Marlow, talking loudly, ordering and consuming food and wine, and using Murray's credit card to pay for the meal; and that Coffman subsequently used Murray's credit card again at a sporting goods store in Big Bear.

We conclude the prosecution gave sufficient notice to Coffman of the April 5, 1986, brandishing incident and its surrounding circumstances. Contrary to Coffman's implicit argument, she was not entitled to notice of all the testimony the prosecution intended to present. (*People v. Scott* (1997) 15 Cal.4th 1188, 1219 [65 Cal.Rptr.2d 240, 939 P.2d 354].) We note that although Coffman objected to the introduction of evidence relating to the incident and sought a mistrial on that basis, she did not claim she was denied discovery and did not seek a continuance to defend against the evidence.

We further conclude that the testimony regarding Coffman's behavior at the time of the April 5, 1986, brandishing incident, the incident about a year earlier involving driving at Huntley in her car, and her conduct after the killing of Lynell Murray did not constitute improper nonstatutory aggravation. Regarding the brandishing and driving incidents, the prosecutor expressly offered the circumstances of these incidents as rebuttal to Coffman's

defense—which she introduced with the aim of negating or mitigating her guilt in the initial phase of trial and later continued to assert in her case in mitigation in the penalty phase—that she had at all times pertinent to the current offenses acted under Marlow's domination. That is, the prosecutor properly sought to rebut Coffman's evidence by showing that before she ever met Marlow, she had behaved violently and aggressively and had demonstrated a willingness to possess and use a firearm. In addition, the evidence of Coffman's behavior following the Murray offenses was both properly noticed as part of the "facts and circumstances surrounding" the kidnapping, robbery, rape and murder of Murray and admissible as pertinent to section 190.3, factor (b). Thus, we reject Coffman's claims of error.

### B. Testimony of Dr. Craig Rath

#### 1. Asserted Prosecutorial Misconduct in Suggesting Through Inadmissible Evidence That Marlow Fit the Definition of a Sexual Sadist Serial Killer

In his direct testimony in Coffman's case in mitigation, Clinical Psychologist Craig Rath, Ph.D., opined that Coffman could not be classified as a serial killer, primarily because serial killers are "almost exclusively male." On cross-examination, the prosecutor reviewed with Dr. Rath the various characteristics of serial killers and whether they applied to Coffman, observing, "I'm not talking about Mr. Marlow at all." Dr. Rath stated he knew of no cases of female sexually sadistic serial killers and repeatedly insisted that certain identified traits were characteristic only of *male* serial killers. The trial court instructed the jury that Dr. Rath's testimony was offered only as to Coffman and was inadmissible as to Marlow. Marlow now contends the prosecutor engaged in misconduct by eliciting Dr. Rath's opinion that sexual sadist serial killers are exclusively male in an impermissible effort to induce the jury to use Rath's testimony against Marlow.[40]

We first observe that Marlow forfeited this claim of misconduct by failing to make contemporaneous objection at trial, although he objected on other grounds not renewed here. As previously noted, a prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it

---

[40] Marlow also suggests the prosecutor engaged in misconduct in cross-examining Dr. Rath with a published article written by Dr. Richard Rappaport regarding sexual sadist serial killers and their profiles. The trial court had ruled that Rath could be questioned concerning the article, but directed the parties not to reveal that the article in fact analyzed Coffman's and Marlow's case. (Rappaport earlier had been retained to evaluate Marlow, but was not called as a witness. According to Marlow's defense counsel, the publication of the article violated the "patient-client" [sic] and attorney-client privileges.) We see no error in the court's limitation on the use of the article and, in the absence of any instance in which the prosecutor transgressed it, no misconduct.

"infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales, supra,* 25 Cal.4th at p. 44.) A prosecutor's conduct " 'that does not render a criminal trial fundamentally unfair' " violates California law " 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) The prosecutor's cross-examination of Dr. Rath properly sought to impeach Rath's opinion that Coffman did not meet the criteria for a diagnosis of antisocial personality disorder and could not properly be classified as a serial killer. (Evid. Code, §§ 773, subd. (a) [scope of cross-examination], 801, subd. (b) [permissible bases for expert opinion].) He did not examine Rath concerning whether Marlow could be so classified. We find no misconduct.

### 2. Asserted Prosecutorial Misconduct and Trial Court Error in Failing to Limit Cross-examination of Dr. Rath

Coffman contends the prosecutor engaged in misconduct by, in effect, presenting, during his cross-examination of Dr. Rath, his own unsupported theory that Coffman was a sociopath and a serial killer. The trial court's failure to confine the prosecutor to the proper scope of cross-examination, she argues, constituted prejudicial error. Noting that the prosecutor, during his guilt phase cross-examination of Dr. Lenore Walker, had sought to demonstrate that Coffman fit the diagnostic criteria for antisocial personality disorder by eliciting examples of criminal conduct in which Coffman had engaged before she met Marlow, Coffman further maintains the prosecutor, during the penalty phase, continued this tactic of introducing evidence of her bad acts to prove a criminal disposition, contrary to Evidence Code section 1101, subdivision (a). Coffman acknowledges that her counsel attempted, in his case in mitigation, to counter the prosecutor's suggestion that she was a sociopath by eliciting from Dr. Rath the opinion that serial killers are almost exclusively male and that Coffman did not fit the profile of a serial killer. She then complains that the ensuing cross-examination "was not rebuttal but a continuation of the themes which the prosecution itself had originally raised in the trial." In particular, Coffman argues, the prosecutor improperly examined Dr. Rath concerning the Rappaport article (see fn. 40, *ante*) in order to reinforce the suggestion that she was of a criminal disposition. Coffman also contends the prosecutor improperly questioned Dr. Rath concerning whether a sexual sadist serial killer could be female and whether Coffman's bragging about the offenses, as testified to by jailhouse informant Robin Long, was consistent with the behavior of a serial killer. In this connection, she also complains that the prosecutor wrongly put before the jury, during the penalty phase, nonstatutory aggravating evidence including that she had carried a gun in Barstow before ever meeting Marlow and that, shortly after the murder of Lynell Murray, she behaved exuberantly in a Denny's restaurant in the City

of Ontario. Coffman argues the above evidence was improper rebuttal, as her defense did not attempt to portray her as "having a character incompatible with antisocial conduct."

Although Coffman at one point objected to the cross-examination of Dr. Rath as going beyond the scope of the direct examination, she did not object to the evidence of her behavior before or after the Murray killing or other evidence of violent criminal conduct the prosecutor had introduced in aggravation. She thus failed to preserve these claims for appeal. In any event, we find the challenged cross-examination entirely proper as an exploration of the basis of Dr. Rath's opinion, and the evidence of Coffman's conduct was proper rebuttal to her penalty phase defense. The trial court, therefore, did not err in failing to "confine" the prosecutor's cross-examination of Rath, and the prosecutor did not engage in misconduct by probing into the basis of Dr. Rath's opinions. As no ground appears on which additional objections would have succeeded in limiting the scope of the cross-examination, Coffman's trial counsel cannot be faulted for failing to make them.

### C. Testimony of Katherine Davis and Marlene Boggs

#### 1. As Nonnoticed Aggravation and Improper Propensity Evidence

Marlow complains that the testimony by his former wife, Katherine Davis, and her mother, Marlene Boggs, presented during Coffman's case in mitigation (discussed in detail, *post*) constituted, in essence, nonnoticed evidence in aggravation and improper evidence of his propensity for violence. He further asserts that Coffman's counsel actively concealed from his defense team their intention to call Davis and Boggs. The admission of their testimony, he contends, thus violated Evidence Code section 1101, subdivision (a) and deprived him of his rights to due process and a reliable penalty determination as guaranteed by the federal Constitution.

Marlow did not object to the evidence on the ground that it had not been included in the notice of aggravating evidence, but rather questioned its relevance to Coffman's case in mitigation and asserted it constituted nonstatutory aggravating evidence. He therefore has forfeited this contention for appellate purposes. (*People v. Boyette, supra*, 29 Cal.4th at p. 453, fn. 15.)

In any event, we disagree with the substance of the contention. As pertinent to the introduction of aggravating evidence, section 190.3 provides: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has

been given to the defendant within a reasonable period of time as determined by the court, prior to the trial." The statute thus contemplates that the *prosecution* will give notice of the aggravating evidence it will present, but omits any mention of a codefendant's obligation to provide notice of penalty phase evidence. Moreover, the testimony of Davis and Boggs was not introduced by the prosecution in aggravation of Marlow's penalty, but by Coffman in *mitigation* of her own, and the trial court specifically admonished the jury not to consider the evidence as aggravation against Marlow. We presume the jury followed the admonition. (*People v. Boyette, supra,* 29 Cal.4th at p. 435.) Defendant Marlow thus was not forced to defend against aggravating evidence without proper notice. Marlow's assertion that Coffman's counsel "actively concealed" their intention to call the witnesses, unsupported by any evidence in the record apart from counsel's failure to mention them in his opening statement, adds nothing to his argument.

Marlow further contends the testimony of Davis and Boggs should have been excluded under Evidence Code section 1101 as improper evidence of a propensity for violence. Again, we observe he failed to object on this specific ground at trial and thus has forfeited the contention for purposes of this appeal. (See *People v. Boyette, supra,* 29 Cal.4th at p. 453, fn. 15.) In any event, the contention lacks merit. Marlow relies on *People v. Farmer* (1989) 47 Cal.3d 888, 921 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another ground in *People v. Waidla, supra,* 22 Cal.4th at page 724, footnote 6, where we rejected a claim of error in the exclusion of evidence of violent criminal activity on the part of a third person, offered to show that person was more likely the killer than was the defendant. *Farmer,* however, is distinguishable, in that here the trial court admitted the testimony of Davis and Boggs to rebut Marlow's insistence that Coffman was the instigator of Novis's murder. In overruling Marlow's objection to the evidence as irrelevant and unduly prejudicial, the trial court stated: "I think this is legitimate evidence to impeach the position which he has taken in opposition to her defense." We conclude the trial court did not abuse its discretion in so ruling. Moreover, before the jury retired to deliberate on penalty, the trial court specifically instructed it regarding the criminal acts it could consider as aggravating circumstances in the case and cautioned that it could not consider any evidence other than those enumerated aggravating circumstances. We again presume the jury followed these instructions. (*Boyette, supra,* at p. 436.)

### 2. *Restriction on Examination of Davis*

Although Davis described in detail the course of her relationship with Marlow and his behavior toward her, Coffman challenges several rulings by the trial court that restricted certain aspects of the examination, claiming they

violated her federal constitutional rights, under the Eighth and Fourteenth Amendments to the federal Constitution, to present mitigating evidence (*Lockett v. Ohio* (1978) 438 U.S. 586, 604–605 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 113–114 [71 L.Ed.2d 1, 102 S.Ct. 869]) and to due process of law (*Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227]). In order to assess the propriety and effect of the challenged rulings, we find it necessary to set forth Davis's testimony in some detail.

Davis testified she met Marlow in 1977, when she was 18 or 19 years old and he was two years older. At their first meeting, they were somewhat hostile toward each other, but a few weeks later she and several of her friends took Marlow to her parents' house, where Davis and Marlow "partied" and had sex together for the first time. Later, when they were among a group of other teenagers and she was not immediately friendly to him, Marlow made a comment that greatly embarrassed her[41] and caused her to be very angry toward him. Not long after that incident, Marlow appeared at the door of her apartment and demanded admission, beating on the door and threatening to destroy her car.

The next time she saw Marlow, he behaved like a gentleman and was attentive, romantic and considerate; on that occasion, she took him to a party she was attending. On the way, Marlow asked her to keep a handgun in her purse. Later that evening, Marlow pointed the gun at a man who was demanding drugs from him and who had broken the driver's window of the car Davis was driving, and gave him a "whipping." Still later that night as Davis and Marlow were visiting at the trailer of some friends, that man, one Jeff Tailor, and another man, both carrying shotguns, forced their way in. Tailor pointed his shotgun at Marlow. Davis, interposing herself between Marlow and Tailor, created a sufficient diversion to enable Marlow to grab both shotguns. After a scuffle, Marlow ran the two intruders off the property. The following morning, police arrested Marlow. Davis eventually bailed him out of custody and married him the same day.

Their marriage was initially happy, but their drug use and other behavior soon displeased Davis's parents, with whom they were living, and resulted in Davis and Marlow's moving to Indianapolis to live with friends there. After the move, Marlow began accusing Davis of flirting with other men. He started manifesting fits of rage and would slap or hit her with his fist for no reason; on one occasion, he cut her on the shoulder and forearm with his pocketknife as she sat in the bathroom. Because of the tension and violence between Davis and Marlow, they soon were no longer welcome in their friends' house.

---

[41] The trial court sustained Marlow's and the prosecution's objections to counsel's asking for the substance of the comment.

At that point, they returned to Kentucky and stayed with her paternal grandparents. There, Marlow kept Davis isolated in their bedroom or elsewhere in the house most of the time, preventing her from talking with her relatives. After two weeks, they moved into a vacant house owned by Davis's maternal grandparents. There, on one occasion, Marlow became enraged and choked Davis into unconsciousness. When Davis became pregnant, Marlow was happy; they decided to name their child Joshua Luke. Marlow then wanted the couple to move back to McCreary County, Kentucky, where Davis had previously lived and where she had many relatives and friends. Davis feared such a move because of Marlow's intense jealousy. She was so distraught over the prospect of the move that she stabbed herself in the leg with a pair of scissors. Immediately after that incident, Marlow left the house, whereupon Davis's father chased him with a pistol and shot at him.

Over the course of her relationship with Marlow, Davis testified, she "wasn't a person any more"; she "didn't have any spirit," "didn't talk to other people," and "hardly even [made] eye contact with other people." She lost 73 pounds during their marriage, and her hair "fell out by the wads." Davis had tried to encourage Marlow to join her in attending church services, but on one occasion he responded by throwing her on the bed, getting on top of her and saying, in a menacing voice, "I am the devil and I own you."

Despite the extensive scope of the foregoing testimony, Coffman contends the trial court committed error of constitutional magnitude in precluding her from examining Davis concerning (1) her subjective reaction to Marlow's sexual performance; (2) the precise nature of Marlow's embarrassing remark; (3) the specific grounds for Marlow's arrest following the altercation in the trailer with two men armed with shotguns; (4) the identity of a person with respect to whom Marlow was particularly jealous in his relationship with Davis; (5) the size of the links on a chain Marlow often carried; (6) the reasons why Davis often cried and whether she lay awake at night during their stay in Indianapolis; and (7) whether Davis feared she would be killed if she returned with Marlow to McCreary County. The excluded evidence, Coffman contends, would have corroborated Dr. Walker's guilt phase testimony concerning battered woman syndrome and supported a lingering doubt of Coffman's guilt of the Novis and Murray homicides; thus, she urges, it constituted potentially mitigating evidence she was constitutionally entitled to have the jury consider. (See *Lockett v. Ohio, supra*, 438 U.S. 586; *Eddings v. Oklahoma, supra*, 455 U.S. 104; *Hitchcock v. Dugger* (1987) 481 U.S. 393, 395–399 [95 L.Ed.2d 347, 107 S.Ct. 1821].)

As Coffman correctly observes, the cited authorities hold that the Eighth and Fourteenth Amendments to the federal Constitution require that the sentencer not be precluded from considering any relevant mitigating evidence. Nevertheless, the trial court determines relevancy in the first instance

and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury. (*People v. Cain, supra,* 10 Cal.4th at p. 64.) We conclude the trial court did not abuse its discretion in excluding the evidence described above. Davis's testimony presented to the jury a picture of a woman who endured abuse from Marlow similar to that described by Coffman, and thus tended to support Coffman's claim that she had acted under duress in committing the offenses. The additional details of Davis's abuse were either irrelevant to Coffman's circumstances, or their probative value was so slight as to be substantially outweighed by the danger of misleading the jury. The trial court properly excluded them.

### D. *Admission of Marlow's 1980 Statement Concerning Three Robberies*

During the penalty phase, Supervising Probation Officer Evelyn Frantz read into the record a statement that defendant Marlow had made to a probation officer in connection with his 1980 guilty plea to three counts of robbery. In the statement, Marlow described the robberies he had committed in an apartment complex in Upland, a leather goods store in Upland, and a methadone clinic in Ontario, all in November 1979. Marlow now contends admission of his statement was error under the rules of *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], *In re Wayne H.* (1979) 24 Cal.3d 595 [156 Cal.Rptr. 344, 596 P.2d 1], *People v. Hicks* (1971) 4 Cal.3d 757 [94 Cal.Rptr. 393, 484 P.2d 65] and *People v. Harrington* (1970) 2 Cal.3d 991 [88 Cal.Rptr. 161, 471 P.2d 961].

Marlow failed to preserve this issue for appellate review by making contemporaneous objection at trial, but he contends his trial counsel rendered ineffective assistance in this regard. In any event, the claim lacks merit.

A line of California authorities, beginning with *People v. Quinn* (1964) 61 Cal.2d 551 [39 Cal.Rptr. 393, 393 P.2d 705], held that statements made under certain circumstances by criminal defendants to probation officers in the course of the preparation of a probation report were inadmissible in any subsequent proceedings. In *Quinn,* for example, the probation officer told the defendant he would not recommend probation if the defendant failed to tell the truth; this court held that the "[d]efendant's admissions following this threat or implied promise of leniency were . . . involuntary," and their introduction into evidence required reversal. (*Id.* at p. 554; see also *People v. Harrington, supra,* 2 Cal.3d at p. 999 [statements made to probation officer in the hope that candor would persuade the officer to make a favorable report to the court were held inadmissible either as substantive evidence or for impeachment]; but see *People v. Alesi* (1967) 67 Cal.2d 856, 861 [64 Cal.Rptr. 104, 434 P.2d 360] [statements made by the defendant on advice of counsel, with no assertion

of privilege at the time the statements were made, were admissible at a later trial].) In *People v. Hicks, supra,* 4 Cal.3d at pages 761–763, emphasizing the "paramount" nature of the policy of encouraging free and unfettered communication between a defendant and his or her probation officer, this court held it was error to admit a defendant's statement made, on the advice of a probation officer, to a judge in a related case. Similar rules were adopted in the context of juvenile proceedings. (E.g., *Ramona R. v. Superior Court, supra,* 37 Cal.3d at pp. 807–810 [Cal. Const. precludes use of minor's testimony at fitness hearing in juvenile court in later adult criminal trial]; *In re Wayne H., supra,* 24 Cal.3d at pp. 598–601 [statements made by juvenile to probation officer held inadmissible in any subsequent proceeding as substantive evidence or for impeachment].)

In *Minnesota v. Murphy* (1984) 465 U.S. 420 [79 L.Ed.2d 409, 104 S.Ct. 1136], however, the high court held that the federal Constitution does not compel exclusion from criminal proceedings of a defendant's statement to a probation officer. The court reasoned that the Fifth Amendment privilege against self-incrimination is not self-executing, but must be affirmatively asserted, except in limited situations involving inherently compelling pressure to speak (e.g., when the declarant is undergoing custodial interrogation), the threat of a penalty for exercising the privilege, or, related to the latter, a gambler's failure to file a gambling tax return. (*Id.* at pp. 429–430, 434, 439.) Although the defendant in *Minnesota v. Murphy* was required to speak—and speak truthfully—with his probation officer, he was not precluded from asserting the privilege and was not shown to have been subject to any penalty for doing so. Consequently, the high court held, his statements were voluntary and thus admissible. (*Id.* at pp. 436–439.) Following *Minnesota v. Murphy,* and in light of article I, section 28, subdivision (d) of the California Constitution,[42] the Court of Appeal in *People v. Goodner* (1992) 7 Cal.App.4th 1324, 1330–1332 [9 Cal.Rptr.2d 543], held that statements made by a defendant to a probation officer during a presentence investigation interview could be used against him, at least in the absence of any evidence that the probation officer had threatened the defendant with an unfavorable recommendation if he refused to give a statement. (Accord, *People v. Pacchioli* (1992) 9 Cal.App.4th 1331, 1340 [12 Cal.Rptr.2d 156].) Thus, the *Goodner* court recognized, our decision in *People v. Hicks, supra,* 4 Cal.3d 757, did not survive Proposition 8.[43] Marlow's claims, therefore, must fail.

---

[42] This provision, added to the state Constitution by the passage of Proposition 8 by the voters in June 1982, provides that all relevant evidence must be admitted unless excludable under existing statutory rules of evidence pertaining to privilege or hearsay, or Evidence Code sections 352, 782 and 1103. Evidence Code section 940 enshrines the state and federal constitutional privilege against self-incrimination, which thus remains a valid exclusionary principle following Proposition 8.

[43] The rule of *Ramona R. v. Superior Court, supra,* 37 Cal.3d 802, precluding substantive use of a minor's statements made in the course of a fitness hearing, in contrast, is of

### E. *Admission of Marlow's Refusal to Discuss Involvement in Methadone Robbery*

Marlow contends the prosecutor violated the rule of *Doyle v. Ohio, supra,* 426 U.S. at pages 617–618 (*Doyle*), in eliciting testimony from Detective Scharf of the Ontario Police Department that in 1979, after being advised of and waiving his *Miranda* rights and answering several questions relating to methadone found in his possession, Marlow refused to answer questions about the clinic robbery. Marlow failed to object at trial on the ground he now advances and therefore has forfeited the contention for purposes of this appeal (*People v. Hughes, supra,* 27 Cal.4th at p. 332), but he contends his trial counsel rendered ineffective assistance in this respect. We conclude Marlow is not entitled to relief.

■■■ *Doyle* holds that the prosecution may not, consistent with due process and fundamental fairness, use postarrest silence following *Miranda* warnings to impeach a defendant's testimony at trial. (*Doyle, supra,* 426 U.S. at pp. 617–618.) Respondent asserts *Doyle* has no application here because Scharf testified, not in impeachment, but before Marlow took the stand. We find this contention inconsistent with the rationale of *Doyle*, that the impeachment by postwarning silence there condemned was "fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him." (*Anderson v. Charles* (1980) 447 U.S. 404, 407–408 [65 L.Ed.2d 222, 100 S.Ct. 2180].) No less unfair is using that silence against a defendant by means of the prosecutor's examination of an interrogating detective even before the defendant has had the opportunity to take the stand.

Respondent further asserts, citing *People v. Hurd* (1998) 62 Cal.App.4th 1084 [73 Cal.Rptr.2d 203], that *Doyle* does not protect against prosecutorial use of a defendant's refusal to answer selected questions after waiving *Miranda* rights and electing to speak to law enforcement authorities. The *Hurd* court stated: "A defendant has no right to remain silent selectively. Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights. . . . [Defendant] was not induced by the *Miranda* warning to remain silent. . . . [¶] . . . We do not think *Doyle* was meant to preclude the prosecutor from commenting on highly relevant evidence bearing on [defendant's] credibility, including [defendant's] refusal to provide critical details, when he had voluntarily waived his right to remain silent." (*Id.* at pp. 1093–1094.)

---

constitutional dimension and remains viable after Proposition 8. (See *People v. Macias, supra,* 16 Cal.4th at pp. 756–757.)

Other courts have taken a different view. The Ninth Circuit, for example, has held that a suspect may selectively waive his *Miranda* rights by agreeing to answer some questions but not others. (*United States v. Soliz* (9th Cir. 1997) 129 F.3d 499, 503–504, overruled on another ground in *United States v. Johnson* (9th Cir. 2001) 256 F.3d 895; *United States v. Garcia-Cruz* (9th Cir. 1992) 978 F.2d 537, 541–542.) Several other federal circuits have specifically held that *Doyle* precludes the use of partial silence to the extent that the defendant relied on a *Miranda* warning in refusing to answer specific questions. (*Hockenbury v. Sowders* (6th Cir. 1983) 718 F.2d 155, 159; *United States v. Scott* (7th Cir. 1995) 47 F.3d 904, 906–907; *United States v. May* (10th Cir. 1995) 52 F.3d 885, 890; *United States v. Canterbury* (10th Cir. 1993) 985 F.2d 483, 486.) In *United States v. Harrold* (10th Cir. 1986) 796 F.2d 1275, the federal Court of Appeals for the Tenth Circuit reasoned, "To the extent that a defendant clearly relies on a *Miranda* warning to refuse to answer specific questions, he had been induced by the government to do it and his silence may not be used against him." (*Id.* at p. 1279, fn. 3.) We need not, in this case, determine whether comment on Marlow's refusal to answer questions pertaining to the robbery violated *Doyle*, because any such error would be harmless beyond a reasonable doubt in view of other witnesses' testimony regarding Marlow's involvement in the robbery and the incident's relatively minor significance in the prosecution's case in aggravation. The lack of prejudice stemming from the assumed error is fatal to Marlow's related claim that his trial counsel rendered ineffective assistance in failing to object to the challenged comments.

F. *Other Asserted Prosecutorial Misconduct*

Coffman contends the prosecutor engaged in prejudicial misconduct during his penalty phase argument, violating her rights under state and federal law. As noted above, a prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales, supra,* 25 Cal.4th at p. 44; accord, *Darden v. Wainwright, supra,* 477 U.S. at p. 181; *Donnelly v. DeChristoforo, supra,* 416 U.S. at p. 643.) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs, supra,* 427 U.S. at p. 108.) A prosecutor's conduct " 'that does not render a criminal trial fundamentally unfair' " violates California law " 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) By failing to make contemporaneous objection in this situation, where the record supports no contention that to do so would have been futile, Coffman failed to preserve any of her claims of prosecutorial misconduct during the penalty phase argument. (*People v. Frye, supra,* 18

Cal.4th at p. 970.) She contends, however, that her trial counsel's failure to make appropriate objection constituted ineffective assistance. In any event, as will appear, Coffman's contention that the prosecutor engaged in prejudicial misconduct lacks merit, and her claim of ineffective assistance of counsel must fail.

Coffman first contends the prosecutor improperly asserted that the very fact she was defending against the charges in this case with a defense of domination or duress, and in a posture conflicting with Marlow's defense, was itself evidence of sociopathy. She quotes the following portion of the prosecutor's argument: "And I think this theory, the alternative theory, that the defendants' classic sociopaths synergistic result affect each other results in this violent crime spree, really is the best theory to explain all the evidence you've got, for one thing. [¶] I mean, how can you get a fact pattern where each defendant can claim at least plausibly that they were dominated and controlled by the other defendant? [¶] Well, we have heard about sociopaths and what they are. [¶] They are people that abuse and exploit everyone they meet their whole life, right? [¶] So if you have two sociopaths, of course, they probably abused and exploited each other." In the same vein, Coffman contends the prosecutor engaged in misconduct by suggesting that, to the extent her defense drew upon her fear of harm to her son as motivating her to participate with Marlow in the charged crimes (in the face of evidence that she failed to mention any such fear to investigating officers after her arrest and that she wished to take Josh from his grandparents and have him come to live with herself and Marlow), Coffman was exploiting and "abusing" her son. With these arguments, the prosecutor appears to have been urging the jury to adopt a particular interpretation of the evidence, not—as Coffman asserts—misstating the law by asserting that the mere proffer of a defense is itself evidence of guilt. Likewise, the prosecutor's characterizations of Coffman's personality ("an uncontrollable temper," "utterly arrogant," "total disrespect for authority") did not purport to express a professional expertise, but constituted instead permissible comment on the evidence. There was no misconduct and no basis on which to object.

Coffman complains the prosecutor misstated evidence in arguing that the jury should draw no inferences favorable to Coffman from the testimony of Marlow's former wife, Katherine Davis, regarding the abuse she suffered at Marlow's hands. The prosecutor said: "I think in the—the thing I talked about in our guilt phase argument that I found repulsive that—is that battered woman syndrome we see one of Mr. Marlow's former wives. [¶] She clearly fits into that category. [¶] Of course, you'll remember she got out as quickly as she could. [¶] She had injuries. Corroboration. [¶] Miss Coffman's defense

team is hoping that the genuine repulsion that we all feel towards that kind of a crime will somehow wash over Mr. Marlow and make her seem better. [¶] And I think they are trying to exploit that in this battered woman syndrome stuff." Coffman points out that Davis testified Marlow left her after a particularly violent episode, not that she (Davis) left Marlow. Coming as it did in the context of the prosecutor's argument emphasizing the evidence of Coffman's responsibility for the offenses, however, this minor misstatement would not, to a reasonable probability, have unfairly influenced the jury. Coffman further argues the prosecutor misrepresented the evidence in attributing ownership of the shovel with which Novis was buried, and the handcuffs with which Novis (and possibly Murray) was restrained, to both Coffman and Marlow, rather than Marlow alone. But the record contains sufficient evidence of defendants' joint participation in the offenses to support the prosecutor's use of the third person plural pronoun.

Coffman complains the prosecutor improperly referred to nonstatutory aggravating evidence in referring in his penalty phase closing argument to her celebratory behavior at the Denny's restaurant following the murder of Lynell Murray. (*People v. Boyd, supra,* 38 Cal.3d at p. 773.) We see no misconduct in the prosecutor's discussion of this evidence, which arguably tended to suggest Coffman's voluntary, active role in the crimes, contrary to her defense of domination and duress, and thus bore on section 190.3, factor (a), the circumstances of the offense.

Coffman further contends the prosecutor committed *Davenport* error (see *People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861]) in suggesting that deficiencies in her defense of duress constituted aggravating evidence. Clearly, however, in context the prosecutor was merely commenting on the state of the evidence, as he was entitled to do. No misconduct appears.

G. *Asserted Instructional Errors*

1. *Marlow: Instruction That Jury Could Consider All Evidence Received During Both Phases of Trial*

Marlow (joined by Coffman) complains the trial court exacerbated the erroneous admission of evidence in the guilt phase by instructing the jury, in the penalty phase, that it could consider all evidence received during both phases of the trial. (CALJIC No. 8.85.) The giving of this instruction, he contends, deprived him of a reliable penalty adjudication because it invited the jury to consider as evidence such matters as the Kentucky homicide, his

alleged membership in the Aryan Brotherhood, his swastika tattoo, and Dr. Walker's opinion that he was a batterer, all of which was admitted only for purposes of Coffman's defense. The instruction, Marlow urges, also permitted the jury to consider his assertedly coerced confession. Coffman also argues the instruction improperly allowed the jury to consider all the evidence she contends was erroneously admitted against her during the guilt phase of trial.

To the extent defendants argue the trial court erred in failing to clarify the instruction, they forfeited their appellate challenge by failing to request such clarification. (*People v. Quartermain, supra,* 16 Cal.4th at p. 630; see *People v. McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) In any event, the totality of the instructions as given properly guided the jury's consideration of penalty. In particular, before the commencement of penalty phase deliberations, the court instructed the jury as to the statutory aggravating and mitigating factors against which to evaluate the evidence (CALJIC No. 8.85), that evidence had been admitted against one defendant and not the other (CALJIC No. 2.07), that evidence had been admitted for a limited purpose (CALJIC No. 2.09), how to assess an expert's testimony (CALJIC No. 2.80), and the use of prior consistent or inconsistent statements as evidence (CALJIC No. 2.13). The jury was also properly instructed on the use of statements, taken in violation of *Miranda,* for impeachment purposes, and regarding Marlow's assertion of the privilege against self-incrimination. Defendants therefore were not denied a reliable penalty determination as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the federal Constitution.

### 2. *Coffman: Failure to Define Implied Malice*

Coffman contends that the trial court's failure to instruct the sentencing jury on the definition of implied malice, given the lack of such an instruction in the guilt phase as well, resulted in "grave uncertainty" whether the jury rendered an individualized penalty based on Coffman's own personal conduct and responsibility, in violation of the Eighth Amendment's requirement of reliability in capital sentencing. She argues that the jury might have been so confused by the instructions actually given, including the definition of murder under section 187, a definition of first degree felony murder, and an instruction on murder liability predicated on an aiding and abetting theory, that it might have imposed the death sentence based on a belief that Coffman was guilty of murdering Lynell Murray even if it also concluded she lacked the intent to kill.

 The contention lacks merit. The evidence relating to Lynell Murray's killing was properly admitted as other violent criminal conduct under section 190.3, factor (b). When the prosecution has introduced evidence, during the penalty phase, of a defendant's other violent criminal conduct, the trial court is not required, absent a request, to instruct on the elements of specific crimes that such evidence tends to prove. (*People v. Weaver, supra*, 26 Cal.4th at p. 987; *People v. Cain, supra*, 10 Cal.4th at p. 72.) Here, Coffman never requested an instruction defining implied malice, and the trial court thus had no duty so to instruct. Given the abundant evidence, including Coffman's own guilt phase testimony, showing her active participation in the murder and other offenses against Lynell Murray, we see no reasonable likelihood the jury was confused by the lack of an instruction defining implied malice. (*People v. Benson* (1990) 52 Cal.3d 754, 801–802 [276 Cal.Rptr. 827, 802 P.2d 330].)

### 3. *Coffman: Asserted Defects in Principal Penalty Phase Instructions*

Coffman contends the trial court's failure to instruct the jury that certain sentencing factors could only be considered in mitigation might have confused the jury as to the scope of its sentencing discretion and constituted error under the Eighth and Fourteenth Amendments to the federal Constitution. She argues the introduction of the various sentencing factors by the phrase "whether or not" could have led the jury to conclude that the absence of such factors constituted aggravation. She also asserts the failure to explicitly designate aggravating and mitigating factors violated state and federal guarantees of equal protection inasmuch as, in noncapital sentencing, the factors are separately designated. (See Cal. Rules of Court, rules 421, 423.)

 We have repeatedly held that sentencing factors need not be labeled as mitigating or aggravating, and we see no reasonable likelihood the jury would have misunderstood any mitigating factor as aggravating (see, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 443–444 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Benson, supra*, 52 Cal.3d at pp. 801–803), or that the absence of a mitigating factor was itself an aggravating one (*People v. Sapp* (2003) 31 Cal.4th 240, 315 [2 Cal.Rptr.3d 554, 73 P.3d 433]). Further, we see no merit in Coffman's equal protection argument, for capital and noncapital defendants are not similarly situated for purposes of the choice among sentencing options.

Coffman challenges a number of other aspects of the standard sentencing instruction. She contends CALJIC No. 8.88, in its use of the terms "so substantial" and "warrants," was vague and misleading as to the jury's duty

to return a death verdict only if aggravating circumstances outweighed those in mitigation, and only if it found death to be the appropriate sentence. We have held to the contrary. (*People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585].) She also faults the instruction for failing to inform the jury that if the aggravating circumstances did not outweigh those in mitigation, a sentence of life without the possibility of parole was mandatory. As she acknowledges, we have rejected this argument. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 593–594 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People v. Duncan, supra*, 53 Cal.3d at p. 978.) Nor, contrary to Coffman's argument, was the instruction constitutionally defective for not informing the jury that even if it found the aggravating circumstances outweighed the mitigating ones, it still could return a verdict of life without the possibility of parole. (*People v. Beeler* (1995) 9 Cal.4th 953, 997 [39 Cal.Rptr.2d 607, 891 P.2d 153].) Coffman further contends the instruction unconstitutionally failed to inform the jury that in order to reach a death verdict, it had to find that aggravating circumstances outweighed mitigating ones beyond a reasonable doubt and that death was the appropriate penalty beyond a reasonable doubt. We have rejected these contentions. (*People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Contrary to Coffman's further contention, the instruction was not defective for failing to inform the jury as to which side bore the burden of persuading it of the appropriateness or inappropriateness of a death verdict in this case. (*People v. Hayes, supra*, 52 Cal.3d at p. 643.) Nor was the instruction defective for failing to require the jury to make unanimous separate findings on each of the aggravating circumstances or to render a statement of reasons for its death verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 701 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *Medina, supra*, at p. 782.) We decline to reconsider these holdings.

Finally, Coffman contends the instructions improperly suggested to the jury that it must unanimously agree on the presence of mitigating factors—in particular, the alleged duress or domination by Marlow—before it could consider them in determining her sentence. As we explain, there is no reasonable likelihood the jury so interpreted the court's instructions. (*People v. Benson, supra*, 52 Cal.3d at p. 801.)

The issue arose in the following context. During a conference among the court and counsel to select jury instructions to govern the penalty phase deliberations, Marlow asked that the jury be instructed that in order to consider any aggravating factor, all 12 jurors were required to agree that the factor had been proven. Although the court initially denied the request, it later reversed itself and instructed the jury that "[a]ll twelve jurors must agree as to the existence of any aggravating factor before it may be considered by you.

[¶] If the jury does not unanimously agree that the existence of an aggravating factor has been proved, no juror may consider it in reaching their personal penalty decision." After reading the jury the list of sentencing factors found in section 190.3, factors (a) through (k), the court said: "I have previously read to you the list of aggravating circumstances which the law permits you to consider if you—if you found that any of them is established beyond a reasonable doubt by the evidence."[44]

Coffman contends the jury would have understood the court's reference to "the list of aggravating circumstances" to encompass *mitigating* circumstances, noting the instructions did not specifically advise the jury that no unanimity was needed as to the latter. She contends further that the prosecutor, in his summation, essentially characterized "the manipulative and exploitive way Marlow used" Coffman as an aggravating circumstance within the meaning of section 190.3, factor (a). Because the jury could not believe Coffman had acted under duress or substantial domination without also believing Marlow had engaged in such duress or domination, she reasons the instructions would have led the jury to believe it must unanimously find the factual underpinning to the mitigating factor of section 190.3, factor (g), contrary to the rule of *McKoy v. North Carolina* (1990) 494 U.S. 433, 439–444 [108 L.Ed.2d 369, 110 S.Ct. 1227].

We disagree. Nothing in the instructions told the jurors to consider any mitigating factor only if they unanimously found it to be supported by the evidence; the unanimity requirement was explicitly directed to aggravating factors. Nor did anything in the prosecutor's comments on Coffman's duress defense suggest that Marlow's exploitation of Coffman should be weighed against her as a factor in aggravation.[45] To the extent the prosecutor

---

[44] Of course, contrary to the instruction, the law does not require that the jury agree unanimously regarding the existence of aggravating factors. (*People v. Mayfield, supra,* 14 Cal.4th at pp. 806–807.)

[45] Coffman relies on selections from the following portion of the prosecutor's summation, placed in context for ease of understanding: "Other than the 'k' factor, there are really two defenses in my mind that have been raised all [the] way through this case. [¶] One is the domination and control argument, the other one is the drug usage. [¶] So let's deal with those first and then go to these 'k' sorts of factors. [¶] Okay. [¶] Domination and control. [¶] I have one more chart. [¶] By now you all could probably tell me my alternative theory to the defense theories better than I could. [¶] I do think the evidence shows quite clearly that Mr. Marlow was not dominated by Miss Coffman. [¶] Miss Coffman was not dominated and controlled by Mr. Marlow. [¶] They were both full partners in a team of serial killers. [¶] And I think this theory, the alternative theory, that the defendants' classic sociopaths synergistic result affect each other results in this violent crime spree, really is the best theory to explain all the evidence you've got, for one thing. [¶] I mean, how can you get a fact pattern where each defendant can claim at least plausibly that they were dominated and controlled by the other defendant? [¶] Well, we have heard about sociopaths and what they are. [¶] They are people that abuse and exploit everyone they meet their whole life, right? [¶] So if you have two

suggested that Coffman exploited Marlow, we presume the jury, as instructed, weighed in aggravation only the factors specifically defined as aggravating, namely (as relevant to Coffman) the circumstances of the offense (factor (a)) and other violent criminal conduct (factor (b)).

Finally, contrary to Coffman's argument, California's sentencing process remains constitutionally valid after *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. (*People v. Valdez* (2004) 32 Cal.4th 73, 139 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

### H. *Other Asserted Instance of Ineffective Assistance of Counsel (Marlow)*

Marlow contends his counsel rendered ineffective assistance in connection with the admission of evidence concerning the serological testing of urine stains on Lynell Murray's clothing. Marlow notes that in a hearing prior to the testimony of criminalist Dan Gregonis, who performed the testing, the prosecutor stated he would not seek to introduce evidence of any testing beyond the base tests (identifying the urine as bodily fluid) and ABO typing, and that such testing would, "in my opinion [make] Mr. Marlow look less culpable than the base evidence did in my opinion. . . . [¶] But the record should be clear in case later on someone accuses me of trying to make Mr. Marlow more guilty than he was . . . ." The prosecutor continued: "I don't try the defense case in this case. I think it's going to look worse for Mr. Marlow the way they are asking me to do it than the way it is." The court observed, "There are all sorts of tactical reasons for doing things in the presentation of the case," and asked Marlow's counsel to comment. After noting the necessity of a *Kelly-Frye* hearing (see *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 54 App. D.C. 46 [293 F. 1013]; see also *People v. Leahy* (1994) 8 Cal.4th 587, 591 [34 Cal.Rptr.2d 663, 882 P.2d 321]) on serological evidence going beyond ABO typing, counsel said: "[The prosecutor], as he indicated, does not wish to proceed there[;] that is fine. I'm not asking him for advice on our tactics, and it is our belief that it is in Mr. Marlow's interest." Later in the hearing Marlow's counsel observed further: "Our tactic has been dictated through the events of this trial that we are not putting up an affirmative defense to the

---

sociopaths, of course, they probably abused and exploited each other. [¶] After all, look at the history of Marlow and Coffman. [¶] Didn't they basically exploit and abuse every person they ever lived with? Their family, husbands, kids, their work friends. [¶] Everybody was exploited and abused by them. [¶] So there's no reason to expect that they didn't exploit and abuse each other at times. [¶] That would be the nature of their relationship."

Huntington Beach incident." Before the jury, Gregonis testified that test results were inconclusive as to the identity of the source of the urine. In response to examination by Marlow's counsel, Gregonis acknowledged the stains on Murray's clothing were consistent with the clothing's coming into contact with, and absorbing, a preexisting urine deposit.

In declining to present additional serological evidence, Marlow's counsel clearly considered his client's interests and entertained a tactical purpose to which he alluded on the record. Perhaps he sought to minimize the significance of the stains rather than focus the jury's attention on them, as surely would occur if additional evidence of forensic testing of the urine stains was presented. In any event, because this is not a case in which there simply could be no satisfactory explanation for counsel's action, Marlow's claim of ineffective assistance of counsel fails for purposes of this appeal. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266–267.)

### I. *Denial of Coffman's Motion for New Trial*

Coffman's motion for a new trial relied on many of the contentions advanced in this appeal, including the trial court's denial of defendants' severance motions, the denial of the motions to change venue, the denial of her motion to suppress her postarrest statements taken in violation of *Miranda* and the testimony of Robin Long, and insufficiency of the evidence to support the burglary and sodomy special-circumstance findings, in addition to others not renewed here. The trial court denied the motion, commenting it was convinced that "any jury anywhere" would have convicted Coffman and returned a death verdict. Coffman contends the trial court should have granted the motion or otherwise stricken the special circumstance findings or exercised its power to reduce her sentence to life imprisonment.

"We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182].) As to the grounds that Coffman has renewed in the course of this appeal, we have concluded none merits reversal of the judgment. Coffman thus fails to establish a "manifest and unmistakable abuse of discretion" in the trial court's denial of the motion for a new trial on those grounds. (See *People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) As to the grounds she chose not to renew before this court, she fails to show that the trial court made any error of law rendering the denial of the motion for a new trial an abuse of discretion. Nor does Coffman articulate a basis on which the trial court

should have stricken the special circumstance findings or reduced her sentence to life imprisonment.

### J. Cumulative Error

Defendants contend the cumulative effect of the errors in both phases of their trial denied them a fundamentally fair trial and a reliable penalty determination. We have found merit in three claims of error in the proceedings (error in the process whereby Marlow repeatedly asserted his privilege against self-incrimination before the jury, and instructional errors as to both defendants in instructing on first degree sodomy murder and in the giving of CALJIC No. 2.15 without limitation to theft offenses) and have noted two claims of error by Marlow that, if not forfeited by lack of contemporaneous objection, would have had merit (the admission of Dr. Walker's opinions as to Coffman's credibility and the admission of evidence that Marlow requested an attorney during police questioning). Additionally, we have assumed error in the admission of evidence that Marlow, after receiving *Miranda* warnings, refused to discuss the 1980 methadone clinic robbery, for the purpose of resolving his related claim of ineffective assistance of trial counsel in failing to object thereto. With respect to each claim individually, we have concluded that any error was harmless under the applicable standard. Reviewing these errors cumulatively, we reach the same conclusion. "[N]one of the errors, individually or cumulatively, ' " 'significantly influence[d] the fairness of [defendants'] trial or detrimentally affect[ed] the jury's determination of the appropriate penalty.' " ' " (*People v. Valdez, supra,* 32 Cal.4th at p. 139.)

### K. Constitutionality of the Death Penalty

Defendants raise the following challenges to the constitutionality of the death penalty law, all of which have previously been rejected:

Coffman argues that the statute under which she was convicted and sentenced to death fails to adequately narrow the class of persons eligible for the death penalty, as required by the Eighth Amendment to the federal Constitution (*Zant v. Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 103 S.Ct. 2733]), and creates a substantial and constitutionally unacceptable likelihood that the death penalty will be imposed in a capricious and arbitrary fashion. We have held to the contrary. (E.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Marlow argues that the 1978 death penalty law is unconstitutional because it lacks procedural safeguards necessary to ensure consistent, rational application of the death penalty. In particular, he notes, it fails to require written findings as to the aggravating factors selected by the jury, proof beyond a reasonable doubt and jury unanimity concerning aggravating factors, and a finding that death is the appropriate punishment beyond a reasonable doubt; it also lacks "a procedure to enable a reviewing court to evaluate meaningfully the sentencer's decision" and a presumption that life without parole is the appropriate sentence. Marlow also contends the statute invites arbitrariness and capriciousness by failing to designate which sentencing factors are aggravating and which are mitigating, by failing to require that the jury not consider inapplicable mitigating circumstances, and by permitting allegations of unadjudicated criminal activity to be used as a basis for imposing a sentence of death. We disagree. (E.g., *People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Hines* (1997) 15 Cal.4th 997, 1078 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Arias, supra,* 13 Cal.4th at p. 190; *People v. Johnson, supra,* 3 Cal.4th at p. 1256.)

### L. *Disproportionality of the Death Penalty as to Coffman*

Invoking her right to intracase proportionality review (*People v. Mincey, supra,* 2 Cal.4th at p. 476 [6 Cal.Rptr.2d 822, 827 P.2d 388]; see *People v. Dillon* (1983) 34 Cal.3d 441, 450 [194 Cal.Rptr. 390, 668 P.2d 697]), Coffman contends the death sentence is disproportionate to her personal culpability and thus violates the Eighth Amendment to the federal Constitution and its state analogue, California Constitution, article I, section 17.[46] We disagree. Unlike the psychologically immature 17-year-old defendant in *Dillon,* who fatally shot the victim in a panic during an attempted raid on the victim's illicit marijuana field, Coffman, 24 years old at the time of the offenses, was found by the jury to have committed murder and to have engaged in the charged felonies with the intent to kill or to aid or abet Marlow in killing the victim. The jury also heard evidence that Coffman, together with Marlow, had committed another similar murder and other felony offenses in Orange County. Evidently the jury was not persuaded that Coffman suffered from such physical abuse or emotional or psychological oppression as to warrant a sentence less than death. Contrary to Coffman's argument, the offenses here were of the most serious nature, and her sentence clearly befits her personal culpability.

---

[46] Respondent argues that such review is unavailable in capital cases by virtue of article I, section 27 of the state Constitution, which provides that the death penalty "shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments" within the meaning of article I, section 17 of the state Constitution. We rejected this contention in *People v. Bean* (1988) 46 Cal.3d 919, 957–958 [251 Cal.Rptr. 467, 760 P.2d 996].

## DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

The petition of appellant Cynthia Lynn Coffman for a rehearing was denied October 27, 2004, and the opinion was modified to read as printed above.